## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

D. DUMEBI EGBUFOR

                          *Plaintiff,*

v.

CAROLYN BOYD,
RICK CRISWELL,
JONATHAN HOCHWALD,
ARTHUR KARPATI,
EMURSIVE PRODUCTIONS, LLC,
PDNYC, LLC
                          *Defendants.*

**JURY TRIAL REQUESTED**

### INTRODUCTION AND CAUSE OF ACTION

This matter arises under **Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-2000e-17**, for employment discrimination on the basis of Plaintiff's race (Black), and her national origin (Nigeria), and **42 U.S.C. § 1981**, for intentional employment discrimination on the basis of Plaintiff's race (Black). This lawsuit is also brought under the **Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 to 634**, for employment discrimination on the basis of age (40 or older); and the **Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601 to 2654**, for employment discrimination on the basis of leave for qualified medical or family reasons.

Added to the federal claims, this matter arises under the **New York State Human Rights Law, N.Y. Exec. Law §§ 290 to 297**, for employment discrimination on the basis of age, race, and national origin, as well as the **New York Human Rights Law, N.Y. City Admin. Code §§ 8-101 to 131**, for employment discrimination on the basis of actual or perceived age, race, and national origin.

## ADVERSE EMPLOYMENT ACTION

**The following invidious and adverse actions taken against Plaintiff Egbufor were willfully and maliciously executed by the Defendants in this case.**

1. Defendants maliciously and wrongfully terminated Plaintiff's employment.

2. Defendants willfully did not accommodate Plaintiff's multiple requests for qualified medical treatments that were needed, which was due to a work-related and on-the-job injury caused by the Defendants.

3. Defendants willfully did not approve Plaintiff's use of her earned and sufficient hours of leave for qualified medical treatments that were needed, which was due to a work-related and on-the-job injury caused by the Defendants.

4. In response to Plaintiff's numerous requests for qualified medical treatments, Defendants willfully provided Plaintiff with terms and conditions of employment different from those of similar employees.

5. Defendants willfully obstructed Plaintiff's approved Worker's Compensation leave for qualified medical treatments that were needed and due to injury caused by the Defendants.

6. Defendants willfully and repeatedly retaliated against Plaintiff.

7. Defendants repeatedly harassed Plaintiff; creating a hostile work environment.

8. Defendants repeatedly lied on Plaintiff; creating a hostile work environment.

9. Defendants repeatedly marginalized Plaintiff; creating a hostile work environment.

10. Defendants repeatedly gaslighted Plaintiff; creating a hostile work environment.

11. Defendants publicly relegated and dismissed Plaintiff; creating a hostile work environment.

12. Defendants uttered offensive comments to Plaintiff; creating a hostile work environment.

13. Defendants ambushed and accosted Plaintiff to force her to speak publicly about her discrimination claims in front of her direct supervisor; creating a hostile work environment.

14. Defendants willfully did not reimburse Plaintiff for completing and passing the required FDNY Certificate of Fitness F03-Indoor Place of Assembly Safety Personnel exam.

15. Defendants willfully and illegally did not compensate Plaintiff for work she completed prior to her wrongful termination, on April 3, 2022, April 4, 2022, and April 5, 2022.

## ADMINISTRATIVE PROCEDURES AND PROCEDURAL HISTORY

**Procedural prerequisites for this present matter have been satisfied by the Plaintiff, who was issued and received a Notice of Right to Sue within 90 days by the Equal Employment Opportunity Commission (EEOC) on September 27, 2024** (*See Attachment A*)**.**  Plaintiff Egbufor filed an EEOC Charge of Discrimination and retaliation against Defendants PDNYC, LLC/Emursive Productions on November 2, 2022 (*See Attachment B*), alleging that she was subjected to a hostile work environment, disparate treatment, subterfuge, and marginalization, based on her race (Black), age (over 40), and national origin (Nigeria). She also alleged reprisal and wrongful termination for engaging in protected activity (filing Internal Discrimination Complaints, *See Attachment C, D and E*).

## FACTS SURROUNDING THE PLAINTIFF

1. Plaintiff Egbufor was hired by Defendants PDNYC, LLC/Emursive Productions on December 20, 2021 to serve as Company Manager (CM) for Defendants' show, *Sleep No More* (SNM).

2. Plaintiff Egbufor has a doctorate degree in leadership and policy, and 20 years of successful experience in production and performance management, including two positions she held as a Company Manager in the exact capacity for off-Broadway national tours, prior to working for Defendants PDNYC LLC/Emursive (*See Attachment F, Professional Reference for Egbufor*).

3. As a touring Company Manager, Plaintiff practically lived with, worked and supported 50 cast, crew, musicians and managers 24 hours a day. Thus, her SNM position was a welcomed one.

4.  As Company Manager for SNM, Plaintiff Egbufor was primarily responsible for ensuring the well-being of the performers and stage managers (35 or so cast and crew, also known as the "Company"); scheduling their physical therapy sessions, attending to and reporting work-related accidents and injuries, administering cast and crew payroll, managing leave requests, and serving as the liaison between SNM performers, directors, and Human Resources, along

with PDNYC LLC and Emursive Productions' medical partners and insurance representatives. (*See Attachment G, Plaintiff's Job Description).*

5.  Plaintiff's work hours varied, but were primarily from 3:30 pm – 11:30 pm, Sunday-Saturday.

6.  Plaintiff Egbufor was compensated $1600 per week for her role as Company Manager.

7.  After experiencing several malicious actions, subterfuge, and discrimination throughout her employment with the Defendants, which eventually led to her suffering an on-the-job work-related anxiety attack, suicidal ideation and hospitalization, on top of this, Plaintiff Egbufor's use of her earned 200+ hours of leave was denied by Defendant, along with her approved Worker's Compensation claim with the New York State Insurance Fund (NYSIF) for additional medical treatment, which was vindictively obstructed by the Defendants on April 1, 2022.

8.  Defendants lied to NYSIF about Plaintiff Egbufor's termination date being on April 1, 2022, to maliciously cover up their subterfuge and retaliation, when Plaintiff was actually terminated by Defendants PDNYC LLC and Emursive Productions, on April 6, 2022 (*See Attachment  H for Defendants false, misleading and bogus pretext they manufactured for Plaintiff's termination*).

9.  While Plaintiff Egbufor has been eagerly seeking full-time employment since being wrongfully terminated for over two years, 350 job applications later, Plaintiff has still been unsuccessful given the unfair, adverse and retaliatory actions of the Defendants which have caused Plaintiff Egbufor a garden variety of irreparable harm, pain and suffering, including: emotional turmoil, traumatic stress, anxiety, depression, vestibular dysfunction, embarrassment, humiliation, occupational setback, disadvantage in the job market, and severe financial hardship.

## **FACTS SURROUNDING THE DEFENDANTS**

1.  Defendant PDNYC LLC is a subsidiary of Defendant Emursive Productions, LLC, a New York based producing company, which also operates other businesses within the McKittrick Hotel, including the Gallow Green Bar, Manderley Bar, and The Hideout Restaurant.

4

2. Defendants PDNYC, LLC/Emursive's, *Sleep No More* was a live immersive theater production, that ran for over 11 years and was performed throughout the entirety and in every single inch of a six-story warehouse, the McKittrick Hotel, located at 530 West 27th Street, NY, 10001.

3. During shows, SNM audience members were free to engage with the cast and touch props. As described in *A deep dive into Sleep No More*: https://www.immersionnation.com/immersive-experiences/immersive-experience-sleep-no-more-new-york-city/ "Taking place through the entirety of the 100,000 square feet McKittrick hotel set, actors sprint across rooms and tumble down stairs and the audience rushes to follow; the three hour long show. There is no off stage and the story is told through dance and motion rather than dialogue."

4. Defendants PDNYC LLC/ Emursive have a second location at 20 Exchange Place, NY, 10005, which was primarily unoccupied for storage use during Plaintiff's time of employment.

5. Defendants PDNYC LLC/ Emursive Productions joint owners are Defendants Jonathan Hochwald and Arthur Karpati, who are both White males.

6. Defendants PDNYC LLC/ Emursive's Director of Human Resources (HR) is Defendant Rick Criswell, also a White male, who has worked with this company for over 12 years.

7. At the time of Plaintiff's employment, Defendant Criswell, had no other staff person in his department and was the sole and primary contact for HR responsible for over 400 employees.

8. Out of 400 plus employees, at the time of Plaintiff's employment, less than 3% of Defendants PDNYC LLC/ Emursive Productions employees were Black, the high majority were White.

9. The bulk of the employees at PDNYC LLC/ Emursive Productions were also under 40.

10. During her employment, Plaintiff Egbufor was under the direct supervision of Defendant Carolyn Boyd (also known as Carrie), Director of Performance and Production, who is a White woman under 40 who had been employed at PDNYC LLC/Emursive for over 10 years.

11. During Plaintiff's employment, Defendant Boyd had two direct reports for Performance and Production, Plaintiff Egbufor and the Head Stage Manager, who is also a White woman under 40 and had been with PDNYC LLC/Emursive for several years.

12. EEOC proceedings and position statements filed by the Defendants confirm that Defendant Boyd and the Head Stage Manager were both under 40 at the time of Plaintiff's employment.

13. At the time of Plaintiff's employment, Defendant Boyd also oversaw the work of six department managers, one Black male (housekeeping manager) and the remaining managers, who were all White and presumably all under 40.

14. In just six months, from the period of January 2022 through June 2022, three Black employees departed from Defendants PDNYC LLC/ Emursive Productions by resignation and/or wrongful termination due to claims of racial discrimination, harassment, marginalization, gaslighting, racial tropes, and/or a hostile work environment, including: 1) Plaintiff Egbufor, company manager with start date on December 20, 2021 and wrongfully terminated on April 6, 2022, 2) the only Black male dancer with a start date of January 3, 2022 and abrupt resignation on February 9, 2022, citing claims of hostile workplace and malicious use of racial tropes, and 3) the Diversity, Equity and Inclusion (DEI) consultant hired to support the cast after Plaintiff's work-related, on-the-job anxiety attack occurred in February 2022. The DEI consultant abruptly resigned on June 30, 2022, citing claims of a hostile workplace and discrimination.

15. More recently, in September 2024, it was reported to Plaintiff Egbufor that another person of color was wrongfully terminated by the Defendants and is currently seeking legal action.

16. Defendants have a history of willfully dismissing and ignoring employee complaints of a hostile work environment and harassment.

17. For instance, the law firm currently representing Defendants PDNYC LLC/Emursive Productions is cited in a February 6, 2018 *BuzzFeed News* article, where multiple SNM performers and staff allege that audience members were allowed to sexually assault them and their complaints repeatedly went unchecked by the Defendants: https://www.buzzfeednews.com/article/amberjamieson/sleep-no-more .

18. Also of importance to note, is the fact that, moments before Plaintiff suffered her work-related and on-the-job anxiety attack on February 10, 2022, she was actually just advocating for two

female crew members who were frightened to death and in tears after learning a previous

PDNYC LLC/Emursive Productions staff member, who employees had filed several sexual

harassment complaints on, was being permitted by the Defendants to re-enter the building.

## LEGAL ARGUMENT

A case of discrimination on the basis of race, national origin or other protected class is

established when a Plaintiff exhibits: 1) she is a member of a protected class; 2) she was qualified for

the position she held; 3) she suffered an adverse employment action, and 4) the adverse employment

action occurred under circumstances that give rise to an inference of discrimination **(Citation taken**

**from: <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973)).**

A hostile work environment exists when unwelcome racist, discriminatory, and/or other

offensive conduct unreasonably interferes with a person's performance and/or creates an intimidating

hostile, or offensive working environment **(Citation taken from: <u>Meritor Sav. Bank FSB v. Vinson</u>,**

**477 U.S. 57, 65-67 (1986)).** As such, *prima facie* of a hostile work environment is established when a

Plaintiff evidences that: 1) she suffered intentional discrimination and/or hostility because of her

membership in a protected class; 2) the discrimination and/or hostility was severe or pervasive; 3) she

was detrimentally affected by the discrimination and/or hostility; 4) the discrimination and/or hostility

would detrimentally affect a reasonable person in her position, and 5) respondent superior liability

exists **(Citation taken from: <u>Cardenas v. Massey</u>, 269 F.3d 251, 260 (3rd Cir. 2001)).**

Summarily, "the frequency of the discriminatory and/or offensive conduct; it's severity;

whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with an employee's work performance, are all factors utilized by the court as a

whole to establish if an environment has been considered hostile or abusive" **(Citation taken from:**

**<u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 23 1993))**.

Principally, as the EEOC maintains "employers should care about stopping harassment because

harassment is wrong – and, in many cases, it is illegal. Workplace harassment can produce a variety of

harms – psychological, physical, occupational, and economic harms that can ruin an employee's life" (U.S. EEOC, www.eeoc.gov). Moreover, **"for Black Americans, perceived racism may cause mental symptoms similar to trauma and could lead to mental health disparities between Blacks and other populations in the United States"** (University of Albany Counseling Psychology Department, www.albany.edu).

With a show entitled "Sleep No More," audience members were definitively not the only ones losing sleep. All in all, the below timeline of facts, critical incidents and evidence surrounding this claim, caused many sleepless nights for Plaintiff; and clearly demonstrate that the events Plaintiff Egbufor was subjected to throughout her employment with Defendants PDNYC LLC/Emursive Productions, while under the oppressive supervision of Defendant Boyd and failed leadership of Defendants Criswell, Hochwald and Karpati were: threatening, discriminatory, retaliatory, marginalizing, humiliating and unreasonably interfered with Plaintiff's employment, and thusly, created a hostile work environment.

### TIMELINE OF FACTS AND CRITICAL INCIDENTS SURROUNDING THIS CLAIM

***Defendant's Disregard Plaintiff's Complaints of Discrimination, Retaliation, Hostile Supervision***

1. By the second week of employment, Plaintiff Egbufor was experiencing discrimination, marginalization, microaggressions, gaslighting, micromanagement, retaliation and an oppressive hostile work environment perpetrated by her supervisor, Defendant Boyd, who treated staff outside of Plaintiff's protected classes more favorably.

2. To start was an unexpected judgment call, where Defendant Boyd asked Plaintiff which part of Queens she lived in during an initial meeting. Plaintiff answered: "Long Island City."

3. Defendant Boyd responded: "Huh, oh, that part of Queens," perplexed by this unusual question and unpalatable response from a superior, Plaintiff perceived that Defendant Boyd had already wrongly determined and judged which side of Queens Plaintiff resided in, because of her race.

4. Although physical requirements <u>were not included</u> in Plaintiff's job description *(See Attachment G)*, on January 3, 2022, out of the 15 or so employees outside of Plaintiff Egbufor's protected classes, who were existing production staff with physical demands and responsibilities as their essential job functions, Defendant Boyd targeted, directed and relegated Plaintiff Egbufor, a new employee, to perform moving duties on the same day, when Plaintiff should have been in attendance at New Employee Orientation.

5. Plaintiff ended up basically missing the orientation due to the inappropriate moving assignment she was directed to do by Defendant Boyd, which took place offsite at Defendant PDNYC LLC/ Emursive Productions' second location.

6. Because of this, Plaintiff Egbufor missed pertinent introductions and was not properly on-boarded to her new job, which is the most important day of a new employee's Life Cycle.

7. Yet and still, although physical demands were not listed in Plaintiff's job description, Plaintiff was once again relegated and inappropriately assigned to moving duties by Defendant Boyd, on February 2, 2022, where she had to now move out furniture and clean up the same Rehearsal Director's apartment offsite at Defendant's second location.

8. During the move on February 2, 2022, Plaintiff suffered an on-the-job injury where due to the unsafe and hazardous conditions maintained at Defendant's second location, Plaintiff fell down the steps in a dark hallway with no electricity (*See Attachment I for Work Injury Report*).

9. Plaintiff Egbufor was treated for a twisted and bruised ankle, and back, waist and hand contusions at NYU Langone Health on February 7, 2022.

10. By week three, Plaintiff Egbufor was <u>the only manager</u> repeatedly and completely ignored by Defendant Boyd for five straight days and excluded from giving important updates and information during all staff Company meetings, which was unlike the acknowledgment and reception other managers outside of her protected class were receiving, and unlike universal standards in the performance and production industry.

11. Defendant Boyd would literally go around in a round-robin fashion asking every single White manager in attendance if they had any comments to share.

12. Defendant Boyd <u>did not</u> extend the same latitude to Plaintiff Egbufor. Rather, Defendant Boyd would end Company meetings without calling on Plaintiff, who was the Company Manager.

13. The only Black singer noticed this as well, as she interjected during a meeting and asked Defendant Boyd directly, if the Company could finally hear from their new Company Manager.

14. In addition, Defendant Boyd willfully began excluding <u>only Plaintiff Egbufor</u> from debrief meetings with managers, which constantly left Egbufor out of the loop on vital information and cast/crew issues Plaintiff was expected to know and address in her role.

15. Plaintiff Egbufor was constantly left outside of "huddles" Defendant Boyd had with other managers, where Plaintiff would literally stand alone in the room, while they were encircled.

16. After sharing her frustrations and observations with family and friends, by the fourth week, Plaintiff Egbufor decided it was best to just politely interject her comments at the end of staff meetings as attendees were leaving, although in doing so, she was embarrassed and humiliated.

17. As a result, later that same week, without any reasoning or justification, Plaintiff Egbufor was <u>the only manager</u> approached by Defendant Boyd and told that she would be moved downstairs to a back office, which was very far away from the open space office she was currently sharing with Defendant Boyd, the Head Stage Manager, and eight other Stage Managers.

18. When told, Plaintiff instantly internalized and took this rash decision and microaggression by Defendant Boyd as retaliatory and punishment for speaking during staff meetings.

19. At her next available time that day, Plaintiff Egbufor went to speak to Defendant Rick Criswell, Director of HR in his office, where she asked, "Why [she] would have to move?"

20. Defendant Criswell's response was: "I don't know. I don't know why that's happening. That doesn't make any sense." Plaintiff also shared with Defendant Criswell that any time Plaintiff showed up or spoke up anywhere at work, she was met with disgust by Defendant Boyd.

21. For example, if Plaintiff asked a question or made a suggestion during Department or HR meetings, within minutes or by the next day, Defendant Boyd was guaranteed to retaliate against Plaintiff by dismissing her or randomly sending her offsite without advance notice. Like after an HR meeting where Plaintiff suggested that specifics about cast injuries should be limited to only senior staff for privacy reasons vs. the entire company (cast, crew, maintenance, directors) who were receiving accident injury updates, Plaintiff considered private and personal.

22. After that meeting, Defendant slammed her office door in Plaintiff's face, and within minutes, Defendant Boyd sent an email, <u>only to Plaintiff,</u> directing her to go to Brooklyn immediately to take the Certificate of Fitness F-03 exam, while other new employees had weeks and much longer time to prepare and were free to schedule the exam on their own.

23. Plaintiff did as directed and passed the exam. On the other hand, to date, Plaintiff has not been reimbursed for the testing fee as promised by the Defendants and as other managers were. Her requests to Defendant Boyd for reimbursement were repeatedly ignored.

24. During the same timeframe and while still dealing with discrimination, marginalization and retaliation from Defendant Boyd, the disparagement continued as Plaintiff Egbufor was slapped with racist and offensive comments said to her face about her national origin by Defendants PDNYC LLC/ Emursive Productions, co-owner, Defendant Arthur Karpati.

25. In late January 2022, Defendant Karpati and Plaintiff Egbufor met for the first time in the elevator, given that Plaintiff had basically missed New Employee Orientation. Defendant Karpati's first question to Plaintiff was about the origin of her name.

26. Defendant Karpati to Plaintiff Egbufor: "So you're, D. What's the origin of your name?"

27. Plaintiff Egbufor: (with a huge smile) "Nigerian"

28. Defendant Karpati: (with vengeance, anger, irritation, and frustration) "Oh, Nigerian. Out of all the African countries, I <u>hate</u> Nigeria."

29. An awkward silence came about from Plaintiff Egbufor as she stood still looking in anguish and with great sadness over the highly offensive comment by Defendant Karpati, her employer.

30. Defendant Karpati continued with a justification for his hate: "A Dutch friend of mine started a copy business in Nigeria and they ripped him off. They took all his money. There is just so much corruption there."

31. While the awkward silence and stillness remained from Plaintiff Egbufor who was stuck in a trance and completely deflated by Defendant Karpati's cruel and offensive words about her original homeland and the homeland of her parents, siblings and ancestors, Plaintiff also felt powerless, speechless, and unable to challenge Defendant Karpati as her superior.

32. To cover up his hateful and hurtful speech, Karpati switched the subject to Fela Kuti.

33. It was too late, however. Defendant Karpati's gaslighting and topic switch could not repair the emotional damage Plaintiff Egbufor was feeling.

34. After feeling totally exasperated, distressed, perplexed, and saddened by her oppressive working conditions and discriminating supervisor and employer, with one month on the job and no improvements, Plaintiff Egbufor decided it was time to formally report her discriminatory and hostile supervision concerns to HR/Defendant Criswell.

35. While Plaintiff's initial description of Defendant Karpati's offensive comment was lightly characterized out of shock in her written Complaint, Defendant Karpati's attorney did not deny Karpati's use of the term "hate" during questioning at the Workers' Compensation hearing.

36. Plaintiff Egbufor scheduled and held a meeting with Defendant Criswell on January 19, 2022. Then a follow-up meeting with Defendant Criswell was scheduled by Plaintiff and took place on January 21, 2022, along with several subsequent impromptu meetings (*See Attachment C, Plaintiffs Race and Age Discrimination Complaint, February 17, 2022, page 46-49*).

37. In each and everyone of the meetings initiated by Plaintiff,  Plaintiff specifically informed Defendant Criswell that she truly felt like she was being marginalized, relegated to a lower position, authority and assignments, along with being gaslighted, made to feel invisible, intimidated, and largely being discriminated and retaliated against due to her race and age,

which was making it increasingly difficult for her to sleep at night, and to successfully execute her overall job functions as Company Manager.

38. At these meetings, Plaintiff Egbufor also pointed out and reminded Defendant Criswell that she was <u>the only manager</u> being skipped over by Defendant Boyd at meetings and excluded from sharing pertinent information to staff, and how she was not being recognized or heard, unless she interjected herself at the end of meetings.

39. Plaintiff Egbufor reminded Defendant Criswell that Defendant Boyd informed her she would be <u>the only manager</u> on the team to be moved to another floor which felt like isolation and punishment for speaking at meetings.

40. Plaintiff Egbufor told Defendant Criswell about how she was <u>the only manager</u> denied purchasing privileges, access, and independent cast communications, like managers outside of her protected class had; and how Plaintiff had to literally beg Defendant Boyd to book an Uber ride for her at 2am to come back to the office for her belongings, after Plaintiff stayed in the hospital with a White cast member who tore his ACL during a show. Defendant quickly booked a round trip Uber for him. It took multiple requests from Plaintiff to get the same treatment.

41. In fact, Defendant Boyd's directive for Plaintiff to copy her on all communication, which was unlike that of any other manager, created fear in the cast/crew, who became afraid to email Plaintiff since they knew their concerns and issues were not being treated with confidentiality.

42. By and large, Plaintiff expressed to Defendant Criswell that the differential treatment she was receiving from Defendant Boyd, was limiting her ability to provide timely responses to the cast/crew and to facilitate open conversations and 1:1 cast/crew meetings as required in Plaintiff's job description.

43. Plaintiff emphatically communicated to Defendant Criswell that she perceived what Defendant was doing to her was unfair, illegal and creating a major disadvantage for her to meet and exceed her work expectations in building trusting relationships with the cast and crew.

44. Plaintiff ended the January 21, 2022 meeting by revealing to Defendant Criswell that she had started to document her concerns and instances of discrimination, hostility and retaliation she was being subjected to by her supervisor, Defendant Boyd.

45. Defendant Criswell's only response to Plaintiff was: "Keep documenting."

46. From then on, absolutely no subsequent action from Defendant Criswell or any of the Defendants took place to address Plaintiff's ongoing concerns, which was evidenced in Defendant Criswell's testimony under oath during a controverted psychiatric injury and claim hearing with the Workers Compensation Board (WCB) on December 22, 2022.

47. During the WCB hearing, Defendant Criswell confirmed that he had met with Plaintiff Egbufor and he stated that the only action he took was: "to follow proper protocol which would be to report to [his] direct reports, which were the producers."

48. Significantly, during that WCB hearing, Defendant Criswell did not state that he or the producers (Defendants Jonathan Hochwald and Arthur Karpati) took any action to address Plaintiff's concerns directly with her supervisor, Defendant Boyd, which was willful neglect, a failure of their leadership obligations as superiors, and which also caused Plaintiff Egbufor to experience pervasive and continual psychological harm and injury.

49. Instead, Defendant Criswell admitted to brushing off Plaintiff's concerns as he stated during the that December 22, 2022 WCB hearing,  "[Egbufor] was upset at Carrie Boyd and felt it was kind of, I think it was bullying…I did not hear any report back from you [Egbufor], so I thought it was honestly done."

50. As a follow-up question, Defendant Criswell was then asked under oath at the same WCB December 22, 2022 hearing what exactly he did do, after discussing with the producers that Plaintiff was being "bullied by Boyd."

51. Defendant Criswell had no answer and just made callous excuses: "You know, I don't recall exactly what happened after that meeting. It's been a year ago I don't recall."

14

52. Contrary to Criswell's "selective" memory tactic, Plaintiff Egbufor never used the word 'bullying' to Defendant Criswell, and she specifically stated to him that she was experiencing oppression and hostility from Defendant Boyd, perceived to be discrimination and retaliation.

53. During this same timeframe, in late January 2022, PDNYC LLC/ Emursive Productions, co-owner, Defendant Jonathan Hochwald admitted and revealed in a phone conversation with Plaintiff Egbufor how upset he was that Defendant Boyd directed Plaintiff to move furniture on the day of New Employee Orientation, which is why they were not properly introduced.

54. Plaintiff Egbufor was fully aware of Defendant Hochwald's frustration given that Defendant Boyd was repeatedly telling Plaintiff at just about every meeting that "the producers are angry at me for having you move stuff rather than going to orientation. I told them you were okay with it," which was Defendant Boyd's classic pattern of lying on Plaintiff and gaslighting.

55. Defendant Criswell even shared with Plaintiff that Defendant Boyd told "them" [him, Hochwald and Karpati]: "You [Plaintiff] volunteered to do the move," another flat out lie.

56. On the same phone call with Plaintiff Egbufor, Defendant Hochwald also expressed frustration over the cast sending complaints directly to HR and the producers without first sending issues and concerns to her, as Plaintiff was hired to liaise between management and the cast.

57. Defendant Hochwald continued with his frustration on the call by asking Plaintiff: "I don't understand why the cast didn't first send the email to you. Do they see you as their manager and representative?"

58. Plaintiff Egbufor answered: "I'm not sure if they do."

59. Precisely, at this point, Plaintiff knew she was being intentionally marginalized and erased.

60. All in all, dismissing such claims of this magnitude, whether it be bullying – what Defendant Criswell stated - or discrimination, marginalization and retaliation – what Plaintiff actually experienced, is still a gross level of mismanagement and willful neglect of superior liability by Defendants Criswell, Hochwald and Karpati, who even violated their own organizational policy which states Defendants have: "a firm commitment to providing an environment free from

unlawful discrimination and harassment and to take affirmative action measures against

discrimination in employment" *(See Attachment J for Defendants' Employee Handbook).*

61. Substantially, Defendants Hochwald and Karpati are both just as complicit as Defendant

Criswell on all grounds of failed superior liability for disregarding Plaintiff's complaints.

### *Defendant's Lies, Hostility, Harassment Cause Plaintiff's Unfair and Discriminatory Reprimand*

1. On February 4, 2022, Defendants Criswell and Hochwald held an all staff meeting where in-person and virtual staff members were told by the Defendants that Covid-19 testing for audience members would no longer be required.

2. Defendant Hochwald attended and officiated the meeting via Zoom. Defendants Criswell and Boyd, and Plaintiff Egbufor were physically present, while Defendant Karpati was absent.

3. As described in *Facts Surrounding the Defendants*, SNM was an immersive production, open, with no seats or off stage, where upwards of 400 audience members freely moved from room to room, touching and engaging performers, while drinking alcoholic beverages from the bar.

4. This sudden audience testing policy change was also being modified in the thick of Covid-19.

5. By the cast/crew reactions, Plaintiff Egbufor saw this announcement create an absolute panic.

6. Based on what Plaintiff was hearing and to bring the Company down from that panic, she offered during this same meeting on February 4, 2022, to create a survey and feedback form for cast/crew to identify potential new Covid "hot spots" and plausible  show modifications.

7. On her suggestion, Defendant Hochwald commented to Plaintiff Egbufor during this same meeting on February 4, 2022, in front of the other Defendants, crew/cast: "That's a great idea!"

8. That same evening of February 4, 2022, Plaintiff Egbufor emailed Defendants Hochwald, Criswell and Boyd a link to the feedback form she created using Defendant PDNYC LLC/ Emursive Productions' Google Suite account, along with her notes and action items.

9.  Defendants Hochwald, Criswell and Boyd replied <u>with highly favorable responses</u> to the content of Plaintiff's message that also had a link to the feedback form (*See Attachment K, Egbufor's Covid Policy Update Form Link and Meeting Notes Sent to Defendants*).

10. Plaintiff <u>did not receive any disapproval</u> from Defendants Hochwald, Criswell or Boyd.

11. Two days after the meeting, on February 6, 2022, however, Defendant Criswell communicated one message and tone to Defendant Boyd and Plaintiff Egbufor, then texted Plaintiff Egbufor later that day with a totally different message and tone.

12. As soon as Plaintiff posted the feedback form link to WhatsApp on February 6, 2022, Plaintiff Egbufor learned from a text message from Defendant Criswell that she was lied on *again* and falsely accused by Defendant Boyd as sending out a survey regarding Covid testing, which was not the case (*See Attachment  L, Criswell's February 6, 2022 Apology Text to Egbufor*).

13. Defendant Criswell in his February 6, 2002 text: "Hi, D. Please call me. I am really confused. <u>I was given the wrong information</u> about a survey today. I thought it was pertaining to Covid related things specifically and I was told different. I sincerely apologize and I love working with tou and have all the faith and belief  in what Ypu are doing. I have never not trusted Ypu. You and I are on the same page all the time. I seriously thought it was Covid related which I was asked to have under my wings. I am so sorry to uou. I would love to discuss with you."

14. In total exasperation, Plaintiff simply responded: "That's Carrie's way. It is unfair and illegal."

15. Defendant Criswell knew exactly what Plaintiff meant by "it" being unfair:  *it*- the lies, *it*-discrimination, *it*- retaliation, *it*-harassment, *it*-hostility, *it*-gaslighting, and *it*-marginalization.

16. Pointedly, the feedback form questions and responses Plaintiff constructed, as approved by the Defendants, and as shared with the Defendants and the elected cast representatives, reflect that participants choosing to complete the survey, were only asked for ideas on potential Covid "hot spots" and recommendations for show modifications, <u>not Covid testing,</u> which Plaintiff knew fell under the purview of Defendant Criswell (*See Attachment M, Covid Policy Update Feedback Form Questions and Revealing Participant Responses Submitted to Defendants*).

17. After learning from Defendant Criswell on February 6, 2022 that Defendant Boyd had lied on Plaintiff again, coupled with the repeated discrimination, marginalization and harassment Plaintiff was already now suffering from, Plaintiff's work-related distress and anguish grew.

18. Given all of this, on the same day of February 6, 2022, Plaintiff decided to elevate her outstanding complaints, that were ignored and brushed off by Defendant Criswell, in an email to Defendants Hochwald and Karpati. Defendants Criswell and Boyd were copied as well.

19. To Plaintiff's shock and dismay, and contrary to what Defendant Criswell testified under oath at the WCB December 22, 2022 hearing, Defendant Hochwald's response to Plaintiff's email shows beyond a doubt Defendant Criswell never informed Defendants about her complaints.

20. Defendant Hochwald in his reply to Plaintiff: "Confirming I've received this. While I'm unaware of the specific issues being raised, it's extremely important that we establish clear lines of communication. The 5 of us should meet asap" *(See Attachment N, Hochwald's February 6, 2022 Email Response to Plaintiff's Complaint)*.

21. Defendant Hochwald's email didn't end there. As a result of Defendant Boyd deceiving her supervisors, Defendants Hochwald and Karpati, and HR/Defendant Criswell, by falsely accusing Plaintiff of sending a survey on Covid testing, Plaintiff became the only manager directed by Defendant Hochwald to cease using third-party chat and text messaging services, specifically WhatsApp, to communicate with employees.

22. Defendant Hochwald to Plaintiff Egbufor: "Also, I learned that you may be communicating with cast and crew in connection with workplace issues via third party chat/text messaging services like WhatsApp. Moving forward, we ask that all work-related electronic communications with cast and crew be conducted via our company email server only" (*See Attachment O, Hochwald's February 7, 2022 Directive for Plaintiff to Cease Using WhatsApp)*.

23. Again, this directive was not company-wide, but intentionally targeted Plaintiff after she was falsely and maliciously accused by Defendant Boyd for doing something she did not do.

24. At no such time from January 5, 2022 through February 6, 2022, did Defendant Boyd inform Plaintiff that she was violating policy by using WhatsApp or that the information, policies and updates, which were all similar to what Defendant Boyd and other managers had been sending via third-party applications, was against company policy.

25. In fact, Plaintiff Egbufor established the WhatsApp group chat after receiving permission from Defendant Boyd and staff cell phone numbers from the Head Stage Manager.

26. Plaintiff had also been using WhatsApp and other third party applications, like Slack (which Defendant Boyd invited Plaintiff to join), exactly as her supervisor, Defendant Boyd and other department managers were using them  -  to send staff reminders, updates, links to surveys/forms, and schedules.

27. Examples of Defendant Boyd's work WhatsApp channels begin on December 31, 2021 for the New Year's Eve event  (*See Attachment P, Examples of Defendant Boyd's WhatsApp Chats)*.

28. In fact, all if not most of the Covid testing and policy messages were sent by Defendant and the Head Stage Manager, while Plaintiff Egbufor's text messages were mainly pertaining to cast and crew physical therapy sessions (*See Attachment P, Defendant Boyd's WhatsApp Chats)*.

29. Boyd would also direct Egbufor to add or remove cast and crew members from WhatsApp when they were hired or leaving the show.

30. Nonetheless, upon receiving the directive from Defendant Hochwald on February 7, 2022, Plaintiff immediately left all of the WhatsApp and Slack groups, which she notified Defendant Hochwald she had done *(See Attachment Q, Plaintiff Confirms Deletion of WhatsApp/Slack)*.

31. Undoubtedly, becoming <u>the only manager</u> directed to cease using WhatsApp, placed Plaintiff at a disadvantage in comparison to other managers and staff outside of her protected class, who were allowed to continue using third party communications, namely WhatsApp and Slack, after Plaintiff Egbufor was unfairly forbidden to do so.

32. This unfair directive also greatly reduced cast and crew communication response times on critical matters and diminished Plaintiff's capability to lead with more efficient communication.

33. Additionally, Plaintiff's withdrawal from WhatsApp created confusion and embarrassment.

34. In his follow-up email to Plaintiff's complaints, on February 7, 2022, Defendant Hochwald requested to meet with Plaintiff on February 9, 2022.

35. The only subject matter Defendant Hochwald focused on and mentioned in his email for this meeting, was communication policies *(See Attachment R, Hochwald's February 7, 2022 Request to Meet Egbufor on February 9, 2022)*.

36. Defendant Hochwald to Plaintiff in his meeting request : "…it's important to establish <u>clear lines of communication</u> and to understand what we expect from one another. Here, we have an excellent opportunity <u>to discuss how best to communicate</u> amongst our management teams and discuss expectations so that we can all work positively and effectively together."

37. In the mid-section of this email, after Plaintiff received approval by the Defendants, Defendant Hochwald incorrectly described the feedback form Plaintiff created when he warned that "…no one is authorized to create or distribute surveys seeking personal information from employees."

38. Plaintiff Egbufor <u>did not</u> seek any personal information from respondents who volunteered to provide their feedback. Questions on the feedback form did not ask for any personal information, not even email addresses. All responses were anonymous.

39. Out of Defendant Hochwald's eight paragraphs on communications, in his February 7, 2022 email, the last paragraph was the only one that discussed Plaintiff's complaints, where Defendant Hochwald basically admitted once again to being unaware of Plaintiff's claims she had been sharing all along with Defendant Criswell.

40. In his email, Defendant Hochwald also referred Plaintiff to Defendant Criswell/HR (which she had already done, but to no avail), and the PDNYC LLC/Emursive Productions' written policies for reporting discrimination and retaliation.

41. Defendant Hochwald to Plaintiff on February 7, 2022: "Finally, while your email below makes references to "retaliation" and "discrimination", it is unclear as to whether you wish to file a formal complaint. We have strict policies prohibiting such conduct and detailed reporting and

investigative procedures governing the same. If you are concerned that you have been discriminated or retaliated against, please let me, your manager, or HR know so you can be directed to the appropriate next steps and have your concerns addressed in accordance with our written policies." By this time, Plaintiff had already met with Defendant Criswell several times.

42. On this same day as receiving Hochwald's meeting request, February 7, 2022, given her continued despair and desperation for help, Plaintiff contacted the NYC Employee Assistance Program (EAP) (*See Attachment S, Egbufor's Communication with NYC EAP Representative*).

43. Taken into account the gravity and sensitive nature of the unfair discriminatory and retaliatory issues being perpetrated against Plaintiff by Defendant Boyd throughout her employment, combined with the severe unease and discomfort Plaintiff was experiencing from all of the Defendants, on that same day, Plaintiff Egbufor also decided to reach out to the New Peace Institute to inquire about potentially having a neutral mediator at the forthcoming meeting with the Defendants (*See Attachment T, Egbufor Request for Mediation with New Peace Institute*).

44. In addition, Plaintiff made a similar request to the Defendants for a neutral mediator to be in attendance at the February 9, 2022 meeting. Defendant Hochwald denied Plaintiff's request.

### *Defendant's Mislead, Ambush and Attempt to Force Plaintiff to Discuss Complaints Publicly*

1. The meeting on February 9, 2022 was held at the Defendants' second location.  In addition to Plaintiff Egbufor, Defendants Hochwald, Karpati, Criswell and Boyd were in attendance.

2. At the top of the meeting Plaintiff quickly discovered she was misled by the subterfuge and underhanded scheme of the Defendants, aiming to force her to publicly state her complaints.

3. Unbeknown to Plaintiff, who was tricked, communication policies were never on the agenda.

4. As soon as the February 9, 2022 meeting began, Defendant Hochwald demanded for Plaintiff to discuss her discrimination claims in front of her supervisor, Defendant Boyd and everyone.

5. Plaintiff responded calmly: "I thought this meeting was about communications. Your email directed me to see the handbook for my complaint. That this meeting was on communications."

6. Defendant Hochwald responded (with a very assertive tone and heavy handed gestures): "We can't move forward without you telling us about your claims of discrimination."

7. Plaintiff repeated calmly: "I thought this meeting was about communications. I'm not prepared to discuss my claims without documentation. As a new employee, I was prepared to listen and learn more about company communications."

8. In anger, Defendants Hochwald and Karpati then requested that Defendants Criswell and Boyd <u>leave</u> the meeting, which are actions described and corroborated by Defendant Criswell's WCB testimony on December 22, 2022.

9. Defendant Criswell also confirmed under oath during his WCB hearing testimony on December 22, 2022, that the purpose of this February 9, 2022 meeting was to "discuss communications," <u>not</u> Plaintiff's discrimination and retaliation complaints.

10. Once Defendants Criswell and Boyd left the meeting and shut the door, Defendants Hochwald and Karpati: ambushed, harassed, yelled, banged on tables, verbally attacked and essentially ganged up on Plaintiff Egbufor repeatedly, in their attempt to intimidate and force her to speak.

11. Plaintiff Egbufor was absolutely terrified and traumatized by the behavior and actions of her superiors, Defendants Hochwald and Karpati, two White men and owners of her workplace, who now had Plaintiff Egbufor behind a closed door, and were using their displaced anger, aggressions and their masculinity to attack her as a Black woman, who was already fragile.

12. Plaintiff Egbufor began to plead with Defendants Hochwald and Karpati, and repeatedly request to meet at a later date with her documentation.

13. Because Defendant Hochwald and Karpati could not get their way, they began to use microaggressive and sarcastic tactics to further overwhelm Plaintiff, throwing insulting and contemptuous questions about her qualifications and credibility at her like a ping pong ball.

14. One by one, Defendants Hochwald and Karpati hassled Plaintiff and attacked her credibility.

15. Beginning with Defendant Karpati, who was already enraged by Plaintiff's national origin which he had made clear to her earlier that he hated, and was sitting next to Plaintiff just ready to retaliate against Plaintiff as he spewed underhanded insults and used fear tactics to her face.

16. For example, from Defendant Karpati: "You think you're a good employee?

17. Plaintiff responded: "Yes, I do."

18. Defendant Karpati: "How do you know that?"

19. Before Plaintiff could answer, Defendant Hochwald yells from across the table: "You seem like you want to work unilaterally and are not collaborative."

20. Defendant Karpati comes back with: "You think you're collaborative?"

21. Plaintiff: "Absolutely. Collaboration is one of the top principles I stressed in my resume and cover letter. I've always been a collaborative leader. I've trained leaders to be collaborative."

22. Defendant Karpati: "I have too and what you're doing doesn't seem collaborative."

23. This again [Plaintiff's qualifications and work performance] had nothing to do with communication policies, and were not on the agenda she was provided.

24. Holding back tears, Plaintiff was now really shaken, extremely confused and dejected, as she had never felt so attacked and threatened in her life by anyone, especially her employers.

25. Plaintiff proceeded with sharing her experience as a 20 year organizational/production leader.

26. After the Defendants finally let up, Plaintiff hurriedly left the February 9, 2022 meeting.

27. Plaintiff wept all the way from 20 Exchange Place to the World Trade Center subway station.

28. Still in tears, Plaintiff immediately called an associate to share what had happened.

29. Unable to cope, given the anguish, fear, headache, sadness, and hopelessness she felt, which was all caused by the harassing Defendants, Plaintiff decided to call out from work that day.

30. Irrefutably, by utilizing such hostile and illegal tactics to verbally attack and offend Plaintiff Egbufor, Defendants Hochwald and Karpati, again, willfully violated their own organizational policy on discrimination and harassment which states: "Emursive Productions, LLC is firmly committed to providing an environment free from unlawful discrimination and harassment."

*Defendant's Lies, Hostility, Retaliation, and Discrimination Cause Plaintiff's Hospitalization*

1. The next afternoon after her traumatizing experience and meeting with the Defendants, as Plaintiff walked to work on February 10, 2022, she discovered and reviewed an email Defendant Boyd sent to all managers earlier that day announcing a new hiring policy change.

2. Defendant Boyd described the change as a matter she had mentioned at the Department Heads meeting on February 9, 2022, which was held on the same day and right after Plaintiff was ambushed by the Defendants in their attempt to force Plaintiff to talk about her complaints against her will.

3. Due to harassment from the Defendants, Plaintiff called out that day and missed the Department Heads meeting *(See Attachment U, Boyd's Email to Managers on New Hiring Policy Change).*

4. Defendant Boyd to Department Heads on February 10, 2022: "I mentioned briefly in the Dept heads meeting yesterday that there's a new process in town for hiring, and wanted to expand here. For the time being, Dan [accounting], Jonathan [Hochwald], and Arthur [Karpati] all want to sign off on anyone new being hired to the company."

5. Seeing that this cruel, in your face embarrassment from Defendants PDNYC LLC/Emursive Productions and sudden hiring policy change was being placed into effect on the exact day after Defendants Hochwald and Karpati had just maliciously attacked Plaintiff's credibility and work performance, Plaintiff's anxiety grew as she immediately perceived this policy change as personal, as a form of discrimination and retaliation, and a sign of rejection from her employer.

6. While the other managers may not have been aware of why the policy change occurred, the subliminal message, retaliatory sentiment and employment action from the Defendants that were enveloped in this sudden shift and new hiring policy change became extremely clear.

7. With this random and sudden policy change, the Defendants were basically telling Plaintiff:

   *"We don't want you here, we should have never hired you, and we will never hire another CM who looks like you (Black, Nigerian and over 40) ever again."*

8. This perception of her reality, moreover took a profound and agonizing toll on Plaintiff.

9.  Seconds after reading the email about the policy change, in the sane moment, Plaintiff received a follow-up email to the February 9, 2022 meeting, from Defendant Hochwald, which was threatening, microaggressive and a coverup message full of lies and gaslighting.

10. Defendant Hochwald gave the impression that things went well – which it *did not*, and that discussions on communications took place during the meeting – which indisputably *did not*.

11. Defendant Hochwald was also once again demanding that Plaintiff be prepared to discuss her discrimination claims by a newly set meeting date *(See Attachment V, Hochwald's February 10, 2022 Follow-up Email to Plaintiff)*.

12. Defendant Hochwald in that email: "D. Thank you for meeting with us yesterday. We think it was a good starting point to share our thoughts about how we can move forward with better lines of communication and expectations." <u>Harassment is never a good start</u> to anything.

13. Contraily, Defendant Hochwald's email does bring light to the facts of what actually did happen at that February 9, 2022 meeting as experienced by Plaintiff Egbufor, where he and Defendant Karpati blatantly attacked Plaintiff in their attempt to force her to speak against her will, about her discrimination/retaliation complaints publicly, and unprepared.

14. Defendant Hochwald to Plaintiff: "As we told you yesterday, we take references to "discrimination" and "retaliation" in your email seriously… In that connection, <u>we attempted to understand from you the basis of any related concerns but, again, you indicated that you were not prepared to do so at that time.</u>"

15. On that same walk to work on February 10, 2022, Plaintiff went from reading two distressing emails from Defendants to a third email, which came just minutes later after Hochwald's.

16. This third email was from Defendant Boyd, and to Plaintiff Egbufor and Defendant Criswell, which stated that the only Black male dancer had abruptly resigned that morning after a little over a month on the job *(See Attachment W, Boyd's February 10, 2022 Email on Resignation)*.

17. Defendant Boyd: "_____ has given his resignation today [February 10, 2022] due to personal reasons effective immediately. Rick, he would like to speak with you about some resources you might be able to explain to him via EAP."

18. After reading Defendant Boyd's message, Plaintiff immediately thought about how she rushed to this same Black male dancer's aid during a dress rehearsal performance on January 12, 2022, where he vomited during the performance.

19. As Plaintiff helped to get him cleaned up from his vomit, this Black male dancer who was also a returning performer from before the pandemic, confided in Plaintiff when he told her that he was being discriminated against and picked on by some of the White rehearsal and production directors, who were using racial tropes when giving him feedback.

20. When hearing this on January 12, 2022, Plaintiff took the time to acknowledge and share in his commonality of pain and aggravation. While Plaintiff chose not to go into details about the exact discrimination and harassment she was also receiving from the Defendants, specifically because she believed it was inappropriate to do so as a manager, Plaintiff gave assurance to him by stating to him that day: "I know exactly what you mean."

21. Plaintiff asked if the Black male dancer was interested in reporting his claims. He stated he was not interested in reporting the issue at that time.

22. Later that day on January 12, 2022, this Black male dancer sent a text to express gratitude for Plaintiff's support: "Hey, D, I am ok, and thank you so much for today. Words can't describe what your presence means in the space and what it meant for me today" (*See Attachment X, Black Male Dancer's Thank You Text to Egbufor*)

23. Now essentially a month later from the vomiting incident with this Black dancer, while on her way to work on February 10, 2022, Plaintiff was calling to console him after abruptly resigning.

24. During that call, this only Black male dancer said to Plaintiff exactly what she was feeling, that he grew tired of the racial discrimination and harassment at PDNYC LLC/ Emursive.

25. Black Male Dancer: "I'm tired of being in spaces that don't have room for people who look like me. They [Defendant Boyd, directors] told me things would change and be better this time around. But things have not changed."

26. In listening to his expressed pain and frustration as Plaintiff walked to work that day on February 10, 2022, she was immediately re-traumatized, re-triggered and left in despair.

27. Plaintiff's state of being was shattered, especially as she kept thinking about the appalling meeting with the Defendants and the unfair harassment and treatment she had just experienced from them a day before this, combined with the prolonged oppressive supervision she was experiencing throughout her employment, and now a new hiring policy that targeted her.

28. Plaintiff also felt powerless and at a disadvantage as a manager, unable to help the staff assigned to her, and horrified over another Black person experiencing the same racism and hostility she had been experiencing at PDNYC LLC/Emursive Productions for too long.

29. As Plaintiff arrived at work, she had a phone meeting with Defendant Criswell on the concerns crew members had about a former sexual harasser being allowed in back in the building, then she walked into the Ballroom where the daily Company Meeting on February 10, 2022, was already in progress, with 30 cast and crew in attendance, predominantly White and under 40.

30. The atmosphere was  very solemn, emotions were heated.  What Plaintiff could hear and eventually saw was the only Black female dancer painfully grieving over the abrupt resignation of the only Black male dancer. She was also lamenting over how difficult it is for Blacks to work in majority White spaces.

31. Black Female Dancer: "This has to stop. Today is a sad day. We should all be sad by what happened to ___. Y'all don't know what it means to work in predominantly white spaces. I'm going to set up a WhatsApp group chat for just Black people. Because we need it. Today is a sad day."

32. Next in that same February 10, 2022 meeting, the only Black female Rehearsal Director began to speak, but her tears got the best of her as she started crying over the same issue as the only Black female dancer.

33. This exact point was the last thing Plaintiff Egbufor remembers as she started to physically fall apart with: rapid heart palpitations, rapid breathing, sharp pain all over her body, a pounding headache, and uncontrollable tears falling down her face.

34. Seconds later, Plaintiff instantly rushed out of the Ballroom and up the stairs weeping loudly.

35. The only Black Stage Manager ran after Plaintiff. When the only Black Stage Manager caught up with Plaintiff, Plaintiff was at the elevator weeping and breathing uncontrollably.

36. Defendant Criswell's WCB hearing testimony under oath on December 22, 2022, corroborates exactly with Plaintiff's account of events leading up to her work-related anxiety attack.

37. Defendant Criswell on December 22, 2022 described what was reported to him: "The incident that was reported to me, that there was a company cast meeting, we have company meetings before rehearsals, before performances. We had a performer who left the show and I guess there was some discussion about that within the company meeting the cast were having. One of the performers was discussing something I'm not exactly sure what was being said specifically. There was some sort of outburst or something of that nature by Ms. Egbufor during that meeting. She became visibly upset; verbally upset and left the room. And ended up I guess was crying pretty uncontrollably and left the building."

38. By the time Plaintiff went upstairs to her desk to get her belongings and came downstairs that day, her health and state of being was quickly progressing to full blown anxiety attack mode.

39. Plaintiff hopped into a taxi and went straight to the closest CityMD facility near Penn Station.

40. While in that taxi on February 10, 2022, Plaintiff was overwhelmed with - anxiety, trauma, disappointment, and grief - all brought on by Defendants PDNYC LLC/Emursive Productions' discrimination, retaliation, marginalization, and hostility, that went unchecked from day one.

41. Plaintiff's anxiety intensified as she began to grapple with suicidal ideation and thoughts of jumping over the bridge that was one block away from the McKittrick Hotel crossing her mind.

42. That same day in the taxi, on February 10, 2022, while en route to the closest CityMD, Plaintiff immediately sent Defendant Criswell an email message alerting him of her anxiety attack she was having. Plaintiff also informed Criswell she was headed to get help (*See Attachment Y, Egbufor's February 10, 2022 Work Injury Medical Emergency Notification to Criswell*).

43. Plaintiff's Email to Criswell on February 10, 2022: "Hi, Rick, During the company meeting, I felt an anxiety attack approaching my body and mind when discussions were underway regarding —— departure, I had outbursts at the elevator. I left the building to seek help for my mental state. I'm headed to the urgent care for observation and a check up."

### *Plaintiff's Work-related Injury*: *What Doctors, Social Workers, the WCB, and IME Said and Did*

1. On February 10, 2022, CityMD physician, Dr. James Keating was the first to examine Plaintiff Egbufor. He described in his medical report that Plaintiff had a "sudden attack beginning around 5 pm after a coworker quit and <u>feeling discriminated against at work</u>; feels as though <u>these events brought it on</u>. Patient sent to ER due to: Severe MEDICAL Complexity" *(See Attachment Z, Egbufor's February 10, 2022 CityMD Summary of Care and Bill).*

2. That day, Dr. James Keating's also wrote a note to the Emergency Room (ER) at Mt. Sinai Hospital which stated: "Pt became <u>upset/anxious at work,</u> had suicidal ideation."

3. Dr. Evan Zheng Gui at Mt. Sinai Hospital performed an ER Assessment of Plaintiff on the same day of February 10, 2022, where he found and stated: "F hx anxiety here c/o palpitations, dyspnea, feeling anxious, <u>Sx began because she thinks her boss was racially discrimination against her</u>. Given suicidal thoughts will also require psychiatric evaluation."

4. On the same day, a Psychiatric Assessment of Plaintiff Egbufor was conducted by Dr. Geoffrey Taylor also at Mt. Sinai, where he stated: "<u>She says that her supervisors at work were accusatory and she felt "gaslit.</u>" This made her feel very panicky and anxious. She says since

then she hasn't been able to sleep and <u>she reached out to EAP</u> because she wanted to talk to someone because <u>she says "it was getting more than I could handle."</u>

5. Dr. Taylor ultimately admitted Plaintiff to the Mt. Sinai Psychiatric Ward, on February 10th through February 13, 2022, where Plaintiff was isolated in a room, removed from all technology and slept on plastic for three days – a sad, horrific and humiliating experience.

6. After finding out, she would be admitted to the hospital, just before having her personal items confiscated by security, Plaintiff Egbufor emailed Defendant Criswell at 10:49 pm.

7. Plaintiff to Defendant Criswell: "Hello, Rick, Unfortunately, I've been admitted to the hospital until Sunday per the doctor's orders. Given this I will have very limited capacity to perform any company management duties while here" *(Attachment A1,  Plaintiff's Hospitalization Email).*

8. While at Mt. Sinai, Plaintiff was given and prescribed Lexapro for generalized anxiety disorder.

9. Plaintiff met several times during her hospital admittance to discuss an Exit Plan with her assigned Mt. Sinai social workers. As part of her agreement and Exit Plan, since Plaintiff did not have family in New York or New Jersey, Plaintiff was ordered to proceed to her closest relatives, who reside in Washington, DC (*See Attachment A2, D. Egbufor, Mt. Sinai Medical Record and Hospital Bill, February 10-February 13, 2022).*

10. Upon being discharged and as she agreed to do, on the afternoon of February 13, 2022, Plaintiff traveled to Washington, DC by Amtrak train.

11. Workers Compensation Law Judge (WCLJ) Mary Carter-Flanagan decided during the WCB pre-hearing on September 29, 2022 that Plaintiff's claim had: "<u>Prima facie medical evidence</u> generalized anxiety disorder and anxiety based on Dr. Keating's report of 2/10/22" *(See Attachment A3, WCLJ Deems Prima Facie Decision for Plaintiff's Claim).*

12. From this, Plaintiff Egbufor was then required by the WCB to complete an Independent Medical Exam (IME) on December 19, 2022, through Defendants PDNYC LLC/Emursive Productions insurance carrier, New York State Insurance Fund's (NYSIF) physician consultant, an appointment that kept being cancelled and rescheduled by the Defendants representative.

13. Plaintiff completed the IME with Dr. Bienenfeld on December 19, 2022. His findings stated: "Within a reasonable degree of medical certainty, [his] opinion is that the <u>claimant does suffer from causally related anxiety</u>" *(See Attachment A4, IME Findings of Plaintiff's Work Injury)*.

### *Defendants Intentionally Cut Internal Investigation Short, Plaintiff's Work-related Injury Worsens*

1. Upon being released from Mt. Sinai Hospital on February 13, 2022, Plaintiff Egbufor informed Defendant Criswell of her status and requested to take sick leave from Monday, February 14 through February 16, 2022 (Tuesday, February 15th was an off day for SNM, as every Tuesday was dark), *(See Attachment A5, Egbufor's February 13, 2022 Request for Sick Leave)*.

2. In following Defendants' policy, Plaintiff Egbufor submitted an internal Accident and Injury Report describing her February 10, 2022 on-the-job and work related injury to Defendant Criswell on February 17, 2022 *(See Attachment A6, February 10, 2022 Work Injury Report)*.

3. Defendant Hochwald's harassment continued as he cruelly and insensitively emailed Plaintiff on the day of her injury still trying to force and demand for Plaintiff to speak on her complaints.

4. To avoid what was perceived as a threat to Plaintiff's employment in Defendant Hochwald's follow up email to Defendants' disastrous meeting held on February 9, 2022 (*See Attachment A7, Hochwald's February 10, 2022 Demand for Plaintiff's Complaints)*, and while still suffering mentally and physically and trying to recover from her multiple work-related injuries, as a response to Defendant Hochwald's directive, Plaintiff pushed herself to submit an internal written Race and Age Discrimination Complaint while on approved sick leave, which she submitted to Defendants Criswell, Hochwald, and Karpati on February 17, 2022 *(See Attachment C, D. Egbufor, SNM Race and Age Discrimination Complaint, February 17, 2022)*.

5. Along with her Complaint submission to Defendants on February 17, 2022, and given the sensitivity of the matters and that Plaintiff desperately needed to continue her injury recovery in a safe environment, Plaintiff requested to work remotely during investigations of her complaint.

6. Defendant Criswell approved Plaintiff's request for remote work during the investigation on February 17, 2022, the same day Plaintiff submitted her Race/Age Discrimination Complaints.

7. Defendant Criswell to Plaintiff Egbufor: "D, We are in receipt of your email below and the documents you attached. …While your position as Company Manager requires that you report to work on a daily basis, we will allow you to work remotely on a temporary basis while the investigation is being conducted" *(See Attachment A8, Egbufor's Remote Work Approval).*

8. On February 18, 2022, the next day after Plaintiff submitted her written Internal Race and Age Discrimination Complaint to Defendants, Plaintiff received a very revealing "check-in" text message from the only Black SNM singer. This singer was close with Defendant Criswell.

9. Plaintiff did not and never informed this Singer or any existing cast/crew about her Complaint.

10. Plaintiff did, however express concerns of the differential treatment, discrimination and retaliation she was experiencing from Defendant Boyd, while having lunch with this Singer in early February 2022.

11. Only Black Singer's text on February 18, 2022, to Plaintiff: "You are a presence (just like I am a presence) and that always causes panic to those who are misbegotten."

12. The only Black Singer continued in her texts revealing details from her meeting with management, plausibly HR, which reflects there was a <u>pattern</u> of discrimination and retaliation perpetrated by Defendant Boyd that was once hidden and allowed to persist, and was finally coming to light through Plaintiff Egbufor's complaint.

13. Only Black Singer to Plaintiff : "I tried to chat but got swatted with we are doing the best we can…More like we need a pat on the back for our lip service. So I was like okay…keep going….But before I did that I labeled the issue as a whole in three parts – Fear, Secrets and Transparency. Then was told that not many people know what was going on there before now…"

14. Plaintiff Egbufor and this Singer knew exactly what - "what was going on there before now" meant: Defendant Boyd's discrimination, retaliation, marginalization and relegation of Black employees (*See Attachment A9, Plaintiff's Text Message from Only Black Singer*).

15. On February 22, 2022, Plaintiff was contacted by Lisa Harris, an attorney from SheppardMullin, the retained law firm of Defendants PDNYC LLC/Emursive Productions.

16. Attorney Harris stated in the email that she had "been asked by the McKittrick Hotel to investigate your [Egbufor's] concerns" and she requested Plaintiff's availability that week for "1.5-2 hours" (*See Attachment A10, Harris' Introduction Email and Meeting Request*).

17. During the initial part of the investigation at Harris' request, Plaintiff and Harris met by Zoom from 1 pm – 3 pm on February 24, 2022 and also from 1 pm – 3 pm on February 28, 2022.

18. As Harris notified Plaintiff in advance, her colleague, Attorney Lindsay Stone was in attendance at the first meeting on February 24, 2022.

19. During the investigation, Harris presented Plaintiff with several discrepancies and falsehoods told to Harris by Defendants PDNYC LLC/Emursive Productions, including where Harris was provided with the wrong job description and the false notion that as she said, Plaintiff was working as "administrative support" and "not as a manager" in a Department Head capacity.

20. This lie said by the Defendants evidences their attempt to marginalize and minimize Plaintiff.

21. To follow-up Plaintiff submitted more evidence and additional documents to correct the untruths Harris was receiving from Defendants, such as the actual job description Plaintiff was provided at the time of her hiring, along with other instances of discrimination, harassment and retaliation perpetrated by Defendant Boyd (*See Attachment D, Race and Age Discrimination Complaint, Additional Information to Investigators, February 25, 2022 and Attachment E, Complaint Follow-up Information to Investigators, March 4, 2022*).

22. For example, in the above mentioned follow-up documentation, Plaintiff discussed that while working in an approved remote work status, Defendant Boyd stripped Plaintiff from her payroll duties, reassigning it to managers outside of her protected class without any notification.

23. Plaintiff also reported to Harris that she was <u>the only manager</u> being excluded from Department Head meetings while working remote, while managers outside of Plaintiff's protected class were allowed to participate by Zoom. Zoom links for these meetings were not sent to Plaintiff.

24. At the end of Harris' session with Plaintiff on February 28, 2022, Harris informed Plaintiff the investigation would take some time since as Harris stated, she had been given a "long list" from Defendants PDNYC LLC/Emursive Productions, and "close to 40 names" of staff to interview.

25. As Plaintiff continued to work remotely during the investigation of her Complaints, by the end of February, Plaintiff's condition from her on-the-job injuries, prolonged work-related stress and anxiety attack worsened and began to manifest physically as concussion-like symptoms.

26. Plaintiff started to experience: dizziness, tension headaches, balance and coordination difficulty, vertigo, visual disturbances, nausea, ear ringing, fatigue, neck and back stiffness, and a high sensitivity to light and sound.

27. These new symptoms were also limiting Plaintiff's ability to concentrate and function. For instance, during Plaintiff's pre-occupational therapy assessment, it was observed that what took the average literate person to read in 52 seconds took Plaintiff a minute and six seconds to read.

28. During the investigation and while working remotely, Plaintiff was receiving calls with mixed messages from cast and crew stating they heard from the Defendants that she was on "vacation and taking a break," or that she had "fallen up the stairs" – which were all false statements.

29. After an urgent care visit and being examined by a neurologist in an emergency appointment on March 9, 2022, Plaintiff was diagnosed by Dr. Komal Patel as having vestibular dysfunction, which Patel confirmed:  "elevated levels of stress and anxiety often accompany vestibular dysfunction." (*See citation and full research study in the National Library of Medicine and the National Institutes of Health:* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3406321/)

30. The Vestibular Disorders Association (VeDA) maintains that "the vestibular system includes parts of the inner ear and brain that help control balance and eye movements. If the system is damaged, vestibular disorders can result in many symptoms, such as: dizziness, imbalance,

vertigo, brain fog, tinnitus, nausea, cognitive changes and psychological changes." *(See full description at:* [https://vestibular.org/article/what-is-vestibular/vestibular-symptoms/](https://vestibular.org/article/what-is-vestibular/vestibular-symptoms/)*)*

31. "Psychological problems are common in patients with vestibular dysfunction, particularly those with chronic symptoms." *(See the full peer-revised research article in Science Direct:* [https://www.sciencedirect.com/topics/medicine-and-dentistry/vestibular-disorder](https://www.sciencedirect.com/topics/medicine-and-dentistry/vestibular-disorder)*)*

32. Johns Hopkins Medicine describes "a common cause of vestibular balance disorder as problems rooted in your brain, such as a traumatic brain injury. Dizziness and vertigo are symptoms of a vestibular balance disorder, including blurred vision, disorientation and nausea. Treatment depends on the cause of the balance disorder and may include rehabilitation and balance retaining therapy." (*See full Johns Hopkins Medicine article and medical description at:* [https://www.hopkinsmedicine.org/health/conditions-and-diseases/vestibular-balance-disorder](https://www.hopkinsmedicine.org/health/conditions-and-diseases/vestibular-balance-disorder)*)*

33. To treat and correct this emerging medical condition, which was directly stemming from Plaintiff's work-related anxiety attack, prolonged work-related stress, discrimination, retaliation and hostile work environment, and all caused and allowed to persist by the Defendants,  on March 9, 2022, Dr. Patel referred Plaintiff to several therapies: visual therapy, physical therapy (PT) and occupational therapy (OT), twice a week, four to six weeks *(See Attachment A11, Egbufor's Neurologist Referral for PT and Attachment A12, Egbufor's Referral for OT).*

34. Once Plaintiff received the therapy referrals, on March 11, 2022, Plaintiff Egbufor notified Defendant Criswell of the need for her to continue working remotely so she could begin therapy sessions for "4-6 weeks, 1-2 days a week and that as a matter of importance she wished to complete therapy with the referring doctor and facility in DC" *(See Attachment 13, Plaintiff's Need for Therapy and Request for Remote Work to Complete Qualified Treatments Email).*

35. Defendant Criswell <u>responded on the same day without any issues</u>, disapproval or indecision: "Hi D. Thanks for letting me know. Reach out if you need anything. Thanks."

36. That same day on March 11, 2022,  Attorney Harris sent Plaintiff an email inviting her to meet virtually to discuss "the results of the [our] investigation." *(See Attachment 14,  Harris' Close-out Investigation Meeting Request Email to Egbufor).*

37. Just the day before Plaintiff received the meeting invitation for a Close-out investigation session, on March 10, 2022, Plaintiff also received a call from the only Black singer reaching out to Plaintiff again to inform her that their was a Company meeting on the evening of March 10, 2022,  where the entire cast/crew were "demanding to know what has happened to D."

38. Gleaning from what Egbufor learned had happened at the March 10, 2022 Company meeting, Plaintiff instantly knew Harris' Close-out email was disingenuous and the investigation shut down was a reactionary move, and due to cast/crew demanding to know what really happened.

39. In her response to Attorney Harris' March 11, 2022 meeting request, Plaintiff Egbufor expressed her concern of the mixed-messages she was hearing about her work status, and the fact that it was highly suspicious of Harris to close out the investigation so soon and immediately following the cast/crew expressed interests in knowing what happened to her.

40. Harris stated in her response that concerns from Plaintiff were "purely coincidental."

41. Harris, however, did not deny Plaintiff's description of what happened at the March 10, 2022, Company meeting where cast/crew wanted to know what really happened to Plaintiff *(See Attachment A15, Plaintiff's Close-investigation Concerns Emailed to Attorney Harris).*

42. Ultimately, Plaintiff Egbufor agreed to meet with Attorney Harris at the said date and time for the "so-called close-out investigation" session via Zoom on March 14, 2022 at 2 pm.

43. When logging into the Zoom session on March 14, 2022, to Plaintiff's utter shock and dismay, her harasser, Defendant Hochwald appeared on the screen and took over most of the meeting.

44. With her work stress level already on a high note, at this moment, Plaintiff's stress level grew even more significantly as she was traumatized by Defendant Hochwald's sudden appearance, which re-triggered her back to that horrible meeting she had with Defendants on February 9, 2022, where she was ambushed and attacked by Defendant Hochwald and Defendant Karpati.

45. Plaintiff expected this meeting, like the other two, to be a 1:1 session <u>without</u> Management.

46. Plaintiff was also extremely devastated by Harris' lack of sensitivity, lack of transparency and lack of advance notification that Hochwald would be attending the March 14, 2022 meeting.

47. Plaintiff felt betrayed and setup once again by the Defendants, which immensely increased her existing work-related anxiety, psychological pain and suffering.

48. During the March 14, 2022 meeting, Harris informed Plaintiff that she did not find evidence of discrimination, but that she did "identify issues with leadership practices and communications."

49. When Plaintiff asked Harris for specifics about her findings and whether there was a written report she could review, Harris stated that she had shared the issues she discovered with the Defendants, and that there was "no report available."

50. Harris then randomly <u>switched the topic</u>, which demonstrates and duplicates a malicious pattern of her clients, the Defendants who use trickery like this often - to intimidate and threaten.

51. Harris began discussing Plaintiff's emerging medical condition and request for therapy treatment, which was another shock to Plaintiff as Plaintiff <u>did not</u> share any information about her medical status and need for treatment with Attorney Harris, only with Defendant Criswell.

52. Plaintiff also did not provide Defendants PDNYC LLC/Emursive Productions a medical release form with permission to share her personal and private health information to anyone.

53. By sharing Plaintiff's health information with a third party organization and external individual, on grounds that <u>were not in anyway germane to the Complaint investigation</u>, and without Plaintiff's prior knowledge and permission, Defendants PDNYC LLC/Emursive Productions violated Plaintiff's privacy, along with enforcement guidelines under the American with Disabilities Act (ADA), and plausibly aspects of the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and Rules, as a business associate.

54. Then Attorney Harris stated the <u>real reason</u> they decided to close out the investigation.

55. Harris to Plaintiff: "The cast and crew really want you back."

56. Plaintiff became highly confused by Harris' comments and her sudden switch from being a so-called "independent investigator" to now speaking on behalf of Defendants PDNYC LLC/Emursive Productions, as their advocate and legal representative.

57. Plaintiff expressed her perplexity to Harris: "Sorry, Lisa I'm a little confused. You told me you were an independent investigator and not their representative but you are now speaking to me on behalf of the company about my medical condition. So who are you now?"

58. Defendant Hochwald jumped in and took over the remainder of the meeting.

59. Off-subject again, and just as Defendant Hochwald behaved in the injurious meeting on February 9, 2022, Defendant Hochwald inappropriately started to target Plaintiff's credibility.

60. In this "close-out" investigation meeting on March 14, 2022, the first thing Defendant Hochwald stated to Plaintiff Egbufor was that he: "saw and reviewed her resume and saw the number of leadership positions she had held," – again, this had absolutely nothing to do with the investigation or Plaintiff's complaint, just another sarcastic fear tactic.

61. Defendant Hochwald went on to imprudently diminish, stigmatize and reduce Plaintiff's medical condition and therapy request to being isolated in a room, all while Harris looked on.

62. Hochwald to Plaintiff: "I'm sure we can find a room to put you in to stop the triggers."

63. Plaintiff to Hochwald: "This has nothing to do with triggers. This is physical not mental. I would appreciate it if you wouldn't make references about me that you don't understand."

64. Then Hochwald went on using the same words as Harris: "The cast/crew really need you back."

65. Hochwald also said they have had to "backfill" others to step in to complete Plaintiff's work.

66. Knowing that she had not missed or failed to complete any of her responsibilities even as she worked daytime and overnight, in darkness and quietly due to her new symptoms, Plaintiff specifically asked Hochwald to share "which company manager duties had to be backfilled."

67. Defendant Hochwald could not and did not provide one answer, and none of the Defendants ever answered this question when posed by Plaintiff in subsequent communications.

68. Case in point, Defendants PDNYC LLC/Emursive Productions backfilling claim was bogus, made-up and unsubstantiated.

69. With a complete disregard for Plaintiff's immediate need for treatment and therapy, during that same virtual meeting, Defendant Hochwald requested for Plaintiff to meet at the office.

70. Plaintiff then responded by suggesting the meeting be held virtually to begin again in a safe and controlled environment, given the debilitating, traumatic experience and outcomes that came about from her last meeting with Defendants on February 9, 2022, she was still healing from.

71. Plaintiff to Hochwald: "I was absolutely traumatized by my experience at the last management meeting. I think I would feel more safe and comfortable if we were to reconnect virtually first."

72. Hochwald to Plaintiff: (callously and on the defense) "I mean we were traumatized too."

73. Plaintiff to Hochwald: "Ok, which is all the reason for us to begin again with everyone in a place of comfort and then build from there." Simply put, Plaintiff's request was reasonable.

74. During this March 14, 2022 meeting, Plaintiff Egbufor also never refused to return to work as she was not specifically given a date to return back to work, or even a date to meet again.

75. Plaintiff also did not request to only meet with the Defendants by video conference.

76. All in all, Defendant Hochwald's last words to Plaintiff made it clear that her healing and recovery from the injuries Hochwald and his co-Defendants had caused, were not a priority.

77. Ignoring Plaintiff's video meeting request, Hochwald responded: "We really need you back."

78. From Harris illegally gaining access to Plaintiff's medical information, to Hochwald's sudden appearance, and the abrupt closure of an investigation that was not led by an independent entity, Plaintiff concluded just as she had thought from the beginning that: the entire investigation handled by Defendants PDNYC LLC/Emursive Productions retained law firm and represented by Harris, was skewed and a complete sham.

79. Clearly, the Defendants fundamentally, morally and professionally flawed expectation was for Plaintiff to just get up, move on, kick the can down the road, and pretend like nothing had ever happened to her, which is the worse thing a person can do, especially

when recovering from a psychological and psychiatric injury, as Plaintiff was at this time.

80. Defendants were more concerned about Plaintiff hurriedly getting back to work, while <u>Plaintiff was more concerned about hurriedly getting well to continue doing a great job at work</u>.

### Defendants Use Discrimination, Retaliation to Deny Plaintiff Remote Work for Qualified Treatment

1. After receiving Defendant Criswell's confirmed receipt on March 9, 2022 and his agreeable acknowledgement of Plaintiff's need for treatment and several therapies, Plaintiff Egbufor continued to work remotely and began to schedule her much-needed therapy sessions.

2. Five days after Defendant Criswell gave Plaintiff the green light to receive therapy in DC, to Plaintiff's surprise however, everything came to a halt on March 16, 2022 (also two days after the Close-out investigation meeting), when Defendant Criswell emailed Plaintiff a series of new questions, issues and requirements pertaining to her request to work remotely for treatment.

3. Defendant Criswell to Plaintiff: "What I would like to clarify is <u>whether you are requesting to continue to work remotely for this period or if you are requesting a leave of absence</u>. <u>We are here to support you in caring for your health, either way</u>, but we do need to understand what you are requesting so that we can work with you to identify a reasonable accommodation."

4. Essentially, what Plaintiff perceived from this statement is that the Defendants were willing to accommodate Plaintiff's treatment request to either work remotely <u>or</u> take a leave of absence.

5. Plaintiff had already made her request clear, moreover on March 11, 2022, when she asked to remain in remote work to have treatments with the DC facility and team she was referred to.

6. In addition to the first surprising change of course from Defendant Criswell, there was another one. Defendant Criswell was now requesting for Plaintiff to submit "a certification from your medical provider outlining your need for an accommodation: i. the nature, severity and duration of your impairment; ii. the activity or activities the impairment limits; iii. the extent to which the impairment limits your ability to perform those activities; and iv. the length of your requested accommodations."

7. Significantly, in addition to requesting a medical certification from Plaintiff, at the end of Defendant Criswell's March 16, 2022 email to Plaintiff were again options from the Defendants on how she could receive treatments while working remotely in DC, where Defendant Criswell specifically stated to Plaintiff Egbufor that if she is requesting time off, Plaintiff was free to and could use "any accrued paid time off during such period," with a "leave of absence" (*See Attachment A16, Criswell's March 16, 2022 Request for Medical Certification and Defendants' Leave Offerings for Egbufor to Consider for Treatment*).

8. Lastly, Defendant Criswell informed Plaintiff that she was "eligible to apply for short-term disability, managed and provided by NYSIF," rounding up three options for her treatment.

9. Defendant Criswell provided Plaintiff a response deadline for her decision by March 18, 2022.

10. Right off the bat, as the existing sole manager and personnel responsible for administering all cast/crew/staff injuries and accidents, along with having to manage cast/crew leave requests for payroll, Plaintiff knew the additional rigid request for a "medical certification" suddenly being imposed upon her by Defendant Criswell, after he was very agreeable to her request for therapy just days before on March 11, 2022, was nothing short of discriminatory and retaliatory.

11. Point blank, with at least 30 injury and therapy referrals processed by Plaintiff, she knew there was no standard practice or policy for all employees to submit a medical certification to have needed therapy for accidents and injuries, especially if/when injuries were on-the-job.

12. The only policy and requirement was for injured employees to submit an Accident Injury form to Plaintiff Egbufor as soon as employees were able, which Plaintiff completed and submitted to Defendant Criswell on February 17, 2022 after she was discharged from the hospital.

13. Defendants permitted employees to simply call, text or email their manager about their injury, the required therapy or rest plan, and they would need to provide dates of their leave request.

14. Managers would then refer employees to Plaintiff, who would then contact injured employees by phone or email to see if they needed support and to confirm their leave dates for treatment.

15. In subsequent emails, Plaintiff and Defendant Criswell had several conversations where Plaintiff expressed deep concerns over Defendants PDNYC LLC/Emursive Productions differential treatment towards her in comparison to employees outside of her protected class.

16. For example, Plaintiff referenced and recalled to Defendant Criswell the recent accident and on-the-job injury of a White performer under 40 she was responsible for processing her leave.

17. After the injury, this White employee was seen by a doctor and referred to therapy for six weeks. This employee submitted a similar therapy referral form to Plaintiff, that was liken to the one Plaintiff had already submitted to Defendant Criswell in request for qualified treatments she was referred to by her neurologist *(See Attachment A17, Email on Differing Requirements).*

18. Once received, Plaintiff submitted the injury notes and therapy referral from this White female employee to Defendant Criswell and Defendant Boyd. Subsequently, both Defendants directed Plaintiff to immediately place the White employee on leave and to begin the Worker's Compensation process for her as a precaution.

19. No additional questions were asked of this employee. No additional medical certification was requested of this employee. Neither was ever asked or required by any employees or managers outside of Plaintiff Egbufor's protected class. This new request was only asked of Plaintiff.

20. During that same timeframe of email exchanges between Plaintiff and Defendant, Plaintiff also expressed serious concerns over Defendants' failure to protect and secure her health records.

21. By this point, Plaintiff Egbufor had already observed Defendant Criswell's mismanagement of confidential information and his complete disarray of personnel files, as he was the only person handling all HR matters for the nearly 400 employees working at the McKittrick Hotel.

22. In fact, earlier, when Defendant Criswell assigned Plaintiff to assist with organizing his personnel files, Plaintiff found Defendants PDNYC LLC/Emursive Productions' personnel records in a potpourri of mess, with employee medical information in the same folders as personnel and performance records, misfilings of worker contracts and accident injury reports,

and stacks upon stacks of personal and private information (PPI) outside of file cabinets, and on several desks in an open and shared office.

23. Although file cabinets had a lock, Defendants' personnel files were never locked, which provided easy access to the many employees, performers, and even cleaning staff who frequently walked through the shared office space (The Morning Room) to use the copy machine, to obtain office supplies, to eat, and switch entrances during shows, as this office is directly behind the stage and Green room of a small theater also owned by the Defendants.

24. All of this is a violation of requirements of the American with Disabilities Act (ADA) which maintains that medical records be kept secure and in different files from personnel records with limited access to supervisors, insurance companies, treating doctors and medical personnel.

25. During Plaintiff's correspondence with Defendant Criswell, Plaintiff repeatedly explained that she did not have what she believed Defendant Criswell had <u>inaccurately conceived and described as a permanent disability</u>, which requires a 'medical certification.'

26. What's more, Plaintiff <u>was not seeking time-off</u>, just requesting to remain in the same remote work status she was currently in, for four to six weeks, to receive treatment from a work-injury.

27. Plaintiff's request was not unreasonable, especially considering her White female predecessor, plausibly under 40 and the former Company Manager, who worked remotely for several years.

28. Furthermore, given the caustic culture and discriminatory experience Plaintiff was already facing, Defendant Criswell's new, random and sudden request he was now using to frame Plaintiff's need for therapy treatment as a disability to justify adding unfair demands, made Plaintiff feel confused, threatened, stigmatized, harassed and discriminated against.

29. Seeing all of this combined with the discriminatory and retaliatory actions she had already been experiencing throughout her employment, in her March 17, 2022 response email to Defendant Criswell, Plaintiff requested a day to research the legality of what she was now being asked to submit to Defendant Criswell (*See Attachment A18, Egbufor's March 17, 2022 Request to Research Criswell's Medical Certification and Differential Requirements*).

30. Plaintiff then consulted with the New York Human Rights Office and the Department of Labor to inquire about her privacy rights and HIPAA rules, and to understand what was necessary in requesting remote work for treatment, not a leave of absence or time-off which was not needed.

31. In her findings from such discussions and explorations, Plaintiff was informed her doctor's therapy referral would suffice and that she was not required to submit a medical certification, as executing her job functions would not be impaired and her temporary condition did not pose a direct threat to other employees or the company at-large.

32. Following what she learned from her research, on Monday, March 21, 2022, Plaintiff did just that, she submitted copies of the PT and OT referrals from Dr. Komal Patel to Defendant Criswell *(See Attachment A19, Second Notification and Submission of Therapy Referrals)*.

33. Both therapy referrals submitted by Plaintiff to Defendant Criswell, had electronic signatures and included: 1) the referring doctor, 2) the type of therapy treatment, 3) the duration of the therapy treatment, and 4) the name, address, and phone number of the rehabilitation facility *(See Attachment A11,  Egbufor's Referral for PT  and Attachment A12, Referral for OT)*.

34. Defendant Criswell acknowledged receipt of Plaintiff's therapy referrals on March 22, 2022. Then he flat out denied her request. Even though Plaintiff's medical documentation were deemed compatible and appropriate for Plaintiff's request to work remotely for a short period of time to receive much-needed treatment for an injury her employers, the Defendants caused *(See Attachment A20, Defendants Deny Egbufor's Request for Remote Work for Treatment)*.

35. In one breath the Defendants claimed they "are [were] here to support you [Plaintiff] in caring for your [her] health," but with the next breath, the Defendants maliciously and willfully denied Plaintiff Egbufor the opportunity to care for her health after she suffered pain from their hands.

36. The Defendants essentially went from micromanaging her work to micromanaging her health.

37. In the same email, Defendant Criswell demanded that Plaintiff "identify appropriate therapists based in New York  City by March 28, 2022."

38. Defendant Criswell went on further to inform Plaintif that she had: "…authorization to work remotely until March 28, 2022 to allow you [her] to identify appropriate therapists  based in New York City, if necessary…"

39. Defendant Criswell also stated: "PDNYC did not authorize you [Plaintiff] to relocate outside of New York while performing your job or to work remotely for an extended time period."

40. There are several erroneous statements and false assumptions in Defendant Criswell's response.

41. Firstly, Plaintiff never ever intended to be: hospitalized, recovering in DC, and needing therapy.

42. Case in point, Plaintiff did not place herself in this pit and the prolonged discrimination, retaliation, hostile work environment and work-related stress and injuries she had been suffering throughout her employment with the Defendants, that all went unchecked.

43. Secondly, Plaintiff did not relocate. After being hospitalized due to a psychiatric injury caused by the Defendants, in order to be released from the hospital, Plaintiff's Exit Plan from Mt. Sinai Hospital required her to be under care with family members. Her closest family was in DC.

44. Defendants lack of sensitivity, given the nature of the injury they caused Plaintiff is abhorrent.

45. Thirdly, to deny and dismiss Plaintiff's documentation for qualified medical treatment while accepting similar documentation from other employees outside of her protected class is racist.

46. Lastly, the Defendants did not provide Plaintiff sufficient time to retrieve her medical records, transfer them to another facility, and to identify therapists for multiple treatments she needed.

47. Defendant Criswell continued in his March 22, 2022 email, with a bogus and manufactured problem to try and justify Defendants discrimination and retaliation: "While you have been working remotely, we have been required to backfill several of your on-site responsibilities that cannot be performed virtually, which has created difficult staffing and operational issues for the company" (See Attachment A20, Criswell Denies Egbufor for Remote Work for Treatment).

48. When repeatedly requested by Plaintiff, both Defendants Criswell and Hochwald could not, did not, and never did provide any examples  or instances of how Plaintiff's remote work was causing operational and staffing difficulty. Demonstrating this as a lie and pure falsehood.

49. Getting back to Plaintiff's CM predecessors, both White women plausibly under 40, who worked off-site for ten years, and Defendants remained afloat and maintained high success.

50. As confirmed in the LinkedIn profile of Plaintiff's immediate predecessor, she states very clearly that while in her role as SNM Company Manager, she worked remotely, off-site and on-call for three plus years while managing a cast of 70 (*See Attachment 21, Egbufor's Immediate Predecessor's LinkedIn Profile*) - this was double the size of Plaintiff's workload of 35 cast.

51. By additional comparison, the CM duties Plaintiff's White predecessor states she did while working off-site and on-call are exactly similar to what was expected, and was included in Plaintiff's on-site job duties. Nothing changed from past CMs, except race.

52. Additionally and again, the first SNM CM, also a White woman worked remotely as well.

53. 80% of Plaintiff's job functions could be and were completed using a computer, while only three of Plaintiff's 18 job responsibilities, basically just 16% of her duties were on-site.

54. Although these were on-site duties, Plaintiff could have easily and successfully completed the following functions virtually during the very short time period Plaintiff needed for treatment: "1) Presence during all rehearsals and performances for serving Sleep Mo More cast and crew, 2) Attend a daily team meeting with all cast, crew and on-site mgmt at the top of the Sleep No More call, and 3) Attend weekly production meetings for Sleep No More with other department heads" (*See Plaintiff's Job Description in Attachment G).*

55. Plus on numerous occasions, Plaintiff witnessed each and every last one of her three "on-site" duties being completed virtually by other managers outside of her protected classes, who were: a) working from home while infected with Covid-19, b) based outside of New York and the United States due to relocation, c) injured on the job and working remotely during recovery, or d) simply unable to come in.

56. At each of such instances, Defendants Boyd and Criswell happily setup virtual opportunities for managers and employees requesting remote and virtual accommodations, while Plaintiff Egbufor was again denied the same privilege and access due to her race, age, and retaliation.

57. Since Plaintiff was denied remote work for treatment, and given that she desperately needed medical treatment and therapy, Plaintiff began to pursue the other options Criswell outlined in his March 16, 2022 email where he informed Plaintiff she could use "any accrued paid time off during such period," with a leave of absence, and short-term disability, managed and provided by NYSIF" (*See Attachment A16, Criswell's March 16, 2022 Request for Medical Certification and Defendants Leave Offerings for Plaintiff to Consider for Treatment*).

***Defendants Use Discrimination, Retaliation to Deny Plaintiff Leave/Docs for Qualified Treatment***

1. On March 25, 2022, <u>three days before</u> Defendant Criswell's March 28th deadline, Plaintiff Egbufor notified Defendant Criswell that a follow-up medical appointment that week showed her symptoms were getting worse and that immediate treatment was necessary.

2. In that same email, Plaintiff also shared with Defendant Criswell that she had been in touch with Tom Davis from NYSIF, just as Defendant Criswell had advised, who informed Defendant that her arising symptoms associated with the work-related injury and anxiety attack <u>she had on February 10, 2022 were in fact eligible for Worker's Compensation (WC) benefits</u> (*See Attachment A22, Egbufor's March 25, 2022 Email to Criswell on WC Eligibility*).

3. In that March 25, 2022 email to Defendant Criswell, Plaintiff requested to use her earned sick leave and paid time off (PTO) to begin treatment while her WC benefits were being finalized.

4. <u>Four days later</u> on March 29, 2022, Defendant Criswell responded to Plaintiff's March 25, 2022 email, <u>where he falsely stated that Plaintiff did not submit any medical documentation</u>, and <u>he requested a second round</u> of medical documentation be submitted a day later by March 30th.

5. Plaintiff had already submitted medical documentation and copies of the physical therapy and occupational therapy referrals she received from Dr. Patel to Defendant Criswell on March 21, 2022, and he acknowledged receipt of Plaintiff's medical documentation on March 22, 2022.

6.  In his March 29, 2022 email, Defendant Criswell also willfully disregarded and ignored Plaintiff's request to utilize her earned sick leave and PTO to begin treatments, while her WC benefits were in process.

7.  Defendant Criswell willfully disregarded and ignored Plaintiff's WC developments entirely including the fact that she had received the clearance from Davis at NYSIF, who was waiting for Defendant Criswell to return his calls.

8.  All of which was done on purpose by the Defendants to maliciously cut off Plaintiff from obtaining any assistance or leave to receive qualified treatments.

9.  Plaintiff was simply pursuing the options Defendant Criswell initially offered to Plaintiff in his email on March 16, 2022 (*See Attachment A16, Criswell's March 16, 2022 Leave Options).*

10. Defendant Criswell was now flipping the script to intentionally hassle and harass Plaintiff by requesting a second round of documentation; when by Department of Labor standards and the Defendants standard operating procedures <u>the first set of medical documentation was sufficient</u>, and by cutting Plaintiff's leave request short; <u>although she had enough leave</u>.

11. In his March 29, 2022 email, Defendant Criswell stated that he was only approving leave for Plaintiff Egbufor on that day, March 29th (the date of his email) and for March 30, 2022, the date a new and second medical letter was now due to the Defendants *(See Attachment A23, Criswell's March 29, 2022 Email to Plaintiff Requesting More Medical Documentation).*

12. Interestingly, however, Defendant Criswell's March 30, 2022 leave approval and new deadline was for the same date as Plaintiff's and SNM's off day. SNM was dark (closed) on Tuesdays.

13. As such, Plaintiff did not require any leave use or approval for this day.

14. Defendant Criswell knew Plaintiff was not being provided enough time to obtain more medical documentation, which was unlike requests made to other managers and employees outside of Plaintiff's protected class, who <u>were not</u> hassled like this. This treatment perpetuated hostility.

15. Plaintiff Egbufor also did not think it would be fair to have <u>leave deducted from her on a standard off day</u>.

16. Because of the time constraint being imposed on her by the Defendants when medical offices were still backed up during the pandemic, combined with the unfair use of her leave, Plaintiff contacted Defendant Criswell to <u>request just one extra day</u> and the date of April 1, 2022 to respond to Defendant Criswell's duplicitous request for more medical documentation.

17. There was nothing unreasonable about Plaintiff's request. Even with that, the Defendants discrimination, retaliation and hostility continued to persist, as they still denied Plaintiff's request for just one extra day to submit documentation on April 1, 2022, which created more delay for Plaintiff's qualified treatments to commence, and more pain and more suffering.

18. Defendant Criswell to Plaintiff: "To be clear, we need you back at work in NYC no later than March 31 or ask that you submit medical documentation we've repeatedly requested from you by March 31 – not April 1" *(See Attachment A24, Denial of Plaintiff's Extra Day for Docs).*

19. Minutes later following receipt of Defendant Criswell's response, on the same afternoon of March 29, 2022, Plaintiff emailed Criswell to inquire about her PTO leave balance *(See Attachment A25, Plaintiff's March 29, 2022 Leave Balance Request #1).*

20. Criswell who had been pretty responsive that day to Plaintiff's emails, did not respond.

21. Later that evening, still on March 29, 2022, Plaintiff emailed Defendant Criswell again to inquire about her leave balance *(See Attachment A26, Plaintiff's Leave Balance Request #2).*

22. Again, Defendant Criswell ghosted Plaintiff with no response on her PTO balance requests.

23. Plaintiff knew Defendant Criswell's stalling was all by design, to intentionally ignore Plaintiff.

24. The next morning at 8:59 am on March 30, 2022, <u>Plaintiff emailed a third time with the same leave balance request</u> to Defendant Criswell. This time she emailed from her personal email address *(See Attachment A27, Plaintiff's March 30,2022 Leave Balance Request #3).*

25. Still stalling, Criswell intentionally did not respond to Plaintiff until 12 hours later at 8:56 pm.

26. Defendant Criswell to Plaintiff: "Hello D, Your present balance is as follows: Paid time off: 17.33 hours, Sick Leave: 32 hours" *(See Attachment A28, Criswell Leave Balance to Egbufor).*

27. With 49 hours of earned leave on March 30, 2022, irrefutably, Plaintiff Egbufor had more than enough leave for her to begin using for the qualified treatments she needed, as she awaited WC benefits to be finalized, and exactly as Defendant Criswell offered Plaintiff on March 16, 2022.

28. What's more, is that on February 28, 2022, Defendant Criswell emailed all employees about the Defendants' new PTO policy effective April 1, 2022, where Defendant Criswell stated "each full time employee will receive a bank of hours based on years of service" *(See Attachment A29, Criswell's February 28, 2022 Staff Email with New PTO Policy Effrctive April 1, 2022).*

29. Defendant Criswell to Staff: "Your PTO will be loaded in your PTO bank on Paycom beginning April 1. Your original hire date will be used in determining your tier. 0-4 years get 25 days per year, 5+ years get 30 days per year. These days are good for one year between April 1 – March 31."

30. At this point, this new policy of the Defendants meant Plaintiff Egbufor now had 200 additional hours, and adequate hours of earned leave available to her to complete her entire and much-needed qualified treatments and therapies without WC benefits. Again, this option was in direct alignment and just as Criswell had offered Plaintiff to do in his email on March 16, 2022 *(See Attachment A30, Egbufor's Updated PTO Balance in Paycom System as of April 1, 2022).*

31. To meet the very short less than a day deadline Defendant Criswell required for a second round of medical documentation, Plaintiff Egbufor was able to gain a last minute appointment where she was examined by a second doctor, Dr. Edward Hochman, at a clinic on March 31, 2022.

32. When Plaintiff stressed to Dr. Hochman that each of the five points from Criswell's medical certification email must be included in the letter, he became apprehensively concerned.

33. Dr. Hochman to Plaintiff: "I have provided all that I can without violating your privacy. This isn't permanent. You submitted the therapy referrals, so this letter should do."

34. Defendants PDNYC LLC/Emursive Productions also did not provide Dr. Hochman a medical release form for permission to release Plaintiff's patient information.

35. <u>Exactly on Defendant Criswell's deadline of March 31, 2022,</u> Plaintiff submitted the Patient Letter from Dr. Hochman to Criswell *(See Attachment A31, Egbufor Patient Letter, 3.31.22).*

36. Dr. Hochman's Letter:  "This patient was seen today at the Clinic. Please excuse from work for the following date(s): 3/31/22. The patient has vestibular dysfunction. This limits her function when exposed to loud noises or bright lights. A reasonable accommodation would be to have adjustments made in her work so that she does not have exposure to loud noises or bright lights, such as remote work."

37. On the morning of April 1, 2022, Defendant Criswell acknowledged receipt of Plaintiff's email and her attached March 31, 2022 Patient letter from Dr. Hochman,  *(See Attachment A32 Criswell's April 1, 2022 Email Disapproving Plaintiff's Patient Letter).*

38. In his response email, Defendant Criswell basically rips Dr. Hochman's letter into shreds as Defendant Criswell states: "while the letter provides some of the information we requested, the letter is incomplete, and that "Dr. Hochman's letter merely indicates remote work as an accommodation."

39. Criswell continues with his hassling, falsehoods and then <u>makes a third request</u> for information.

40. Criswell:  "Specifically, the letter does not include (i) the activity or activities your impairment limits; (ii) the extent to which your impairment limits your ability to perform those activities and (iii) the length of your requested accommodation. Please provide a supplemental certification that includes this information as soon as possible."

41. Undoubtedly, the combined medical documentation in the hands of the Defendants, first with occupational and physical therapy referrals from Dr. Patel, stating the frequency and length of time needed for Plaintiff's treatments, then to Dr. Hochman, with a Patient letter explaining Plaintiff's impairment, limitations and reasonable accommodations, did in fact cover and address all of the information the Defendants were requesting.

42. To be clear, Plaintiff did not cause her need for qualified treatment. The Defendants did.

43. Plaintiff's initial request began as a request to work remotely for one month to undergo qualified treatments from an on-the-job work-related injury the Defendants caused.

44. Additionally, Plaintiff's request to work remotely for such a short time paled in comparison to her White predecessor, who worked remotely in the same role and capacity, for the same show, and for several years with twice the size of Plaintiff's workload and cast.

45. Conclusively, this continuation of documentation being requested from Plaintiff over and over and over again, and being denied over and over and over again by the Defendants, was retaliatory, discriminatory, and excessive.

46. These demands went way beyond any and all of the medical documentation ever required, requested or provided to Plaintiff and the Defendants from other staff who had work injuries.

47. In his email, Defendant Criswell contradicts himself when discussing Dr. Hochman's letter.

48. On one hand, at the beginning of his April 1, 2022 correspondence, Defendant Criswell complains that Dr. Hochman "did not specify (i) the activity or activities your impairment limits and (ii) the extent to which your impairment limits your ability to perform those activities" *(See Attachment A32, Criswell's April 1, 2022 Disapproval of Patient Letter).*

49. On the other hand and by the end of his response, Defendant Criswell states: "To accommodate the limitations described in Dr. Hochman's letter, we will provide you with a quiet work location without bright lighting, and you will not be required to attend portions of rehearsals or performances that include loud noise or strobe lighting" - this created confusion on next steps.

50. Equally confusing, are the highly unrealistic and unreasonable accommodations Criswell stated.

51. Back to Plaintiff's symptoms, Dr. Hochman's Patient letter, and Dr. Patel's basis for referring Plaintiff to occupational and physical therapy, Plaintiff had a vestibular dysfunction condition.

52. It bares repeating from The Vestibular Disorders Association (VeDA) which maintains that "the vestibular system includes parts of the inner ear and brain that help control balance and eye movements. If the system is damaged, vestibular disorders can result in many symptoms, such as: dizziness, imbalance, vertigo, brain fog, tinnitus, nausea, cognitive changes and

psychological changes." *(See full description at:* https://vestibular.org/article/what-is-vestibular/vestibular-symptoms/*)*

53. These symptoms, along with light and sound sensitivity, were all symptoms Plaintiff had.

54. Plaintiff's employer and supervisor, the Defendants, however, simply did not care.

55. To restate and illustrate a description of Plaintiff's workplace, there was not any area in the McKittrick Hotel that was quiet or without bright lights during Plaintiff's work hours (3pm - 11:30pm), as the entire building, every single inch of that building was part of the show's set.

56. There was also no off-stage for the *Sleep No More* (SNM) production. The show was all over.

57. SNM performers danced throughout the building without any dialogue just motion and movement to extremely loud music heard and played at concert level, on all six plus floors.

58. The loud music served as cues for the audience who would run behind the performers.

59. Each floor was practically a theater minus seats, so bright moving lights were everywhere.

60. Defendants' use of lighting is described as found on their website's Accessibility section: "Strobe lights, haze, and laser effects occur throughout the hotel. We encourage guests with any accessibility needs to contact us prior to arrival at: housemanager@sleepnomorenyc.com" (*See* https://mckittrickhotel.com/events/sleep-no-more/#/?qty=1).

61. SNM was also on a three hour loop with rehearsals and sound and light checks prior to show.

62. While the bright lights and loud noises were mainly for SNM, at the time of Plaintiff's employment and work hours, there were four additional subsidiaries and companies of the Defendants within the McKittrick Hotel, that were also just as loud with bright lights.

63. These establishments were open daily with shows that ran concurrently to SNM, providing theater, entertainment, live bands, drinks and food.

64. Plaintiff was also required to listen to loud conversations over the walkie-talkie and ear piece.

65. Given that the building elevator was in use for only guests/patrons during Plaintiff's office hours, Plaintiff would have to walk up and down eight flights of steps, which causes dizziness.

66. Principally, Defendants accommodations were absolutely inadequate and inappropriate.

67. Defendants were using forceful and threatening tactics with failed accommodations that would have had Plaintiff working eight plus hours a day/six days a week primarily in the evenings, being subjected to and exposed to the very same conditions that were igniting her dysfunction.

68. Had Plaintiff not received the qualified treatments she was prescribed, working on-site during her state would have most certainly led to a severe disorder, which is why Plaintiff Egbufor was urgently seeking a remote work adjustment and leave use, that were both denied by Defendants.

69. Since the Defendants maliciously employed retaliation and discrimination to deny Plaintiff a temporary remote work status and use of her earned leave for qualified treatments, Plaintiff decided to pursue her eligible Worker's Compensation leave and benefits.

### *Defendants Use Discrimination, Retaliation to Deny Plaintiff WC Benefits for Qualified Treatment*

1. On February 18, 2022, Defendants PDNYC LLC/Emursive Productions and it's carrier, NYSIF filed a Worker's Compensation claim on behalf of Plaintiff for her February 10, 2022 on-the-job and work-related injury she suffered (*See Attachment A33, WC Filing, Case Assembly).*

2. Defendant Criswell emailed Plaintiff her WC claim number on February 21, 2022: "Hi D, I hope you had a nice weekend. Your claim number for your worker's comp claim is _____" *(See Attachment A34, Defendant Criswell's Email to Egbufor with WC Claim Number.)*

3. In addition, Defendants PDNYC LLC/Emursive Productions NYSIF Claims Representative, Thomas Davis filed a First Report of Injury Form with the WCB on February 23, 2022, which reflected an Agreement to Compensate With Liability (*See Attachment A35 Davis/NYSIF WC Liability Filing for Egbufor's February 10, 2022 Work-related Injury).*

4. Beginning on February 23, 2022 through April 1, 2022, Plaintiff had been in regular contact with NYSIF's representative, Thomas Davis to inquire about the process for obtaining additional treatment for her work-related anxiety attack that had developed into vestibular dysfunction, and to learn more about the option Criswell provided to her in his March 16, 2022 email (*See Attachment A36, Plaintiff Egbufor's Call Log of Contacts with Davis/NYSIF).*

5. In a followup call to NYSIF Representative Davis, he informed Plaintiff that <u>there was no need for her to apply for short-term disability</u>, that her WC benefits for additional treatment would be processed, and that he was just waiting for Defendant Criswell to return his phone calls.

6. Plaintiff became aware that the WC benefit and leave option would provide only 60% of her salary, which she was willing to sacrifice to get better and fully recover from her work injuries.

7. At each and every contact, Davis assured Plaintiff that once she knew the start date of her prescribed therapies, she would be able to take WC leave to receive additional treatment since a claim had already been filed with the WCB.

8. On April 1, 2022, Plaintiff Egbufor had a follow-up phone and email conversation with Davis confirming her treatment and WC leave start date of April 4, 2022.

9. After their call on April 1, 2022, Davis requested for Plaintiff to send the therapy referrals and her discharge documents from Mt. Sinai Hospital, which she sent on April 1, 2022, in response to Davis' two separate requests *(See Attachment A37, April 1, 2022 WC Solidifying Emails)*.

10. On that same day of April 1, 2022, Plaintiff emailed Defendant Criswell to inform him that she had been in contact with Tom Davis at NYSIF and had decided it was best to take WC leave for her much-needed treatment and therapies.

11. In her email, Plaintiff also expressed concerns over the lack of sufficient time she was being provided to obtain documentation from her neurologist.

12. Plaintiff shared her great dismay over Defendants' plans to isolate her in a room  - <u>which is exactly what Defendant Boyd tried to do earlier, to **invisibilize** Plaintiff from the workspace.</u>

13. Plaintiff to Criswell: "…given that the leaders of this organization are unwilling to compromise with a short-term request for remote work and the appropriate accommodations as prescribed by my medical providers, I have communicated my decision to go on workers compensation with the NY Insurance Fund effective Monday, April 4, 2022."

14. Defendant Criswell willfully delayed his reply and ended up responding at 5:34 PM with falsehoods and a fourth untimely demand, 5.5 hours later at the end of the day on April 1, 2022.

15. Defendant Criswell to Plaintiff on April 1, 2022 at 5:34 pm: "As noted in my previous email, our carriers have advised us that you are not currently approved for workers' compensation and/or short term disability. To the extent that you have received such approval or any updates from GCG or NYSIF, please provide me with a copy by the close of business today."

16. Using stalling tactics again, Defendant Criswell delayed his response and request for more documentation until after hours, deliberately making it impossible for Plaintiff to comply.

17. In Plaintiff's response to Defendant Criswell at 5:47 pm on April 1, 2022, Plaintiff reminded Defendant Criswell of his refusal to return Davis' calls, the differential treatment, and that she had been approved to "begin WC on 4/4/22" *(See Attachment A38, Plaintiff's WC Reminder).*

18. Plaintiff did not receive a response from Defendant Criswell on that evening of April 1, 2022.

19. In fact, no correspondence was sent to Plaintiff, from Defendant Criswell, any of the other Defendants, or any other members of PDNYC LLC/Emursive Productions management.

20. Plaintiff did not receive any correspondence on April 1, 2022, April 2, 2022 or April 3, 2022.

21. Plaintiff kept working remotely from April 1, 2022 through April 3, 2022.

22. On April 4, 2022, the daily Production Department Day Sheet email and staff schedule for the day which is sent to all managers/cast/crew between 5 am and 6 am every single day, arrived.

23. The Day Sheet did not list Plaintiff, which meant Plaintiff was not scheduled to work on April 4, 2022, *(See Attachment A39, Defendants' Staff Work Schedule for April 4, 2022).*

24. Seeing that Plaintiff was not scheduled and was not listed to work on the Production Day Sheet for April 4, 2022, and she had not heard anything from the Defendants for three days up until this time, Plaintiff Egbufor believed she had been placed on Workers' Compensation leave as confirmed on April 1, 2022 with Davis at NYSIF.

25. Shockingly, although Plaintiff's request for treatment for her on-the-job work injury was approved by Davis and NYSIF for Worker's Compensation benefits, Defendants PDNYC LLC/Emursive Productions had another deceptive and invidious plan.

26. Plaintiff later found out from Davis, that the Defendants willfully and maliciously intercepted her WC process with lies, to disenfranchise and punish her for making claims of discrimination.

### *Defendants Use Malicious Subterfuge, Retaliation, and Lies to Wrongfully Terminate Plaintiff*

1. Continuing from the evening of April 1 through April 3, 2022, Plaintiff Egbufor also did not receive any correspondence from Defendant Criswell, any of the other Defendants, or any other member of management on April 4, 2022 or April 5, 2022.

2. It wasn't until 9:20 am on April 6, 2022, that Plaintiff Egbufor realized she had been wrongfully terminated.

3. Plaintiff received a "good-bye" text message from a Performer, who received an email from Defendant Criswell written to all staff, informing them on that day of April 6, 2022 that Plaintiff was no longer with the company.

4. To say the least, Plaintiff Egbufor was completely floored by the performer's message.

5. Performer to Plaintiff: "D, I am so sad to hear you are going..I hope you're okay and I will miss your beautiful spirit so so much" *(See Attachment A40, Performer's Goodbye Text to Plaintiff)*.

6. Plaintiff immediately checked her email on April 6, 2022 where she found a message from Defendant Criswell with the Subject line: "Fwd: Letter" and an attached letter of termination.

7. The April 6, 2022 termination letter and scheme attached to Defendant Criswell's message is full of and overflowing with manufactured pretext, bogus reasons, false statement after false statement, and untrue accounts of what Plaintiff did and what actually happened to Plaintiff.

8. In their termination letter, Defendants cunningly cover up their illegalities and pretext of discrimination, marginalization, harassment, hostility and retaliation against Plaintiff.

9. Plaintiff has closely examined and highlighted the malicious subterfuge and deliberate falsehoods, discrepancies and misconstrued statements Defendants exhibit in their April 6, 2022 termination letter *(See Attachment  H, Defendants' Termination Letter with Pretexts)*.

10. While excruciatingly dealing with the consequences of the pervasive discrimination, retaliation, hostility, offenses, injuries and false accusations from the Defendants throughout her employment, and now another devastating blow and reality, a wrongful termination; on May 10, 2022, Plaintiff decided to contact Davis to inquire about what happened to her WC benefits.

11. Primarily, Plaintiff Egbufor contacted Davis to find out why she didn't end up on WC leave after being informed by Davis on several occasions that she had done what was necessary to begin WC leave for additional treatment on April 4, 2022.

12. Davis stated during the May 10, 2022 phone conversation with Plaintiff that he received a phone call from Defendants PDNYC LLC/Emursive Productions on April 4, 2022, where he was told that Plaintiff no longer worked for Defendants PDNYC LLC/Emursive Productions - more pathological lying coming from the mouth of the Defendants.

13. During the call, Davis repeatedly made up excuses while fumbling over his words trying to sell and tell Plaintiff the same lie he was told by the Defendant, which was that since Plaintiff was terminated there was no need for him to process her WC leave slated to begin on the same day of April 4, 2022 *(See Attachment A41, Transcript of Davis and Egbufor May 10, 2022 Call)*.

14. Davis to Plaintiff: "…we've, I've, I've been in contact with your employer and they've let me know that you are no longer with them as of, I believe four, four was the date. … So at that point if they've terminated you, um, we have your claim but if you've been terminated and you've been working up until that point, there's really nothing we can do."

15. The problem with this, is that the Defendants did not terminate Plaintiff on April 4, 2022.

16. The date on Plaintiff's termination letter is the same date Plaintiff received the letter – April 6, 2022, not April 4, 2022 *(See Attachment 42, Criswell's Email Cover for Termination Letter)*.

17. Ironically, on the same day of this call, May 10, 2022, the only Black Singer, who did not know Plaintiff's background or that Plaintiff filed a discrimination complaint, called to tell Plaintiff: "You were terminated because you were overqualified." Plausibly, another troubling reality.

18. Precisely, the Defendants intentionally and illegally misrepresented the facts about Plaintiff's job status to their insurance carrier and Davis <u>to willfully shut down Plaintiff's WC leave and benefits set to start two days before they actually terminated her – all to retaliate against her</u>.

19. Added to this, Defendants malicious actions and willful retaliation against Plaintiff did not end with the lie they told to Davis and NYSIF about Plaintiff's termination date, as if causing Plaintiff's work-related injuries, hospitalization, and unemployment were not enough.

20. It was not. Two weeks after Plaintiff's May 10, 2022 phone conversation with Davis regarding her disrupted WC benefits and the incorrect termination date deceitfully reported to him by the Defendants, <u>Davis used the same deceptive tactics and backhanded scheme as Defendants</u> PDNYC LLC/Emursive Productions to completely reverse the liability for Plaintiff's on-the-job and work-related injury that occurred on February 10, 2022.

21. On May 26, 2022, Davis capriciously submitted a WCB Subsequent Report of Injury MTC-O4 Denial Form objecting Plaintiff's WC claim and willfully reversing the previously accepted medical liability Davis/NYSIF had already agreed to and filed with the WCB on February 22, 2022 (*See Attachment A43, Davis' May 26, 2022 Subsequent Injury Report to WCB*).

22. Davis, NYSIF and the Defendants' sudden actions and denial of Plaintiff's claim <u>three months after Plaintiff's injury</u> were highly suspicious, even for the WCB.

23. On August 22, 2022, the WCB penalized and fined NYSIF/PDNYC LLC/Emursive Productions, LLC, in the amount of $300 for "Untimely notice of controversy" (*See Attachment A44, WCBs August 22, 2022 Notice of Determination and Penalty)*

24. To date, although eagerly seeking employment, Plaintiff remains unemployed and continues to suffer from a loss of her livelihood, loss of wellbeing, loss of stability, and a loss of enjoyment.

## <u>RELIEF</u>

**Due to the pervasive and severe discriminatory, retaliatory, hostile and adverse actions perpetrated by the Defendants, Plaintiff pleads with the Court to order the following relief in the amount of $1,500,000 (One million five-hundred thousand dollars).**

1. Direct the Defendants to rescind their unfair and wrongful termination of Plaintiff.

2. Direct the Defendants to make Plaintiff whole, by compensating Plaintiff for her lost wages with interest, unused PTO leave, Medicare, Social Security, and all standard employer contributions she was eligible for, from Date of Termination to the present date.

3. Direct the Defendants to reimburse Plaintiff for the required F-03 Certificate of Fitness exam she completed and passed.

4. Direct the Defendants to compensate Plaintiff for work performed from April 1-April 5, 2022.

5. Direct the Defendants to pay for Plaintiff's CityMD medical visit on February 10, 2022.

6. Direct the Defendants to pay for Plaintiff's Mt. Sinai Hospital stay from February 10-13, 2022.

7. Direct the Defendants to pay punitive damages to Plaintiff for her pain, suffering, and hardship.

## **PLAINTIFF'S CERTIFICATION**

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11. I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date: December 16, 2024                                   /s/   D. Dumebi Egbufor
                                                         4628 Vernon Boulevard
                                                         Unit 217
                                                         Queens, NY 11101
                                                         ddumebiegbufor@gmail.com