**TABLE OF EXHIBITS**

| Exhibit | Description |
| --- | --- |
| A | EEOC Notice of Right to Sue Issued to Plaintiff Egbufor on September 27, 2024 |
| B | EEOC Charge of Discrimination Against Defendants PDNYC LLC/Emursive |
| C | Plaintiff's SNM Race and Age Discrimination Complaint, February 17, 2022 |
| D | Plaintiff's Complaint, Additional Information to Investigators, February 25, 2022 |
| E | Plaintiff's Complaint, Follow-up Information to Investigators, March 4, 2022 |
| F | Professional Reference for Plaintiff Egbufor |
| G | Plaintiff's Company Manager Job Description |
| H | Defendants' Letter of Termination to Plaintiff, April 6, 2022 with Highlighted Pretexts |
| I | Plaintiff's February 2, 2022 Work Injury Report Form Submitted to Defendants |
| J | Defendant PDNYC LLC and Emursive Productions Employee Handbook |
| K | Plaintiff's Covid Policy Update Form Link and Notes Submitted to Defendants |
| L | Defendant Criswell's February 6, 2022 Apology Text Message to Plaintiff Egbufor |
| M | Covid Policy Update Form Responses Submitted to Defendants from Plaintiff |
| N | Defendant Hochwald's February 6, 2022 Email Response to Plaintiff's Complaint |
| O | Defendant Hochwald's February 7, 2022 Directive for Plaintiff to Cease Using WhatsApp, Slack and all Third Party Chat and Text Messaging Services |
| P | Examples of Defendant Boyd's WhatsApp Group Chats Created and Used for Work |
| Q | Plaintiff's Notification of Deleted WhatsApp/Slack Accounts to Defendant Hochwald |
| R | Defendant Hochwald's February 7, 2022 Request to Meet Plaintiff, February 9, 2022 |
| S | Plaintiff's Email with a New York City Employee Assistance Program Representative |
| T | Plaintiff's Request for Neutral Mediation with the New Peace Institute |
| U | Defendant Boyd's February 10, 2022 Email to Department Heads/Managers on Defendants' New Hiring Policy Change |
| V | Defendant Hochwald's February 10, 2022 Meeting Follow-up Email to Plaintiff |
| W | Defendant Boyd's February 10, 2022 Email to Defendant Criswell and Plaintiff Egbufor Regarding Abrupt Resignation of Only Black Male Dancer |
| X | Black Male Dancer's January 12, 2022 Thank You Text Message to Plaintiff Egbufor |
| Y | Plaintiff's February 10, 2022 On-the Job Injury and Work-related Medical Emergency Notification Email to Defendant Criswell |
| Z | Plaintiff Egbufor's February 10, 2022 CityMD Summary of Care and Bill of Service |
| A1 | Plaintiff Egbufor's February 10, 2022 Hospitalization Email to Defendant Criswell |
| A2 | Plaintiff's Mt. Sinai Hospital Medical Record, Hospital Bill for February 10-13, 2022 |
| A3 | Workers Compensation Law Judge Deems Prima Facie for Plaintiff's Claim |
| A4 | Independent Medical Examination Findings of Plaintiff's Causally Related Anxiety |
| A5 | Plaintiff's February 13, 2022 Sick Leave Request to Defendant Criswell |
| A6 | Plaintiff's February 10, 2022 Work Injury Report Form Submitted to Defendants |
| A7 | Defendant Hochwald's February 10, 2022 Email Demand for Plaintiff's Complaints |

| A8 | Plaintiff's Request and Approval for Remote Work During Complaint Investigation |
| A9 | Plaintiff's Text Message Received from Black Singer on Meeting with Defendant |
| A10 | Defendants' Attorney Harris' February 22, 2022 Meeting Request Email to Plaintiff |
| A11 | Plaintiff's March 9, 2022 Medical Referral from Neurologist for Physical Therapy |
| A12 | Plaintiff's March 9, 2022 Medical Referral from Neurologist, Occupational Therapy |
| A13 | Plaintiff's March 11, 2022 Email to Defendant Criswell with Therapy Notification and Request for Additional Remote Work Status to Complete Qualified Treatments |
| A14 | Attorney Harris' March 11, 2022 Close-out Investigation Meeting Request to Plaintiff |
| A15 | Plaintiff Egbufor's Close-out Investigation Concerns and Emails to Attorney Harris |
| A16 | Defendant Criswell's March 16, 2022 Email to Plaintiff Requesting a Medical Certification and Defendants' Leave Offerings for Plaintiff to Consider for Treatment |
| A17 | Plaintiff's Emailed Concerns to Defendant Criswell on Differential Requirements |
| A18 | Plaintiff's March 17, 2022 Email Request to Research Certification Requirements |
| A19 | Plaintiff's March 21, 2022 Second Notification and Submission of Therapy Referrals to Defendant Criswell |
| A20 | Defendants Deny Plaintiff's Request to Continue in Remote Work Status Temporarily to Undergo Qualified Treatments from Injury Caused by Defendants |
| A21 | Plaintiff's White Predecessor's LinkedIn Page Exhibiting She Worked Remotely While in Same Role as Plaintiff Without an Injury for Several Years |
| A22 | Plaintiff's March 25, 2022 Notification to Defendant Criswell on Her Workers Compensation Benefits and Eligibility for Additional Treatment |
| A23 | Defendant Criswell's March 29, 2022 Email to Plaintiff Requesting More Documents |
| A24 | Defendant Criswell Denies Plaintiff's Request for Extra Day to Obtain Documents |
| A25 | Plaintiff Egbufor's March 29, 2022 Leave Balance Request #1 to Defendant Criswell |
| A26 | Plaintiff Egbufor's March 29, 2022 Leave Balance Request #2 to Defendant Criswel |
| A27 | Plaintiff Egbufor's March 30, 2022 Leave Balance Request #3 to Defendant Criswel |
| A28 | Defendant Criswell's March 30, 2022 Response with Plaintiff's Leave Balance |
| A29 | Defendant Criswell's February 28, 2022 Email to All Staff with New Paid Time Off (PTO) Policy and Leave Increases Effective April 1, 2022 |
| A30 | Plaintiff's Updated Leave Balance in Defendants' Paycom System as of April 1, 2022 |
| A31 | Plaintiff's March 31, 2022 Patient Letter from Outpatient Clinic |
| A32 | Defendant Criswell's April 1, 2022 Email Disapproving Plaintiff's Patient Letter |
| A33 | Defendants' February 18, 2022 Workers Compensation Filing and Case Assembly for Plaintiff Egbufor's February 10, 2022 On-the-Job and Work-related Injury |
| A34 | Defendant Criswell's February 2, 2022 Email to Plaintiff with Her Workers Compensation Claim Number |
| A35 | Defendants' Insurance Carrier, NYSIF's February 23, 2022 Workers Compensation Liability Filing for Plaintiff's February 10, 2022 On-the-Job and Work-related Injury |
| A36 | Plaintiff's Call Log Screenshot Exhibiting Communication with NYSIF and Davis |
| A37 | Plaintiff's April 1, 2022 Emails Solidifying Her Workers Compensation Leave and Benefits with NYSIF Representative Thomas Davis |
| A38 | Plaintiff Egbufor's April 1, 2022 Email Reminding Criswell of Forthcoming Workers Compensation Leave to Commence on April 4, 2022 |
| A39 | Defendants' April 4, 2022 Day Sheet/Staff Work Schedule, Plaintiff Not Scheduled |
| A40 | Plaintiff Shockingly Receives April 6, 2022 "Good-bye" Text from SNM Performer |

| A41 | Plaintiff's May 10, 2022 Transcript of Phone Conversation with Davis Exhibiting Defendants' Maliciously Lied About Plaintiff's Termination to Disrupt Her Treatment |
|-----|---|
| A42 | Defendant Criswell's Email Cover Date for Termination Letter |
| A43 | Defendants' Insurance Carrier NYSIF's May 26, 2022 Workers Compensation Subsequent Injury Report Denying Liability of Plaintiff's February 10, 2022 Injury |
| A44 | Workers Compensation Board August 22, 2022 Penalty and Fine to Defendants for Untimely Notice of Controversy in May 26, 2022 Filing |

# <u>FOR EXHIBIT A AND EXHIBIT B</u>

## See Separate Files Attached to Complaint

## **EXHIBIT C**

**<u>\*\*\*NON-PARTIES AND EXHIBITS BELOW ARE REMOVED FOR PRIVACY\*\*\*</u>**

DATE:          February 17, 2022

TO:            Rick, Criswell, Director of HR, People and Culture at McKittrick Hotel

FROM:          D. Dumebi Egbufor, Company Manager of *Sleep No More*

Cc:            Jonathan Hochwald and Arthur Karpati, Producers of *Sleep No More*

RE:            Third Internal Complaint of Race and Age Discrimination

---

This written complaint serves as a subsequent proceeding to the electronic communications sent to you and meetings held with you on January 19 and 21, 2022 and February 6, 2022. Where on all of these occasions I expressed dire concerns and frustrations to you over the discriminatory treatment, marginalization, and illegal retaliation I continue to experience directly from my immediate supervisor, Carolyn Boyd, based upon the protected class of my Race and Age.

**OVERVIEW OF PARTIES INVOLVED**

1.      D. Dumebi Egbufor is an over 45 year old Black female and the first Black Company Manager in the history of the "Sleep No More" (SNM) production which is performed at the McKittrick Hotel. Egbufor's first day of work began on Monday, December 20, 2021.

2.      Carolyn Boyd is Egbufor's direct supervisor and the Director of Performance and Production, a newly created role for the return of SNM. Carolyn is assumed to be under 4o years old and younger than Egbufor. Boyd is a White female who has worked with this organization for over eight years.

3.    ███████ is a previous SNM Company Manager and White female who remains employed with the organization as Director of Special Events.

4.    ███████ is a previous SNM Company Manager and White female who remains employed with the organization as Director of Operations.

5.    Rick Criswell is a White male serving in the role of Director of Human Resources (HR), People and Culture, and he has worked with this organization for over 10 years.

6.    Jonathan Hochwald is a White male co-producer of "Sleep No More."

7.    Arthur Karpati is a White male co-producer of "Sleep No More."

## STATEMENT OF THE COMPLAINT

I believe I have been discriminated against in the terms, conditions, and privileges of employment based upon my Race and Age, and subjected to retaliation in the following ways:

**Hostile Work Environment**

**Relegation and Reduction of Work Duties**

**Stripped of Access**

**Denial of Privileges**

**Marginalization**

**Retribution and Retaliation for Suggestions**

**Microaggressions**

**Gaslighting**

**Manipulation**

**Stalled Communications**

1.    **Unable to Openly and Independently Communicate with Cast and Crew -** In comparison to other Department Managers within this organization (2 White females, 2 White males and 1 Black male), I am the only manager who has been directed to copy their supervisor on all communication sent to the team under their purview and leadership.  As an experienced company manager of five tours, over the years it became extremely important for me to intentionally establish rapport with the cast, crew and company at-large in advance of rehearsals and pre-production activities.  Building on prior knowledge and best practices, exactly like I have done with other tours, when I began working in my new role as company manager for SNM, I sent text messages to the SNM cast and crew over the weekend prior to their start date of January 3, 2022. The short greeting and text messages I sent provided a brief introduction of myself and contact information for the company to save in case they needed me for any reason. While sending text messages to the company that weekend, several questions were asked which I later sent to my supervisor Carolyn Boyd. Rather than addressing the questions, Boyd declined to respond and instead became irate over me texting the company. Next, Boyd proceeded to direct me to copy her on all communications to the company. I then replied informing Boyd the

communication was sent via text message and was not an email. Boyd replied again with the same response to copy her on all communications to the company. Perplexed by why I, as a manager with legitimate authority and responsibility to support the company per my job description, was being directed to copy my supervisor on every single communication sent to the cast and company, I replied again explaining the questions came from the text intro messages I sent, not an email. Boyd's final response was – "Oh" or "Aha." When I took this issue to the HR Director, Rick Criswell, I learned from him that my White predecessors Trigg and Lee were never directed to copy their supervisors on every single message they sent to the company. In fact, Criswell went on to inform me that I am not required to copy Boyd on every email I send. As such, Boyd's directive is discriminatory and punitive.

2.      **Sharing Ideas Leads to Reduction in Duties and Assignments** – During my first week on the job, Boyd shared with me that she was planning a Meet & Greet orientation for the entire staff to attend on January 3, 2022. When I inquired about what's needed to assist this effort, Boyd directed me to construct an online invitation for staff to RSVP their intentions. After completing the invitation, given my expertise as a former executive director of professional development, I shared suggestions with Boyd on the benefits to disaggregating the data responses and creating new worksheets to include additional data on the location of breakout sessions, presenters, in-person participants vs. Zoom participants, etc., just to have an internal "world view" of the day. In editing the Google sheet where data responses were being populated, I constructed extra tabs to store additional information and orientation details that would be useful in the planning process. Once I shared this idea and example of the new tabs I added to the worksheet with Boyd, my access to the invitation data responses was immediately shut down and disabled by Boyd without any verbal or written justification or notification. Because of this

abrupt action by Boyd, I was no longer able to view and access response data and RSVPs. After this task was stripped from me, being able to fully complete the task I was assigned became impossible. This serves as another example of how I am the only one within Boyd's department who when sharing any ideas ends up having assignments stripped and taken away.

3.      **Sharing Ideas Leads to Isolation and Reduction in Work Space -** The next day, as additional retribution and punishment, out of nowhere, I was told by Boyd I would be moving from my present workspace to a fourth floor office that is currently being occupied by the Director of Production, ███████████████████, Assistant Director of Production. My present workspace is in the Make Room office on the 6th floor of the building. The Make Room is also occupied by the entire Performance and Production team, which includes the complete Stage Management team, all of whom are employees under the supervision of Carolyn Boyd. My position as Company Manager falls under the Department of Performance and Production as well, along with the Head Stage Manager, ██████████████ role. None of these roles are under the Production team located on the fourth floor and led by ████████. Added to this, my former White female company managers and predecessors both held office spaces in the Make Room with the rest of the performance and stage management teams. Simply put, I am the only one on Boyd's team who was told that I would be leaving the team office for another office away from my department and my colleagues. In discussions with HR Director Criswell, he said the decision to do so does not make sense. That it would make more sense for me to move to the Morning Room where he is stationed since company management works closely with HR. By and large, there's no legitimate reason for Boyd to require just me to leave the rest of the team in the Make Room to move to the Production office or the Morning Room, except that I am being diminished, marginalized and discriminated against due to my race and age.

4.      **Sharing Ideas Leads to Relegation of Duties and Assignments** - On the day of the

McKittrick Hotel "Meet and Greet" orientation, January 3, 2022, rather than being permitted and

able to attend the all-staff orientation as every new and existing employee was requested and

invited to do, I was the only person from my team deployed by Boyd to physically move and set

up furniture into the short-term leased apartment for the rehearsal director, ███████. I,

along with ███████ Assistant Director of Production, who is used to and required to

strike sets and spaces as part of her job description, and ███████ contact doing her a favor, was

also there to assist. Once the move-in occurred, ███████ was able to exit the apartment to hurry

back to attend the orientation while I was required to stay and attend to a repair issue with the

shower installation. I ended up sitting and waiting close to an hour to resolve the matter with the

management office. It's worth noting, this secondary company location and worksite was

completely new to me. I was not provided sufficient contact information from Boyd in advance

which made navigating this assignment very difficult to complete in a timely manner. In all, I

missed Covid testing provided by the onsite medical organization (ended up using an at-home

test provided by Boyd at my desk), and I did not get to the McKittrick Hotel for orientation until

30 minutes before it ended. Sadly, I was the only staff member out of hundreds, who did not have

the opportunity to attend the orientation because I was relegated to another assignment.

Unfortunately this also meant that I was unable to meet and to be properly introduced to my new

colleagues, the new cast and crew, and the SNM producers. All because I was relegated to an

alternative task as punishment for sharing ideas about how to best organize the "Meet and Greet"

event.  Incidentally, the guilt trip didn't stop there. During a 1:1 meeting with Boyd a week later,

utilizing gaslighting and manipulation tactics, Boyd informed me that the producers were very

upset at her for directing me as a new employee to apartment move-in duties, as they believed

she could have identified someone from the existing staff to complete this assignment, and they also believed this is not a task for company management. Admittedly I felt very uncomfortable listening to her complaining about the producers being upset at something I did. What's worse, to this day, every time we have a 1:1 meeting, Boyd continues to rehash the issue of producers being upset with her over how she staffed the move-in. When I shared this with the HR Director, Criswell, he informed me that Boyd told him and the producers I volunteered to help with this assignment, which is not true as I had no idea what this assignment entailed. I also had no idea that a second site affiliated with this organization even existed. Simply put, Boyd intentionally directed me to administer this task and that's what I did. Moreover, this example demonstrates Boyd's use of gaslighting, manipulation and lies to cover up her discriminatory and retaliatory actions towards me.

5.      **Continued Relegation of Duties and Assignments** – Immediately following the Meet & Greet orientation, the cast and crew of SNM relocated to the ballroom for its first company meeting of the season. Having already missed the opportunity to meet my new colleagues during orientation, I was quite thrilled to meet the team of cast and crew I was hired to directly serve and support. The meeting went on for at least an hour. Not once did Boyd stop to introduce me. In fact, as Boyd talked to the company about facility updates and changes, she only acknowledged me as she pointed to me when telling the company I would be responsible for fixing up the Break room (a task, during my tour of the building, I was told was being performed by the production leaders, ██████████████). Since this was my first time hearing about this assignment, as everyone turned around to look at me I just stood there in a sheer state of disbelief and embarrassment. I was extremely deflated in my spirit from the pain of not being acknowledged on my first day, but also from the agony of being relegated in public to another

clean-up job, and an assignment never shared with me now being put on display in front of 40 people I was meeting for the first time. An example of diminishment and degradation by Boyd due to my race and age.

6.    **Lack of Acknowledgement During Company Meetings** – The first company meeting held on January 3, 2022 consisted of presentations from every department head, except me, even though I had prepared talking points to share with the company as well. As the meeting was about to end without me being asked to say one word or even being acknowledged like the other managers, one of the cast members asked Boyd if they could hear "from their new company manager, D." Without this request from a cast member, it became clear, Boyd never intended on introducing me to the group as another way to marginalize and diminish my existence. For instance, in the course of the next four consecutive company meetings, that first week of rehearsals I literally had to almost shout just before the meeting ended "I have an announcement!," to get the floor and to be recognized like a normal company manager, which is unheard of for any company manager to have to do in this industry. Every day I stood silently frustrated as Boyd would acknowledge the White female rehearsal director ████████ for a cool down activity, then she proceeded to the White female head stage manager, ████████ ████ for announcements. Next, Boyd gave the floor back to the rehearsal directors, White females, ████████████████████, and then Boyd closed the meeting, never looking my way. Such a painful process to watch and experience. Again this happened during four consecutive meetings until I decided the only way I would be recognized, not for showmanship but to share several items of importance was to literally jump in right as the meeting ended. By the third time of doing this, ████████████, not Boyd, began tossing the floor to me after her comments to ask if I have any announcements to make, which she continues to do to this date.

All in all, I have learned my White female predecessors and former company managers Lee and Trigg actually *conducted* company meetings and led in the presentations and planning of company meetings during their tenure. They were never overlooked or unrecognized during company meetings. Unfortunately, Boyd has chosen to display behaviors that will not acknowledge and recognize me in the same way as my predecessors due to my race and age.

7.    **Stalling on Communications/Requests with Harsher Responses** - Since the beginning of my employment here, I have observed Boyd responding to the electronic communications and verbal requests from my White co-workers in a faster and less harsh manner than she responds to mine. For instance, when requesting supplies to set up a filing system in the dressing room for cast to retrieve and submit vital information to company management and/or HR, I sought permission from Boyd to use one of the many empty file cabinets I saw at the secondary vacant worksite location in the basement of 20 Exchange Place. Since the bin my predecessors used was sitting idle for nearly two years, I was unsuccessful in cleaning the bin out and decided it was best to request new supplies. The file cabinet I requested to use from 20 Exchange Place could be locked to secure personal and private information, and would easily fit in the exact location where my White predecessors set up a former storage bin to maintain cast files in previous seasons. In Boyd's response to my borrowing an empty file cabinet from 20 Exchange, she rejected the idea of having a file cabinet saying setting up "something fancy" was unnecessary. We then discussed obtaining supplies through Amazon and I sent her a link to my Wish list. In the meantime, cast members were constantly asking where they should place Accident Injury reports and other important documents. Embarrassingly with no answer to share and unlike what my White predecessors were required to do, I had to walk around and "chase down" cast members to collect forms. After waiting for almost an entire month along with sending and

making several inquiries to Boyd on the status of my supplies (one included an offer to purchase

a bin with my own money), I walked in to work on February 8th to items thrown on my desk that

appeared after I made the third complaint of Boyd's discriminatory and retaliatory actions

towards me. Interestingly, the storage bin and Bankers Box I needed the most was not present so

I inquired again with Boyd. She claimed the box got mixed up with other items in the office for

me to grab it from her office. When I went to retrieve the plastic Bankers box, it was neatly

stored near a chair in her office, not mixed up with other items as she attested. An example of

how Boyd repeatedly sabotages my progress in servicing the company, given my race and age.

For another example, on January 7, 2022 in following up on an agenda item discussed at the

weekly Department Head meeting led by ▮▮▮▮▮▮▮, I sent an email to ▮▮▮▮, her assistant

▮▮▮▮ and I copied Boyd and ▮▮▮▮. In my email, I wrote to ask if a PPE station could be set

up in the Make Room. I recommended the PPE station be set up directly outside of the restroom

on a rundown table holding a mirror and other used items. Boyd replied all and immediately shut

down my request, which was a bit disconcerting to say the least. In her response, she requested I

use the PPE supplies stage management utilizes for the show and exclaimed that she did not want

any PPE on the same table as her coffee and tea station, which would not have been the case as

the table I suggested for PPE was on the opposite side of the tea/coffee station. When I replied, I

stated it was not my intention to use supplies for the show. I really just wanted us to have a bottle

of hand sanitizer for folks to use when working in the Make Room office that is a high touch

zone frequented by several people a day. Undoubtedly, participating in a public back and forth

display and conversation with Boyd over an important and simple request to aid in the mitigation

of disease and Covid infections was absolutely exasperating. Demonstrating again how ideas and

recommendations I make, versus those of my White colleagues, are always publicly shut down, dismissed and disregarded by Boyd given my race and age.   (See Attachment A)

8.    **Retribution for Sharing Ideas and Marginalization of Blacks -** While reviewing Rehearsal Reports emailed daily by Head Stage Manager ███ to over 60 people in the organization, I sent an email to Boyd, ███ and Criswell to inquire about the way injuries are reported to this large group of people. Mainly I was troubled by how the report reflected an incident where one of the cast members, who happens to be one of only two Black female dancers in the entire company of 30+, had just experienced an injury that led to a concussion. The incident was reported on the Rehearsal Report with the person's first and last name and stated the cast member was out of rehearsal due to a "head injury," specifics I did not recall seeing reported on other injured cast members. To the point, as an HR professional and former administrator combined with HIPAA laws, largely I was concerned that providing that level of detail on a person's health condition to the masses was a violation of privacy laws. Criswell and Boyd chimed in and we decided to meet to discuss the matter the next day. The meeting was nothing short of denial, rejection and dismissal. Boyd was quite unnerved by my concerns and recommendation to merely remove specifics about a cast member's injuries going forward. Rather than staying on topic, she brought up the fact that this Black female dancer has had over seven or so concussions which Boyd believed reflects that the cast member is not following concussion management protocols. Stunned by her remarks, I could not help but to correlate Boyd's random comment which was unwarranted, and her pushback of my ideas, with her continual demeaning of Blacks.  At this point, I was uncertain if Boyd was angry because she could no longer display to everyone in the organization how a Black dancer keeps getting head injuries or if she really has a valid point in her assertion that the artistic team, props, facilities,

crew, wardrobe, operations and the entire universe at the McKittrick Hotel really need to know the specific type of injury of every cast member. Essentially, I was trying to figure out is it necessary to state, "John Doe is out from a head injury," or can we accomplish the same safety communications by stating, "John Doe is out from an injury," proceeded by the details of the incident getting reviewed on the Accident Injury report by authorized staff only (not 60 people). That was my point. During the meeting, HR Director Criswell agreed with my position. At the end of the meeting I walked a few steps behind Boyd to our office. Hearing her slam her office door was definitely a sign she was not pleased with me expressing this concern. While Boyd did not follow-up with me on the recommendation, her pattern of retribution and retaliation emails came early the next work day as backup to let me know my ideas and suggestions are not wanted by her. In the email, she directed me to use time that week to take my Fire Guard assessment and First Aid class which are offered at locations in Brooklyn, NY. Again, just like being the only one on Boyd's team deployed to the location site at 20 Exchange for moving duties, being the only one on Boyd's team told I'm moving to the fourth floor, this too was an example of Boyd dismissing only me and canceling me from the space whenever I share any ideas and recommendations because of my race and age. In my response to her directive, I explained to Boyd that I am not prepared to take the exam at this last minute. Boyd wrote back that it's important for me to take the exam before the start of performances. I proceeded to explain in my response that I am fully aware of the urgency, and I also reminded her that I sent an email two days prior to my first day of work and roughly a month ago from the time of her email, about scheduling the test and class, but she did not respond until now (thoughts to myself - a day after the meeting was held on how I suggested to report injuries). In the end, I went the following week to take the exam. After passing the exam, I sent Boyd an email to inquire about which

department I should select when uploading my credentials to the portal as Performance and

Production was not listed. Boyd to this day has yet to respond to my email. This shows the

matter was not as urgent, just discriminatory and punitive due to my expressed concerns. (See

Attachment B)

9.      **Denial of Management Privileges** - On January 27, 2022, ████████████, Assistant

Director of Production emailed me to inquire about restocking First Aid kits and identifying

company management supplies vs. production supplies. As the process was explained to me,

████████ indicated she was developing a request form using the AirTable software for employees

to use. Data responses/bases with supplies company management is responsible for restocking

would be sent to me to order. I then asked if this meant I would be provided a credit card to order

supplies, which is the process and access every other Department Manager uses and has been

provided. Boyd interjected shutting down the entire idea of me having access to a credit card. In

her response, she directed me to send the supply links to her to order for me. Unlike my White

predecessors and other Department Managers, I am the only manager being denied privileges to

use the company credit card.  Taking into consideration the amount of time Boyd took to order

five items for me to place in the dressing room, the process she is mandating for me to reroute

requests to her is unfair, discriminatory, and inefficient. Boyd's actions are solely based on my

race and age.   (See Attachment C)

10. **Stripped of Efficient Communication Method and Access to Company via WhatsApp  -**
Similar to explanations provided in Item #1, as a company manager creating easier and more

efficient ways for the cast and crew to communicate with me has always been a top priority. For

the last three tours I have managed, utilizing WhatsApp has proven to be highly effective and

efficient given that WhatsApp is an encrypted application which is compatible with both Apple

and Android phones. Right at the onset of my work with SNM, I sought and received permission from Boyd to establish company group chats via WhatsApp. Beginning January 5, 2022, I created three WhatsApp group chats: 1) SNM All-Company, 2) SNM Company Manager/Stage Managers and 3) SNM Department of Performance and Production. For the last month and a half, Boyd has not expressed any concerns about my use of WhatsApp to communicate with the company. In fact, both Boyd and ███ were added to each of these group chats and they have been actively engaged participants in all of the group chats, answering questions and sending text messages and announcements to company members as well. In addition, Boyd and ███ would always send me requests to add employees to the WhatsApp group chats when new hires joined the organization. After posting a link to a Google feedback form I created for the company to use to share their suggestions on potential new "hot spots" post the no-audience Covid testing policy taking effect, I was the only one from the department directed by the producers to no longer use WhatsApp to communicate with the company and told that I am to only communicate using the company email server. As the one who established the group chats, making my exit announcement to the group chats was extremely disgraceful and mortifying. To date, I continue to be the only person within this company who has been prohibited from using this application, although similar third-party applications such as the McKittrick Hotel Slack account continues to be in use by department managers and the WhatsApp group chats I created continue to be in use by the entire company, Boyd and ███ included. This is of course another example of the retaliatory treatment I have been receiving from Boyd for making suggestions and recommendations. Taking a deeper dive into the reasoning for the abrupt WhatsApp directive I received from the producers, further illuminates the discriminatory actions,

microagressions and gaslighting that continues to be perpetrated towards me by Boyd due to my race and age. (See Attachment D)

11. **Stripped of Efficient Company Engagement System and Access to Company via Google Forms -** The turning point leading me to elevate all of my concerns pertaining to the discriminatory and retaliatory treatment I've received from Boyd since the inception of my employment at the McKittrick Hotel, is stemming from a Google form I created to engage the company on their suggestions for potential new "hot spots" and other show adjustments that might need to be implemented after the no-audience Covid testing policy took effect. Prior to creating the survey form I shared this idea with producer Jonathan Hochwald, the cast, crew, Boyd, Criswell and department heads in attendance at the Covid update meeting held in person and via Zoom on February 4, 2022. Unsurprisingly, the sudden shift to a no-audience testing policy was generating lots of frustration, angst, questions, concerns and fears from the cast and crew. This is why as the liaison between the company and management, I decided the best way to capture complaints and concerns over new hot spots and audience placement would be to create a survey where cast and crew could submit recommendations, ideas and issues that would be shared with the artistic team for possible implementation and show modifications. Favorable commentary was received including from Producer Hochwald who stated my idea "made a lot of sense." For the next couple of days, I spent time constructing a survey to gain input from the company and to assess their satisfaction/dissatisfaction over the policy change. When I completed the draft, I sent the form to HR Director Criswell and Producer Hochwald for review. Simultaneously, while waiting for approval on the first draft of the form, I continued to receive multiple concerns and complaints from the company on this matter, so much so that I decided it would be best to develop another communication method for their thoughts to be recorded as

given to me instead of trying to recall every single conversation. This led me to revise the initial survey and to rebrand it as a Company Management Feedback Form. In doing so, I intentionally dropped the word "survey" from the title, and restructured and deleted questions with an organizational lens around satisfaction/dissatisfaction of the policy since I had not received approval from management on the use of organizational-type questions. I revised identity questions to a question seeking the role only (Cast or Crew) with a name option provided at the bottom of the form. The rest of the questions asked about show locations in the building that may need an extra review for safety, and lines were provided for company recommendations, suggestions and ideas. These were all similar topics to questions I was receiving in person and via email/text from the company. Creating an electronic version of those conversations, moreover, was a more efficient and effective way to accurately record what I was already hearing. On February 6, 2022, I posted a link to the feedback form in the SNM All-Company WhatsApp group chat. An hour later, I received an alarming and extremely confusing text message from Boyd inquiring as to whether or not I sent a survey to the group. I was absolutely conflicted by what I was reading as I know Boyd regularly reads WhatsApp messages which means she definitely saw the message I had already sent to the company. Boyd's motive for sending this text was highly suspicious. She was present when I mentioned to the company at least twice to look out for an opportunity to share their concerns and ideas on this matter. Not once did Boyd say to me that I was not permitted to seek input from the company this way. By this point, I had also created and utilized close to 10 Google forms to obtain personal information and input from the company so I was really bewildered by the dilemma before me. Then I received a course correction email from HR Director Criswell stating that I should obtain permission from him prior to sending out any surveys.   The dots were immediately connected.

At once I knew it was time to again voice my concerns about the unfair, discriminatory treatment and microaggressions I have been receiving from Boyd. Following the response and complaint I sent to Criswell, the producers and copied to Boyd, Criswell texted me stating he was very confused and sorry, that he was told something completely different from Boyd. Essentially, Boyd pretended to not be aware of the form and misconstrued its use to the producers and Criswell. Seeing this, it became absolutely clear to me that Boyd with her retaliatory and gaslighting schemes was at it again, which provoked me to call this out in my email complaint to the producers and HR on why this course of events coupled with the above items described here all exemplify Boyd's deliberate actions and the extent she is willing to go to ostracize and punish me due to my race and age.  (See Attachment E/Attached Text Message)

12. **Management Callous and Retaliatory Actions Lead to Anxiety Attack -**  To provide additional information to support the existing complaint, it's critical to illustrate and recount my concerns and frustration over the pessimistic and distrustful encounters I have had with management and producers of this organization that led to me having a mental breakdown. Firstly, is the inaction of HR Director Criswell. After describing my complaints (above Items 1-8) to Criswell during a meeting I requested with him that occurred on January 21, 2022, the only response I have received from him is that "we will get through this" and to "keep documenting, D." To date, no follow-up and no substantive changes have been made known to me.  Secondly, although I did not have the chance to meet the producers during the employee orientation event on January 3, 2022, I ran into Producer Arthur Karpati in the elevator on January 31, 2022. We were both headed to the 6th floor so we chatted a bit in the hallway once we reached the 6th floor. Because I have a foriegn name, Karpati asked where I was from. I told him that I am from Nigeria. Karpati then asserted his privilege to shame my country by telling

me that "out of all the African countries, he does not like Nigeria; there is too much corruption in

Nigeria." He went on further to explain how his friend, a Dutchman, was taken advantage of

while doing business in Nigeria. In trying to keep a straight face after hearing my country being

demeaned and stereotyped by the leader of the organization I work for, I replied by saying "Yes,

I understand, but there.." When Karpati interrupted me by saying, "Yes, I know, corruption is

everywhere." As we ended the chat and walked in opposite directions, I was utterly

dumbfounded by what appeared to be another example of race discrimination and prejudice

within the organization, this time coming from the very top.  Thirdly, in response to my

complaint email, Producer Hochwald called a group meeting on February 9, 2022 at the 20

Exchange worksite and office. Meeting attendees included Boyd, Criswell, Karpati, Hochwald

and myself. Prior to the meeting, I sent an email to Hochwald inquiring about the meeting

agenda. Hochwald responded for me to refer to the email message he sent on February 7, 2022.

In referring to his message, two things were understood by me: 1) Hochwald wanted to address

communications general to the organization, my role and Covid safety, and 2) my claims of

discrimination were being pushed further down the road and could only be handled using the

procedures in the Employee Handbook. I reviewed the handbook and decided to proceed as

indicated and directed by Hochwald. To my surprise and dismay, although my complaint was

deferred to another process in Hochwald's email, it was the first matter to come up at the meeting

in front of the entire group, which left me feeling highly distressed, unsafe and betrayed.

Instantly I knew I was no longer among people I could trust; this was now a precarious

environment that lacked the empathy, ethics and expertise to proactively address my concerns,

which is why I recommended in a previous email that we identify a neutral party to mediate this

matter. As Hochwald and Karpati kept scolding me with sarcasm and demanding that I speak on

my complaint, I kept explaining that I was unprepared to do so as I was not aware the meeting

would be focused on my concerns. They then asked Boyd and Criswell to leave the room. The

ambush, bullying tactic and interrogation continued at the pace of balls flying across a ping pong

table as I was berated from one producer to the next. Both producers began to question my work

performance  - "You think you're doing a great job"; "So what are you going to do just do

nothing, only follow directives." Discourse around me not being collaborative took off from

here, where Hochwald proclaimed, "It seems like you want to work autonomously without

supervision." I then highlighted my three buckets as a leader just as it states at the top of my

resume - Collaborative, Strategic and Ethical. They went on to misconstrue my statements when

I told them I came to the meeting to listen and learn as a new employee to this role. They also

attempted to minimize and diminish my claims - "So you just said you're not going to talk," "It

was just a simple request from Rick and you elevated it to this level." Basically, I was being

belittled and retaliated against for making my complaint known. After several minutes of being

interrogated and forced to talk, I requested that we proceed with the other items within

Hochwald's email on protocols for communications. They rejected my suggestion and continued

with their harassment, stating, "They can't move forward without hearing more about my

complaint."  I reminded them that these issues were not born yesterday, that they are very

personal and highly sensitive to me, and that I had already shared these concerns with HR

Director Criswell on two occasions. I also stated I believe sharing my concerns without

documentation would not be the best use of time for anyone. Essentially, I begged for them to

give me the time I needed to prepare the documentation that supports my complaint. I was

excused from the meeting. Walking to the subway in tears, mortified and anxious, it became

clear to me, Hochwald and Karpati's main goal for this meeting was never about company

communications but instead to manipulate me into discussing my complaint without preparation - very similar to Boyd's tactics and pattern of behavior. The next day, while using the morning to organize my complaint with the appropriate documentation, just before heading to work, I received an email from Hochwald requesting to meet the following Wednesday, to be prepared to discuss my complaint and to respond with agreement to meet by the next day at 10 am. Hochwald's email also stated they are not interested in identifying a mediator but will hire an investigator instead. The tone of Hochwald's email and recalling the ambush and threatening environment the producers subjected me to the day before caused my anxiety level to skyrocket. I decided to walk to work for fresh air. As I did, I received an email from Boyd that the only SNM Black dancer had resigned effective immediately.  My heart stopped. I began to cry and rush to call him. While listening to him talk about his reason for leaving the company it was as if I was listening to myself. The first statement he made was "they keep taking things from me and reducing my role" - exactly my experience. I also recalled how just two weeks ago, I had to run to his aid in an emergency incident where he vomited during a loop rehearsal. After removing him from the set to a private room, he cried out for help with how to navigate spaces that do not have room for his skin color. Every issue of discrimination he shared with me that day was now so bad that he could no longer take it. I felt the same way but decided I would keep trying to power through the best way I could. I cried all the way to work thinking about the racist bigotry seeping in my new work space and how exhausting workspaces like this are for Blacks. I made it to work, when my world was completely turned upside down during the company meeting. After finishing up a phone call with Criswell to check on a crew matter over banning a guest from the show for inappropriate behavior in the past, I walked in as one of the only two Black female dancers was expressing her outrage over the resignation of the Black male dancer. As a Black

woman facing first-hand what it means to be marginalized in the workplace, I began to feel sick and out of breath. Following her comments, the only Black female rehearsal director began to share the same miserable sentiments with tears in her eyes. At this point, I began to experience a racing heart, dizziness and anxiety building. I ran out of the ballroom soaking in tears. The only Black female crew member ran after me. I was panting and crying uncontrollably while waiting at the elevator with a pounding headache all while knowing from my past episodes, I was experiencing the onset of an anxiety attack. This was confirmed by physicians who examined me at CityMD and then referred me to Mt. Sinai Hospital for a mandatory 72 hour emergency watch in fear that I would harm myself. Conclusively, the flagrant discrimination and retaliation executed by Boyd and plausibly aided, abetted and condoned by Producers Hochwald and Karpati are the direct cause of my recent anxiety attack that occurred at the McKittrick Hotel on February 10, 2022, and the irreparable harm, pain and anguish that continues to destablize and negatively impact my mental health.   (See Attachment F and G)


//

In summary, to protect the sanctity of my mental, emotional and physical health, I wish to work remotely until after a thorough investigation of this complaint has occurred.

# EXHIBIT D

**<u>***NON-PARTIES AND EXHIBITS BELOW ARE REMOVED FOR PRIVACY***</u>**

DATE: February 25, 2022

TO: Lisa Harris and Lindsay Stone, Investigators, Sheppard Mullin Firm

FROM: D. Dumebi Egbufor, Company Manager of *Sleep No More*

RE: Internal Complaint of Race and Age Discrimination - Additional Information

---

Please find the below requested emails, additional information and attachments submitted to further evidence my complaint of illegal discriminatory treatment, marginalization, and retaliation I continue to experience directly from my immediate supervisor, Carolyn Boyd, based upon the protected class of my Race and Age.

1. **Investigators Request: Airtable Invitation for Obtaining Company Directory -** During my in-person interview and on my first day of work, I shared with HR Director Rick Criswell, Carrie Boyd and ████████, Head Stage Manager, my desire to communicate with the Sleep No More (SNM) cast and crew prior to their first day of work for the purpose of introducing myself and providing my contact information. In an effort to complete this mission, I requested company contact information from Boyd and ████. Boyd referred me to ████. Attachment H reflects the Airtable invitational email I received from ████ on my first day of work (December 20, 2021) which provided me access to the Cast directory (e.g. full names, roles, email addresses, pronouns, dietary restrictions, and phone numbers). In addition to receiving an invitation to view the Cast directory, Attachment H also displays the second invitation I received from ████ to access the cast Time Off Requests base (table) which was still under development at such time.

**2. Follow-up Email Regarding Cast Contact Information and CM Intro Text Messages -**
As shared within my written complaint, while sending introductory text messages to the cast and stage managers, multiple questions and company updates arose and were brought to light that weekend, which I then shared (verbally, by text and/or email) with Boyd and ███ for assistance. For instance, Attachment I reflects an email I sent to ███ on the company's first day of work (January 3, 2022) informing her of a phone number change I received by text from two cast members. In short, during my interview and on my first day of work when requesting to communicate and contact the company by text and WhatsApp, at no such time did Boyd, ███ or Criswell oppose my request. This is why Boyd's refusal to answer questions I posed on behalf of the company morphing into receiving an immediate directive from her for me to copy her on all company communications with the cast and crew, combined with the directive she pushed for, to have me cease using WhatsApp for company communications, while others still can, was utterly surprising and depressing. Most important, these directives are discriminatory based on my Race and Age, given that no other direct reports, department managers or former company managers have received this type of directive. HR Director Criswell confirmed this fact during my in-person complaint meeting with him on January 21, 2022.

3. **Company Management Job Description Received with Letter of Employment** - To follow-up on the job description only in the possession of the investigators during the Zoom meeting on February 24, 2022, and of which a few parts were read to me aloud, Attachment J is provided to display the job description I received along with my Letter of Employment from HR Director Rick Criswell on December 16, 2021. At issue are the discrepancies in statements from the job description obtained and referred to by Investigator Lisa Harris which do not line up and read exactly like the attached job description I received. For example, Harris read aloud that the Company Manager shall

"report to the Director of Performance and Production." Case in point, there is no such statement reflected in the job description I received from HR Director Rick Criswell. Highlighted at the top of Attachment J it states the Company Manager "will work under the guidance of the *Producing Director* to ensure all those involved in the production receive the essential support required." Although I assumed Boyd was my supervisor when coming on board, coming from a person who has authored and edited over 100 job descriptions for various organizations world-wide, it's worth emphasizing, working under the "supervision" - versus - working under the "guidance" of an individual (as stated in my job description) can be viewed as different leadership structures with the latter being a less structured and less hands-on leadership model. Secondly, while reading aloud the job description yesterday, Investigator Harris chose to recite and highlight that "the company manager supports administrative activities" which I believe is taken out of context. Attachment J reflects this statement: "The Company Manager will *support* all

administrative activities for the production.." - not *execute* all administrative activities which is more so the role of an administrative assistant. By and large, Boyd and plausibly the producers' decision to relegate my role to a "glorious" administrative assistant and support position rather than the leadership and manager position I applied for, is one example of how they have all chosen to demean my existence and to dilute my authority because of my Race and Age.

4. **Company Manager's Role in Company Meetings** - Yesterday's inquiries from Investigator Lisa Harris greatly encompassed clarifications that are needed for the investigators to understand the way SNM company meetings are structured - versus - the industry-at-large. Plus, there was a need to understand the key actors and responsible parties of such meetings. At the onset of my employment with SNM, gleaning verbatim from the job description as demonstrated in Attachment J, I perceived I was required to attend "daily team meetings with cast, crew and onsite management" coupled with being required to "coordinate with the team" - not passively participate for attendance only. I

signed up to do exactly what's in my job description, a structure that is directly aligned to my experiences and understanding of how company meetings are supposed to work. Boyd's actions however, which included ignoring my existence entirely and not acknowledging me to address the company with updates for several days, coupled with not permitting me to speak like the other managers did during the first company meeting was blatantly and obviously discriminatory due to my Race and Age.

5. **The Company Manager** *is* **a Department Manager** - On several occasions yesterday, in checking for understanding, Investigator Harris questioned whether my role is in fact identical to the role of a Department Manager. To authenticate that the company manager is also a department manager, a statement from my job description in Attachment J is provided: "Attend weekly production meetings for *Sleep No More* with the other department heads." In addition, the attached notes as Attachment K from previous Department Head meetings have been provided to further illustrate my role as a legitimate position within the managerial team. To this end, by comparison, Boyd's actions towards me are starkly different (reduction and removal of access, privileges, assignments, space, authority, misinformation and stalled communication) than that of the other department managers, which exemplifies discrimination and retaliation based on my Race and Age.

6. **Another Recent Example: Retaliation, Deduction of Duties and Denied Access -** After having an anxiety attack at work brought on by the hostile microaggressions and toxic working conditions I continue to experience under the supervision of Boyd (which also led to my hospitalization for three days), following the doctor's orders, I requested an additional three days of sick leave for recovery. My request was granted and my return date and approval to begin working remotely began on Thursday, February 17, 2022. Completing weekly payroll by the end of the day on every Monday has been an essential function of my role as company manager since I began entering payroll during the week of January 10, 2022. In my job description and Attachment J, executing payroll duties

associated with company pay and compensation are reflected several times. McKittrick Hotel/PDNYC utilizes the Paycom system for managing payroll data. Building from my previous experiences completing payroll for other companies, in addition to inputting

payroll into an organization's system of choice, I also maintain an Excel or Google sheet as a notes page and working document for managing leave, reimbursement, employee status changes and compensation updates. This way, I can refer to one master document when verifying and ensuring that accurate information is being entered into the system. When I initially created the payroll spreadsheet primarily using a previous pay sheet Boyd used for the New Year's Eve event, I shared it with HR Director Criswell and Boyd. In addition to tracking pay per rehearsal/performance rates, leave taken and reimbursements for the cast, rehearsal directors, and stage management can be found for each pay period on the sheet. To further explain the process and workflow, basically, Boyd would send me and Criswell notes to keep in mind for each pay period, e.g. guest artist coming on board, prorated employees, 1099 employees, replacements, and long term approved leave. I would reach out to ███████ to confirm time and attendance that she tracks from call-outs and injuries on the Rehearsal Reports. Once those emails are in to me, I organize the data on the spreadsheet and enter data into Paycom. Criswell and Boyd receive a link from me to the updated payroll spreadsheet, and I alert them that payroll is complete in Paycom for the respective pay period. This system has worked each week from the start of my involvement nearly two months ago. The only week I was unable to complete payroll was during the pay period of February 7th since I was in the hospital. The following week after my discharge, week of February 14th, as expected, Boyd began to send me payroll notes for the present pay period. I was in contact with the PT specialist as well to confirm injuries and I had access to ███████ Rehearsal Reports from the week with time and attendance information. This is why I was absolutely dismayed and caught off guard when I went into the payroll spreadsheet and Paycom on this past Monday only

to find that ███ and her Deputy Stage Manager, ███████ had already started a new spreadsheet for the pay period and they had already begun to enter notes, pay rates and leave for the company. The sheet history helped to identify it was █████████ who began entering new information on the same day as my work return date of February 17, 2022. What was also most disturbing about this, like the other instances of having tasks abruptly stripped away by Boyd, is that: 1) Boyd did not even have the courtesy and respect to at least alert me that my payroll duties were being reassigned so I would not have wasted time gathering information and looking for emails to add to the new spreadsheet, and that 2) stage managers, especially the deputy stage manager, who should not be privy to the compensation information of others, were given access to privileged, personnel information, which appropriately so, should only be and had only been, accessible for review by Criswell, Boyd and me. Attachment L reflects the email I sent to Criswell, Boyd and copied to ███ at 11:35 am on February 21, 2022, to gain an understanding of whether or not I was still expected to complete payroll for the week ending February 20th. In Boyd's late response and stalled communication which basically came at the end of the day, 4:52 pm and 8:42 pm on the eve of my deadline to submit payroll (which I ended up submitting at 11:44 pm that evening due to Boyd's stalled response), she asserts ███ got started on payroll because there were a lot of time and attendance issues. Neither is believed by me since there are always lots of time and attendance company issues practically every week given the rate of company injuries. Attachment M shows a series of emails including one received today, with examples of how Boyd only emailed me and Criswell with payroll notes, not ███. Added to that, Boyd did not address the fact that a deputy stage manager along with ███ began entering payroll on the spreadsheet on my first day back to work, February 17, 2022, and four days before my email was sent to her on February 21, 2022. At the same time it's also useful to review Attachment N, which exhibits an email I received from Boyd on February 19, 2022. In this email, Boyd inquired as to whether or not I was ready to "take

back" scheduling PT sessions for the company which I have been doing as part of my essential functions and role per my job description in Attachment J, since the week of January 10, 2022. Within this email conversation you will also find my communication with PT Specialist, ██████████. ████████ was actually the person who informed me that Boyd developed the schedule and that Boyd provided company access to the schedule she made in Google while I was on leave and in the hospital. When I tried to use the link I requested from ████████, to view Boyd's schedule as a point of reference, I was denied access, which was very disappointing considering that although I was on leave and had developed the times Boyd possibly used to update the schedule in the first place, I was again being denied access and unable to follow-through on my work duties. Yet, as one can find in the same email conversation Boyd was giving me a "heads-up" that company members had some issues with the schedule and she asked them to "speak to me about it."My response to Boyd and everyone on the email was that I did not have access to view the schedule. As such, a few significant points are worth underscoring here: 1) Boyd checked in to see if I was ready to take back a scheduling task which is a lower level administrative task, but she did not check in to see if I was ready to take back payroll, which is a higher level management task, 2) Boyd referred company members to see me with issues over the schedule she posted that week, not me, and a schedule she did not even have the courtesy and respect to at least share with me so I could see if she used the same times and format I constructed initially, which would have helped to prepare me in knowing how to best address company issues she believed would be forthcoming, and 3) instead of giving me the same "heads-up" on company issues over the PT schedule, she never communicated that she was assigning my payroll function to another employee. These actions were not necessary, only retaliatory given this current investigation. To the point, throughout my experience and these documented occurrences of discrimination and retaliation commmitted by Boyd, Boyd has proven to specialize in muddying waters, stalling communications, speaking untruths and half-truths , and gaslighting at every

chance she can, as a cover up for the truth. All in all, Boyd reassigning others to do last

week's payroll demonstrates she was once again attempting to strip me from a core duty

and role because of my Race and Age, and as a retaliatory act for this existing complaint.

**7. Additional Support for Written Complaint Item #2: Retaliation and Revoked Access**

**-** In my written complaint submitted February 17, 2022, Item #2 describes the retaliatory

actions of Boyd, specifically how my access to the "Meet & Greet" invitation data was

revoked after I made a suggestion to disaggregate the entry data. Attachment O reflects

the notification email I received when Boyd provided me access to the data along with

my email to Boyd with suggested ideas for the sheet. When I went in to view the data

responses later on the day of this email conversation, I discovered my access was

disabled by Boyd. Unfortunately, similarly to every single time I have made and continue

to make any suggestion or recommendation to Boyd, here lies another example of how

she responds: degrade my suggestions using condescending remarks, cut me off and out

of a task and space, revoke my access and privileges, relegate me to less than tasks,

discriminate against me, and marginalize my existence because of my Race and Age.

8. **Another Recent Example: Exclusion from Department Head Meeting** - Department

Head meetings are held every Wednesday afternoon. For the most part, I have been present

at every meeting except when I was relegated to 20 Exchange Place apartment move-out

duty where I also twisted my ankle on February 2, 2022, and during my most recent hospital

admission. While attending these meetings, on several occasions when managers are out sick

or for an injury, they are provided a Zoom link to attend virtually. I was not provided a link to

participate by Zoom during this week's meeting, even though I reminded Boyd and the production

team I am working remotely until further notice. What's more unnerving is that on this Wednesday,

I discovered from the notes emailed in Attachment P and reviewed by me yesterday evening, a

discussion was held with department heads on a new process underway for Paycom and reporting

payroll, which Boyd knows has been one of my essential functions as company manager. In

summation, seeing that Boyd attempted to strip me from my payroll duties for last week's pay

period. (See Item 6), I am unfortunately stuck with the belief that my participation in this week's Department Head meeting was intentionally eliminated by Boyd as retaliation for my submission of this written complaint of Race and Age discrimination.

# EXHIBIT E

**<u>***NON-PARTIES AND EXHIBITS BELOW ARE REMOVED FOR PRIVACY***</u>**

DATE: March 4, 2022

TO: Lisa Harris and Lindsay Stone, Investigators, Sheppard Mullin Firm

FROM: D. Dumebi Egbufor, Company Manager of *Sleep No More*

RE: Internal Complaint of Race and Age Discrimination - Follow-up Information

---

Please find the below follow-up information and attachments submitted to further evidence my complaint of illegal discriminatory treatment, marginalization, and retaliation I continue to experience directly from my immediate supervisor, Carolyn Boyd, based upon the protected class of my Race and Age.

1. **2/28 Time Away Request -** As a point of information.  After what ended as a highly emotional and extremely distressing second investigation session for me on February 28, 2022, from 1 pm - 3 pm, to prevent another mental breakdown and in following my doctor's orders, it became tremendously paramount for me to request time away from work email and remote work immediately after the session. Attachment Q reflects a copy of my request.

2. **Recommendations for Persons to Interview -** In response to Lisa Harris' request for persons to interview on this matter, while I do not have any specific persons to  recommend at this time, as stated in response to this request on February 28th, I seriously hope Black performers/employees along with other performers/employees of color who have worked with Carrie Boyd in previous seasons, will be interviewed and given time to express and/or be questioned on similar claims as an integral part of this investigation.

**3. Company Responses from Covid Safety Feedback Form** - Attachment R provides copies of the exact responses (raw data) I received from company members who completed the Covid Safety Feedback Form and shared comments with me after the producers and HR Director, Rick Criswell announced audience Covid testing would no longer be required. As I explained during both investigation sessions, the feedback form was developed as a personal leadership initiative to ensure I would be able to accurately record and manage the numerous complaints, issues, concerns, and recommendations brewing from company members who were frustrated and upset by the abrupt change in Covid testing policy. Once this policy change was announced at the staff meeting, during and after the meeting there were lots of commentary and questions. This is why I decided it was critically important to be proactive in designing a rapid response and pathway for employees to voice their concerns and ideas on this issue as the next actionable and viable step. I shared the idea of developing a "survey" for this purpose with all participants at the meeting and in front of those on Zoom, including Producer Jonathan Hochwald who provided positive reinforcement when he stated creating a survey "makes sense." Unlike what Hochwald asserts in his directive to me (dated February 7, 2022, Attachment S ) that the "survey" was "misleading because it implies that senior management and/HR was consulted in preparing and circulating it," I sent the initial document and survey for review with a list of recommended persons to work on each item. Senior management was listed as responsible parties for the survey (see Attachment T) because that survey would have been considered a document sent on behalf of the employer and I definitely knew senior management approval would be necessary. On the other hand, given that I was still waiting for approval on the initial survey, the Company Management feedback form I circulated intentionally omitted questions specific to the employer, and intentionally only requested the role, new "hot spots" and general recommendations employees wanted to offer as solutions. No additional information or "personal information" (like Hochwald described in his reprimand email dated February  7, 2022) was requested. Most importantly, the fields on the feedback form I developed are no different than that of other surveys and Google forms created and disseminated by other department managers, who I am certain also did not seek or receive senior management approval prior to dissemination of the survey. Making Hochwald's directive

and reprimand spearheaded by Boyd, discriminatory and inequitable to me as the only Black female

manager, over the age of 45.

4. **Examples of Surveys and Forms Distributed by Other Department Managers -** Attachment U

displays examples of surveys and Google forms I have received or have had access to

Staff/Management Portal (https://emursive.wixsite.com/mckstaff), during my employment. These

surveys were created and disseminated by other department managers. For instance, the Stage

Management Party Notes form highlighted under Attachment U is no different than the Covid Safety

Feedback form I created for the cast and crew to essentially provide an opportunity for their "notes"

and feedback to be shared on potential new hot spots and recommendations for charting the course

forward post the no-audience testing policy. In addition, during the presentation of some of these

surveys, I have witnessed senior managers such as Boyd and Criswell asking questions about surveys

*after* they were circulated which gives the impression they were seeing the surveys for the first time.

Unlike me however, these managers were not reprimanded for the surveys they circulated or asked to

discontinue the use of their surveys and forms, which is discriminatory and inequitable to me as the

only Black female manager, over the age of 45.

5, **Reassignment of Payroll Duties -** To follow-up on Item #6 from the Additional Information

document I sent on February 25, 2022. Even though I was officially back to work and had returned

from sick leave, at no such time did Boyd notify me that she would be reassigning my payroll duties or

any parts of my payroll duties to another manager, such as the Head Stage Manager, █████████

█████ and Deputy Head Stage Manager, ███████████. Surprisingly on February 21st, I discovered that

on my first day back to work which was February 17th, █████ and █████ had been provided access to

the payroll document and had already started entering several pieces of information on the payroll

notes sheet I created to manage payroll updates, reimbursement and leave taken each pay period. Such

was the case yet again on February 27th, where without any update from Boyd, I was met with

confusing notes and the wrong leave codes entered on the payroll sheet. That evening, I sent

Attachment V, an email to █████ and █████, copying Criswell and Boyd on my request for their

payroll notes to be sent to me as an email instead. In all, Boyd's decision to reassign my payroll duties

to other managers after my complaint of being discriminated against by her due to my race and age is blatant retaliation.

**6. Change in Employer Hiring Policy -** Attachment W shows the new hiring policy that was sent by Boyd to all managers on February 10, 2022, which happens to be immediately following the next day of the meeting I held with producers Hochwald and Karpati on February 9th, along with Boyd and Criswell, at 20 Exchange Place. Essentially, all new hires will now have to be approved and signed off by the producers, which was not the case before I came. Seeing the implementation of a new hiring policy in this light was personally embarrassing and disheartening. The reason being is that during my meeting with the producers, at several times, my work performance was put into question. There was this huge cloud of uncertainty being hung over my head by the producers raising doubt about my employment and capacity to effectively serve as the Company Manager. Couple this with the overall horrendous experience I had that day and the fact that there was now a sudden need to change the hiring policy less than 24 hours from my meeting with the producers, emphatically and remarkably suggest the belief from the top of this organization is that I was not the best candidate for the Company Manager position and should never have been hired in the first place. No employee should ever feel this way. Furthermore, changing an organizational policy solely for the above specified reasons is discriminatory, prejudice and retaliatory.

# EXHIBIT  F



*165 Montgomery Street Bloomfield NJ 07003 phone: (212) 281-1596 edgar.chisholm@gmail.com*

To Whom It May Concern,

Ms. Egbufor has worked for BulletProof Productions on multiple projects. Notably, two major NYC Off-Broadway Theatre Row productions of "The Savage Queen" (One in 2019 and another in  2022). And also, an Audelco award winning 2019 National Black Theatre production of "The Savage Queen." During these productions, I've come to appreciate Ms. Egbufor as a consummate leadership professional. Along the way, she has served as Production Manager, Production Stage Manager,  and Casting Director.

As BulletProof Productions head, I need my initiatives pushed through our organization quickly and accurately. Ms. Egbufor has proven herself both an effective manager and an excellent communicator. Communicating with multiple teams of creative individuals from different walks of life can be complicated. During each production, Ms. Egbufor successfully served as the primary point of communication for BulletProof Productions to the crew, staff, actors, and designers. Her communications and documents were always streamlined, clear, and useful. She is equally effective in person or via email and text. Ms. Egbufor is a well-liked, positive individual who is seen as a go-to person by everyone in management and non-management positions. Talented individuals like Ms. Egbufor, who successfully bridge this gap, are a major plus for any organization. I am continuously impressed by the detailed cross-functional knowledge and experience Ms. Egbufor brings to the table. I tremendously appreciate her dedication to staying on top of open items and  addressing them well before they ever reach crisis mode. Her management skills are first-class and honestly let me sleep at night.

Ms. Egbufor has been immensely valuable whenever hard deadlines and changing conditions produce a serious challenge. Because of her calmness and ability to reason under pressure, she has hurdled each challenge, met every deadline, and exceeded expectations while doing so. Books could be written about the backstage mountains that Ms. Egbufor helped move to ensure a successful, high-quality production was delivered to "The Savage Queen's" paying audience. Ms. Egbufor is a team player who respects everyone. She is personable, optimistic, engaging, easy to get along with, and consistently reliable. Ms. Egbufor is quite simply a joy to work with. That said, I  am highly confident in my recommendation. I believe Ms. Egbufor would be a great fit in any organization that seeks to add to or build a culture of success, inclusion, and accomplishment.

Sincerely,
/s/
Edgar Chisholm,
Executive Producer/Owner
BulletProof Productions

# **EXHIBIT G**

# EMURSIVE PRODUCTIONS, LLC
## Company Manager JOB DESCRIPTION & SCOPE

**REPORTS TO:** Director of Performance and Production

**DESCRIPTION:**

The Company Manager will support all administrative activities for the production and act as the principal liaison between the artists and theater company. They will work under the guidance of the Producing Director to ensure all those involved in the production receive the essential support required.

**RESPONSIBILITIES:**

**Job responsibilities will include:**

- Presence during all rehearsals and performances for *Sleep No More,* serving as Emursive's liaison with cast and crew.
- Attend a daily team meeting with all cast, crew, and onsite mgmt at the top of the *Sleep No More* call to discuss all matters of the day and coordinate with the team.
- Attend weekly production meetings for *Sleep No More* with the other department heads.
- Be available for cast and crew 1:1 meetings and mediation sessions along with the HR department.
- Help facilitate all onboarding of new employees in cast and production in accordance with the HR department.
- Coordinates with the payroll officer for accurate reporting of all cast and crew weekly payroll information
- Assists in coordinating all contracts for actors and production team members.
- Assists the HR department in maintaining the artist and company member personnel files, including hiring agreements and job descriptions, contracts, performance evaluations, etc.
- Arrange transportation/hotels/ground transportation for visiting artists, and oversee all rental listings and acquisitions for guest artist housing.
- Collect and reconcile all company management related invoices and receipts and prepare for payment in a timely manner.
- Assist in the administrative handling of auditions and casting sessions
- Create a positive experience for artists and staff members, and be the onsite representative to ensure all show related personnel concerns are handled.
- Coordinate any onsite catering or hospitality needs for the artists and company members.
- Coordinate with the physical therapist to ensure all cast are meeting their weekly requirements with PT
- Track show related injuries for cast and crew and work with PT to plan out recovery and sustainability plans.

- With the HR department, advance inclusion, diversity, equity, access, and anti-racism goals in production policies, procedures, and practices.
- This is a collaborative work environment, and employees are expected to be open and willing to collaborate across departments and teams.
- Other duties as assigned.

## QUALIFICATIONS:

- Three or more years of related experience and/or training in company management, stage management, production management, general management, or hospitality; interest and/or involvement in an arts related enterprise; or equivalent combination of education and experience.
- Familiarity with COVID-19 Safety regulations in the entertainment industry preferred.

## JOB TYPE:

- Full Time Salaried, Exempt

## PAY:

- $1600 weekly, paid on Fridays

## BENEFITS:

- Company paid healthcare
- Dental
- Vision
- 401K
- Life Insurance
- Accident Insurance
- Paif Time Off
- Employee Assistance Program (EAP)

*Please Note: All McKittrick Hotel staff are required to be fully vaccinated for Covid-19.*

*The McKittrick Hotel is an equal opportunity employer. The McKittrick Hotel does not tolerate harassment and discrimination and will not discriminate and will take affirmative action measures against discrimination in employment, recruitment, advertisements for employment, compensation, termination, promotions, and other conditions of employment against any employee or job applicant on the basis of race, color, gender, religion, national origin, sex, sexual orientation, age, disability, gender identity, marital or veteran status, or any other protected class.*

# EXHIBIT H



PDNYC, LLC.
The McKittrick Hotel
530 West 27th Street
New York, NY 10001

**EMURSIVE PRODUCTIONS/PDNYC, LLC RETALIATORY/MALICIOUS FALSEHOODS/SUBTERFUGE/ AND DISCRIMINATORY ACTS**

**IDENTIFIED IN D. DUMEBI EGBUFOR'S TERMINATION LETTER**

April 6, 2022

**VIA EMAIL & FEDERAL EXPRESS**

D. Dumebi Egbufor

██████████████████

Dear D,

We regret to inform you that your employment with Emursive Productions/PDNYC, LLC (the "Company") as Company Manager is hereby terminated, effective April 6, 2022, based on your continued failure to report to work at the Company's premises in New York or to provide the Company with appropriate documentation justifying your continued absence from work.

**Egbufor's Statements Pertaining to Paragraph #1**

**Employer: "…hereby terminated, effective April 6, 2022"**

- *When speaking by phone on May 10, 2022 to Tom Davis, from the New York State Insurance Fund (NYSIF) about my Workers Compensation (WC) claim, Tom informed me that my former employer, Emursive Productions/PDNYC LLC contacted him on April 4, 2022 with a notice that I had been terminated, which is a <u>false statement</u> made by the employer. April 6th is the effective date on the present letter and also the date I received the letter by email, not the April 4th date they conveniently chose to support their subterfuge. Leading up to this, during several phone and email conversations with Tom Davis (the last one while employed occurred on April 1st), I expressed to him that I would need six weeks of physical and occupational therapy per my doctor's referral and given my work-related head injury on February 10, 2022 (see Attachment A1 for my work injury report and Attachment A2 and A3 for the WC claim filed by my employer). Tom informed me during each conversation that there was nothing additional I needed to do since my claim was still active, that I only needed to let him and my employer know the date I wanted to start leave for treatment.*

- *It is also worth identifying another form of cruelty and malice by this employer in Attachment A4, where after the employer filed a WC claim for my injury that was caused by the employer and that occurred at my workplace on February 10, 2022, in letters I just received on June 2, 2022, my former employer filed a subsequent injury report with the WC board three months later*

denying the exact WC claim they filed on my behalf back in February. They also falsified the date they became aware of my injury as I immediately emailed the HR director on February 10, 2022 while on my way to the hospital, not on February 11th as the employer reported on the subsequent injury document. By and large, all of these malicious actions were carried out by my former employer in blatant retaliation and punishment for my race and age discrimination complaints.

- On March 11, 2022, I provided the employer a notice of my need for treatment (see Attachment B), and on March 16, 2022 (see Attachment C1), I emailed my employer the decision I made to take the option they provided me on the same day, to be placed on Workers' Compensation beginning April 4th. This was all due to the employer denying my request and temporary need for additional time to work remotely. Even though for more than eight years, prior to my employment, my White female predecessors were never onsite and had worked remotely during their entire time in the same role I was holding, which reflects another example of racial discrimination and differential treatment. Summarily, rather than proceed with placing me on WC as was entitled to me, the employer maliciously and deceitfully, stripped my ability to receive much-needed treatment from an injury caused by this employer by lying and providing a false statement to the NYSIF office about my termination date, combined with most recently denying my claim to the WC board three months after they filed the claim for me. These malicious acts were committed by this employer for the sole purpose of deliberately intercepting and canceling all and any benefits due to me as a form of retaliation, punishment and disenfranchisement.

- The actions taken by this employer regarding my need for treatment was very different from the actions they administered when addressing other existing employees who were in need of sick leave or therapy treatments. Such persons were immediately placed on paid injury leave, WC, and/or a replacement hire was put in place for them right away. All of these employees, who are also White, were never harassed or constantly interrogated like I was, for additional private information about their health status, which is another example of this employer's discriminatory and retaliatory actions towards me.

- I have also not been paid for the pay period and days I worked prior to my termination, from April 3-April 5th. Conclusively, this retaliatory and wrongful discharge was committed to punish me for the race and age discrimination, retaliation and harassment complaints I made against my supervisor, Carrie Boyd and eventually against the producers who I now know were also complicit.

- Prior to submitting a written internal complaint on February 17, 2022 (see Attachment C2), I reported the unlawful discriminatory treatment I was receiving from my supervisor to the Human Resources director, Rick Criswell on January 19, 2022, January 21, 2022, and February 6, 2022. My complaints to HR were ignored. No followup action occurred.

**Employer: "Based on your continued failure to report to work at the Company's premises in New York or to provide the Company with appropriate documentation justifying your continued absence from work."**

- At no such time, did I "continually fail to report to work". The attached email correspondence between me and the HR director, Rick Criswell reflects that during my time out of the office from February 10th through April 6, 2022, I was either on approved remote work or approved sick leave. On February 10th, after being harassed, ambushed and setup by the producers of this company who mislead me to attend a meeting on communications the day before, that turned out to actually be a meeting with them trying to force me to speak on my discrimination complaints in front of my supervisor and the

*HR director, I experienced a severe anxiety attack at work.  On this exact day, I also found out the only Black male dancer working for this company resigned immediately due to similar complaints of race discrimination.  Combining his unfortunate departure with the exact deplorable and highly stressful working conditions I was experiencing led me to have a mental breakdown during a staff meeting and eventually to being hospitalized and on emergency suicide watch for three days. As part of my care and exit plan, the hospital team mandated that I be released into the custody of an immediate family member or that I would be required to stay in the hospital for additional time. I explained to my assigned social worker that my immediate family was in Washington, DC. Once we confirmed that an Amtrak train was still available to DC from NYC on the evening of my release, I affirmed to my social worker that I would in fact be traveling to DC to heal from my injury. My care plan was approved and I was released from the hospital on February 13th.*

- *On my release from the hospital on February 13, 2022, I replied to the HR director's email (see Attachment D) requesting sick leave through February 16, 2022. My request for sick leave was approved. While trying to recover from my injury, for fear of losing my job, I worked under a lot of anguish at trying to respond to an email and deadline the producers emailed me three hours before I found myself in the hospital on Februray 10, 2022 (see Attachment E), requesting for me to submit a written discrimination complaint. I submitted the complaint to the HR director and the producers on February 17th. I also requested to work remotely while an investigation was underway. My request for remote work was approved. Therefore, I was never absent from work, just working from home under an approved arrangement permitted by the employer.*

- *During my time on approved remote work, multiple email conversations pertaining to my remote work request for much-needed therapy treatments were transmitted between myself and the HR director. I met every single deadline from the employer, some as short as 36 hours, to provide requested medical documentation and a patient letter from two different doctors which was nearly impossible to obtain given the backlog medical facilities are experiencing from the pandemic. Because of this, I asked for more time to obtain the complete medical documentation that was requested, but my employer denied my request. Since my request for more submission time was denied by the employer and given that I could not obtain an appointment from my primary neurologist in the short amount of time my employer allowed, I ended up going to a clinic who administered an additional assessment that resulted in the same findings.*

- *Collectively, the physical therapy and occupational therapy referral sheets were submitted to my employer, along with a written patient letter all by the timeline provided. However, even after these submissions were made, this employer continued to badger me for more information about my diagnosis (which is private and highly confidential) and this employer continued to make multiple inappropriate requests on my medical status which was another violation of my privacy. In addition, what was equally distressing and embarrassing was that this employer forced me to discuss my medical status and health condition, all highly confidential matters during a Zoom session (that was supposed to only be about the discrimination investigation) with their attorney, Lisa Harris from SheppardMullin law firm, who was the same lawyer hired by the producers to conduct the discrimination investigation. During the session, the producer/employer representative in attendance made inappropriate remarks about my medical condition (that I could "just be placed in a room somewhere in the building to stop the triggers") and he was literally trying to dictate where, how and when I should receive treatment as if decisions pertaining to my life and personal healthcare were decisions for my employer to make. Again, all a violation of my privacy. Added to that, in accordance with comments from my doctor, the employer trying to force my medical doctors to provide a detailed explanation about my health condition was also a violation of HIPAA laws.   To reemphasize, in my role as the liaison on leave request matters between cast/crew and HR, I never witnessed the HR director or producers hassle other employees for private health information as I was hassled and harassed.*

As you know, beginning on February 17, 2022, the Company allowed you to work remotely  on a temporary basis pending the investigation of your workplace claims. That investigation was  completed on March 9, 2022 and we requested that you report back to work in New York on March  14, 2022.

**Egbufor's Statements Pertaining to Paragraph #2**

**Employer: "...we requested that you report back to work in New York on March 14, 2022."**

- *This is a <u>false</u> statement made by the employer. I never received a request from my employer to report back to work in New York on March 14th. In fact, Attachment F reflects that on March 11, 2022, I was invited by their investigator, Lisa Harris to participate in a close-out investigation Zoom session on March 14, 2022 which she scheduled for 2 pm. Harris was present and to my surprise one of the producers/the employer popped up unexpectedly on the screen, which immediately gave me terrible flashbacks, a headache, and anxiety over that awful meeting that happened on February 9th, where I was misled to believe one thing would be happening and something else entirely and extremely unsettling occurred, including me being harassed by this same producer and his partner. Plus, although that February 9th meeting was not about my work performance, my credibility, qualifications and performance were called into question and degraded by both producers. Moreover, similar to what happened during the Zoom session on March 14th, where the employer inappropriately told me he had examined my resume and had looked at my previous experiences, once again my employer was trying to directly relate my discrimination complaints to my job qualifications, which is a form of gaslighting and microaggression.*
- *The previous two virtual investigation meetings I had with Harris only included her colleague Lindsay Stone. In Harris' March 11th meeting invitation she did not mention that my employer would be joining the session. Sadly I was set up once again, this time by the lawyers of this employer. Equally important, it was not mentioned that I was requested to report to work on March 14th, which would have been impossible given that the Zoom meeting which was scheduled by Harris actually took place at 2 pm while I was still in DC. My regular report time was normally at 4pm. The distance between DC and NY is four plus hours. I can not be in two places at once. Again, this employer never requested that I report to work on March 14th.*

On March 11, 2022, you advised us that, at some point between February 17 and March 11, and without notifying the Company beforehand, you relocated to Washington, D.C. and requested that you be allowed to continue working remotely for an additional six weeks while you pursued therapy for reasons that were not entirely clear. On March 16, 2022, we requested a medical certification substantiating your need for remote work as an accommodation. We asked that such certification include: (i) the nature, severity, and duration of your impairment; (ii) the activity or activities the impairment limits; (iii) the extent to which the impairment limits your ability to perform those activities; and (iv) the length of your requested accommodation. In response, you advised the Company that you did not intend to provide the medical certification or information that we were requesting. We responded by reiterating to you that the Company was unable to consider or evaluate your request to work remotely without a medical certification, and requested the same again on March 17 and 18, 2022. We also cautioned you that your failure to comply with our requests could impact your employment status with the Company.

**Egbufor's Statements Pertaining to Paragraph #3**

**Employer: "...you relocated to Washington, DC...while you pursued therapy for reasons that were not entirely clear."**

- *This is a <u>false</u> statement made by the employer. In my email to the HR director on March 11, 2022 (three days before I even knew the investigation would be coming to a close), I did not state that I had "relocated" to Washington, DC. As reflected in Attachment B, I wrote "during my time staying in DC with family, I received a doctor's order on March 9th to*

*begin therapy for the next 4-6 weeks. Therapy is scheduled for 1-2 days a week." The above provided statements explain why coming to DC was an imperative in keeping me alive. My visit to DC occurred while I was on <u>approved</u> sick leave. It was <u>not</u> a relocation. In fact, when I left for DC I didn't bring my work computer or office keys with me or anything else except my purse. I urgently went straight from the hospital on the next train to connect with my family in DC. It's absolutely disheartening and really hurtful to me knowing that unfortunately, this employer chose to    demonstrate that it lacks empathy and understanding of what their employees need when undergoing a personal health crisis, which incidentally, was caused by this same organization.*

- *Honestly, on my discharge from the hospital, the only thing I was concerned with was my health, and rightfully so. Moreover the only thing I desperately needed at that time was love from my family and a safe place to heal. This need should not be punished, misconstrued or demonized. Case in point, there was no need to inform the employer of a relocation or address change because no such change occurred. On another note, living in New York was not a contractual requirement for me to work at this organization. This employer was also not paying any part of my living expenses, which means if I had decided to relocate to any place outside of New York (which I have not) as long as I came to work on time every day and had no interference or decline in my work performance, I was not legally obligated and would not have needed to seek  permission from my employer to move.*

- *Due to privacy laws and the employer's continuous failure to safeguard my medical information (as I was hearing from my former colleagues many different stories and reasons, some health-related, they were told I was working remotely), I became afraid that my personal and private information had been breached, which made me extremely apprehensive about sharing my health details with my employer. Additionally I precisely had the  fear of stigmatization that comes with experiencing  a mental illness which brought more anxiety as this employer continued to pressure me for more information about my personal health. It was also my understanding from the Office of Civil Rights, Office of Human Rights and the Mayor's Office, that because I was not requesting to take sick leave or requesting workers compensation or short-term disability, I was not required to disclose the specific private information my employer was requesting. Again, I was only asking to continue working remotely for a few more weeks, not asking to be completely absent from work.*

On March 21, 2022, you provided the Company with: (i) two medical referrals to physical  and occupational therapy that did not contain the information requested by the Company; and (ii) a  letter clarifying your request for remote work. In your letter, you advised the Company that:

> [Y]our demand and your understanding of my request for an accommodation are  inaccurate and inappropriate, as I am not requesting accommodation for a certified  disability, sick leave or worker's compensation. By and large, your request for a  medical certificate to evidence an accommodation is a requirement for a medical  disability, of which I do not have and I am not claiming to have.



PDNYC, LLC.
The McKittrick Hotel
530 West 27th Street
New York, NY 10001

You further confirmed in your letter that you did not intend to provide any additional medical documentation beyond the above-referenced referrals.

**Egbufor's Statements Pertaining to Paragraph #4**

- *The HR director's response to my request for remote work for the purpose of receiving medical treatment was received by me on March 16, 2022. In his email, he provided me with the following options for addressing my request to receive treatment (see Attachment C): 1) Using accrued paid time off during such period, and 2) Taking a leave of absence which would make me eligible for short-term disability for up to 26 weeks. He also attached the application for short-term disability and the name of their carrier, New York State Insurance Fund. To re-emphasize, I was not asking for either of these options at that time, which is why I did not initially provide the employer the requested information. Along with not being able to trust the employer with this information, I did not want to create any gaps in service to the company or to subject myself to ridicule, stigmatization and embarrassment over my condition. I was only asking to <u>temporarily</u> function in a similar way my White predecessors had functioned for years.*


- *Gleaning from the leave options provided to me by the HR director, specifically option one, Attachment G evidenced that on March 29, 2022 I emailed the HR director a request for my accrued and available leave balance. I received no response to my first request. Later that same day, I emailed a second request for this information (see Attachment H) and again my request was ignored and not replied to. At this point, I knew the HR director was intentionally ignoring my request in retaliation and to prevent me from requesting additional leave that I had earned. It wasn't until I sent a <u>third</u> request from my personal email address (see Attachment I) that I finally received a reply from the HR director around 9 pm on March 30, 2022 which stated in part that I had 17.33 hours of PTO and 32 hours of sick leave available (see Attachment J). It's also worth noting that pursuant to the new attached company policy (see Attachment K) while still an employee of this organization, effective April 1, 2022, I received 200 additional Paid Time Off (PTO) hours in my leave allotment, which was equivalent to 25 days for the remainder of the year. Seeing that I submitted three pieces of medical documentation to this employer by the requested deadline, coupled with the fact that I had enough available leave along with being qualified to take WC , the only reason why I was denied remote work, leave, WC, and ultimately wrongfully terminated was solely retaliatory to punish me for filing internal complaints of race and age discrimination.*


- *It was also my understanding from the Office of Civil Rights, the Office of Human Rights and the Mayor's Office that because I was not requesting to take sick leave or requesting workers compensation or short-term disability, at such time, I was not required to disclose the specific private information my employer was requesting. Again, I was only asking to continue working remotely for a few more weeks, not asking to be completely absent from work.*


On March 22, 2022, we confirmed our understanding that you were not seeking to work remotely as an accommodation and reiterated that, given the responsibilities of the Company Manager position, on-site attendance was an essential part of your job. We also advised you that your continued absence created difficult staffing and operational issues for the Company and was no longer sustainable, particularly given the Company's ongoing performance schedule. As a result, we informed you that the Company could not

grant your request to continue to work remotely from  Washington D.C. for another six weeks. However, we offered to extend your authorization to work  remotely until March 28, 2022 to allow you sufficient time to identify suitable therapy options in  New York, if necessary, and with the expectation that you would report to work in person no later  than March 29, 2022.

**Egbufor's Statements Pertaining to Paragraph #5**

**Employer: "We also advised you that  your continued absence created difficult staffing and operational issues for the Company and was no  longer sustainable, particularly given the Company's ongoing performance schedule."**

- *As soon as I heard and viewed this statement from the employer during the close-out session and in email correspondence, on every occasion I immediately requested additional information on exactly where operational issues existed so that I could address them at once, but unfortunately, I received no response to any of my requests. Again, for the last eight years or so, my two predecessors, who were both White females, did not work on site and were not present during performances. In fact, the cast and crew size has reduced tremendously from times prior to my employment (i.e. from 80 or so to only 30 cast members) which has greatly decreased the company manager's work load. For the most part, as company manager, I had primarily three daily functions while onsite: 1) attend the company meetings two hours prior to the show at 5 pm, which my former supervisor, Carrie Boyd intentionally excluded me from being an active participant in until I took the initiative to interject myself with pertinent information  the cast/crew needed to hear,  2) be on stand-by to respond to any injuries that occurred during the show, and 3) create, post and manage the on-site physical therapy schedule.  None of these duties are new or different from my predecessors, except unlike me, their administration of these roles was performed remotely and off-site. Furthermore, any other roles I found myself doing while onsite were all self-created and self-initiated.*

- *During my time onsite from January 3rd (the first day for cast and crew) through February 10th (my last day onsite before going into remote work), out of two weeks of rehearsals and two weeks of performances or so, I only had to physically respond to three injuries. There were other injuries. However, given that the high majority of the cast and crew were returning employees, they were used to handling injuries on their own and independently like they had in previous years with my predecessors. This meant I was being pulled in <u>after</u> injuries occurred to receive and process accident reports which I did electronically onsite or predominately from home when receiving reports outside of my work hours; just as I was successfully able to do while working remotely.  At no point in time, did anyone complain to me about company management work being missed or incomplete, which is why I am not surprised that I never received an answer from the employer when I kept asking for additional information on their claim. Demonstrating the employer's reasoning of "unsustainability" is unsubstantiated and serves as an excuse and cover up for their unlawful execution of this wrongful, discriminatory and retaliatory termination committed to punish me for making complaints of race and age discrimination.*

**Employer: "...we offered to extend your authorization to work  remotely until March 28, 2022 to allow you sufficient time to identify suitable therapy options in  New York, if necessary, and with the expectation that you would report to work in person no later  than March 29, 2022."**

- *On Tuesday, March 22nd, which was my off day, I acknowledged receipt of the message being referenced. After receiving this message, seeing the importance of attending to my much-needed medical condition and treatments, I contacted the WC associate at the New York State Insurance Fund, Tom Davis to again discuss what was necessary for me to go out on WC leave for six weeks of therapy. On March 25th (<u>four days prior</u> to the stated return date of March 29th), I sent the attached email (Attachment L) to the HR director informing him of my conversation with Tom and that Tom would be in touch with him to*

*discuss my requests for WC. Additionally, in this same email message, I requested to "utilize my earned sick leave and PTO to provide me the much needed opportunity for more aggressive care and treatments until I can connect with Tom to discuss next steps for workers compensation."*

- *By and large, this employer was put on notice on March 25th, <u>four days before</u> the above return date, and the employer was provided advanced notification of my intention to use earned sick leave until my workers compensation status was finalized. Unfortunately, as reflected in the attachments, I was told by Tom that my employer did not return his phone calls, which was intentional and malicious. When asked by the employer about my WC status, I shared with the employer that the representative at NYSIF was still waiting for a return call to finalize my leave request; a phone call the employer never returned, except when they called Tom on April 4, 2022 to intentionally cut off and disrupt my WC entitlements by maliciously lying about my termination date.*

On March 29, you did not report to work in New York and did not provide any further documentation surrounding your request to continue working remotely. Instead, you advised that you intended to use your available paid time off ("PTO") to pursue "care and treatments" for reasons were again unclear. On the same day, we approved your request to utilize PTO for March 29 and 30, but informed you that you would no longer be permitted to work remotely beyond March 30, 2022. In addition, we again offered to consider your request to work remotely as an accommodation for a disability, provided that you submit the previously-requested medical certification no later than March 31, 2022.

**Egbufor's Statements Pertaining to Paragraph #6**

**Employer: "On March 29, you did not report to work in New York and did not provide any further documentation surrounding your request to continue working remotely. Instead, you advised that you intended to use your available paid time off ("PTO") to pursue "care and treatments" for reasons that were again unclear."**

- *This is a <u>false statement</u> made by the employer. Given that my remote work request for treatment was denied, as stated above, in my email to the HR director, dated March 25th (not March 29th), I provided the employer advance notification of my intention to go out on workers compensation and I also requested to be placed on my accrued sick leave until my WC leave was solidified. I did not hear back from the HR director until 9:01 am on March 29th, where as shown in the Attachment M, he confirmed receipt of my March 25th email and he tried to influence me to identify "therapists based in New York" who could as he stated, "provide you [me] with the services required while also allowing you [me] to report to work on-site." Sadly, this reflects my physical health and full recovery to mental wellness after having a work-related mental breakdown on the job was not a priority to this employer, just forcing me to come back to work was their goal, no matter what.*

- *While trying to gauge whether or not it was even safe enough for me to forgo treatment and immediately return to work, due to the increasing pressure stemming from the employer, I kept recalling that during the March 14th Zoom close-out investigation session I asked the producer/employer if we could reconvene the meeting we had on February 9th virtually and before I return so I could gain a full understanding of the communications policies we were supposed to discuss then and to also help reset the tone and try to heal relationships. I knew returning to work cold would re-trigger my anxiety, fear and worry. Unfortunately, my request was denied. During that same Zoom meeting, I asked the investigator since I submitted a written complaint if I could review her investigation findings in written form along with the company issues she communicated that she did discover. My request was denied and I was told there was no written report that she only communicated verbally what she found to the employer. I then asked the producer/employer if there could be building-wide training on equity, diversity and inclusion. My request was denied and I was told such training was not necessary at this time. Conclusively, having every single one of my very reasonable requests repeatedly denied and dismissed exacerbated my anxiety and made it very clear to me that returning*

*to work under the same hostile working conditions without the necessary doctor referred medical care and therapy was just another work-related accident injury and suicidal threat waiting to happen. All risks I was absolutely horrified by and unwilling to take.*

**Employer: "On the same day, we approved your request to utilize PTO for March 29 and 30, but informed you that you would no longer be permitted to work remotely beyond March 30, 2022. In addition, we again offered to consider your request to work remotely as an accommodation for a disability, provided that you submit the previously-requested medical certification no later than March 31, 2022."**

- *Precisely, March 29th was a Tuesday and my day off. Just as everyone else working for this show, I was not required to work on my off day. Tuesdays are dark (closed production days) for show management, cast and crew. In my reply to the HR director's email on March 29th, I responded (see Attachment N) with a reminder to the employer that Tuesday is my off day. Because of this, I requested for the employer to adjust the PTO days they provided me from March 29-March 30th to March 30th - March 31st, which I also thought would have meant the employer's deadline for medical documentation would have shifted by a day to April 1st. Doing so, would have provided more time for me to obtain a letter from my actual specialist who I was waiting to gain a response from. Unfortunately for me, after the HR director asked that I let him know if I needed more time to submit information, upon making the request for additional time, in the next breath and succeeding email from HR, the employer denied my request for just one extra day to turn in the additional requested documentation (see Attachment O).*

On March 31, 2022, you provided a note from your physician, Dr. Edward Hochman, which lacked much of the information we previously requested. However, Dr. Hochman's note did state that you experienced limited function when exposed to loud noises and bright lights, and recommended that:

A reasonable accommodation would be to have adjustments made in her work so that she does not have exposure to loud noises or bright lights, ***such as*** remote work.

**Egbufor's Statements Pertaining to Paragraph #7**

**Employer: "On March 31, 2022, you provided a note from your physician, Dr. Edward Hochman, which lacked much of the information we previously requested."**

- *The attached medical letter (see Attachment P) from Dr. Hochman was my second set of medical documentation submitted to this employer. The first being my referral sheet for physical therapy (see Attachment Q) along with my referral sheet for occupational therapy (see Attachment R), both signed by my neurologist, Dr. Patel. Combining the content from my referral sheets and the patient letter, one can find that my employer received sufficient answers to their requests. Below is the itemized requested information from the employer and the information from my doctors submitted as answers to each item.*

**Employer: "We asked that such certification include: (i) the nature, severity, and duration of your impairment; (ii) the activity or activities the impairment limits; (iii) the extent to which the impairment limits your ability to perform those activities; and (iv) the length of your requested accommodation."**

- ***Answers employer received for Item i:*** *Vestibular dysfunction (which was principally brought on by work-related stress and anxiety) was provided as the nature of my impairment and stated as my diagnosis in the letter from Dr Hochman. In both referral sheets from Dr. Patel, 4-6 weeks was listed as the duration of the treatment and therapies needed to correct my condition. In addition, I sent the attached emails on March 11th, March 16th, and March 25th to the HR director with more information on how I was beginning to experience physical manifestations of my anxiety caused by my working conditions and the discriminatory/retaliatory treatment I had been receiving for months.*

- ***Answers employer received for Items ii and iii:*** *In Dr Hochman's letter, he stated my vestibular function is limited when exposed to loud noises or bright lights. He continued with a recommendation for what he described as a "reasonable accommodation" such as working remotely to avoid my having to be exposed to loud noises and bright lights.*

- ***Answers employer received for Item iv:*** *In both referral sheets from Dr. Patel, 4-6 weeks was listed as the duration of the treatment and therapies needed to correct my condition. Given that my symptoms were worsening (frequent pounding headaches, nausea, dizziness, motion sickness, losing balance, ear pain, visual disturbances, light sensitivity, sound sensitivity, low concentration, and persistent anxiety that caused: crying spells, bleeding teeth, and missed menstruations) my request for remote work was for six weeks to allow me the maximum amount of time for correctional treatment and full recovery.*

(emphasis added). Notwithstanding the deficiencies in Dr. Hochman's note, we agreed to consider it pending receipt of a supplemental certification containing all of the remaining medical information we previously requested. Because the Company requires the on-site presence of its Company Manager, we informed you that you would be expected to return to work no later than April 4, 2022. In accordance with these recommendations, we also advised you that the Company would provide you with a quiet work location without bright lighting, and that you would be excused from portions of rehearsals or performances that include loud noise or strobe lighting. On April 4, 2022, you again failed to report to work or provide any of the aforementioned supplemental information that we previously requested.

**Employer: "...we informed you that you would be expected to return to work no later than April 4, 2022."**

- *In the attached email sent at 12 noon on April 1, 2022 (see Attachment S), I restated and reminded my employer again after stating the same in multiple correspondence, that due to the severity of my condition I had decided it was necessary for me to have the recommended treatment and therapies for six weeks and that I had been in communication with Tom from NYSIF who informed me he had everything he needed, and was informed by me that I would begin WC on April 4, 2022.*

- *At the end of the business day at 5:49 pm on April 1, 2022, I received a reply from the HR director (see Attachment T) requesting that I send documentation from NYSIF by the "close of business" that day. In my reply to the HR director (see Attachment U), I expressed my concern over the employer's untimely request for me to gather documents from NYSIF after they had already closed for the day, and I restated that NYSIF received what they needed from me (see Attachment V) and Tom was just waiting to hear back from HR. My employer did not respond to my message on April 1st, or April 2nd, or April 3rd, or April 4th or April 5th. Equally significant is the fact that my name <u>did not</u> appear on the attached work schedule for April 4, 2022 (see Attachment W), which comes to staff daily, so I believed my WC leave for treatment was effective on April 4th as was discussed with NYSIF and shared with HR multiple times. Unfortunately for me, the next time I heard back from my employer was when I received the termination letter by email on April 6, 2022.*

**Employer: "In accordance with these recommendations, we also advised you that the Company would provide you with a quiet work location without bright lighting, and that you would be excused from portions of rehearsals or performances that include loud noise or strobe lighting."**

- *Based on my condition, which became a highly difficult challenge to overcome day-to-day when trying to function from the house, the accommodations described by the employer were unsuitable and unrealistic. Precisely, the entire workspace and office building for this company is a show location with extremely loud show music blasting and vibrating through the walls, stairwells and on all six plus floors. During performances and rehearsals, there simply are not any quiet floors. Added to this, because rehearsals and performances occur on each floor, one could easily walk directly into bright lights (strobe, spotlights, etc) in use throughout the building for multiple hours.*

- *As company manager, I was required to listen to and wear ear plugs for the walkie-talkie, which meant hearing voices and show music at different levels directly in my ear for hours. If and when cast/crew members were injured, I would have to go to their location which meant using multiple staircases or the freight elevator when it was free and working. Exposure to show music and lights would bring on dizziness, headaches and nausea like I was already experiencing from home, especially an abrupt interjection of sounds and lights.  All in all, the employer's  claim to accommodate me with a "quiet work location without bright lightning," was impossible to execute, irresponsible and lacked genuine care and concern for my health, safety and wellbeing.*

**Employer: "On April 4, 2022, you again  failed to report to work or provide any of the aforementioned supplemental information that we  previously requested."**

- *This is a false statement made by the employer. At the end of the business day at 5:49 pm on April 1, 2022, I received a reply from the HR director (see Attachment T) requesting that I send documentation from NYSIF by the "close of business" that day. In my reply to the HR director (see Attachment U), I expressed my concern over the employer's untimely request for me to gather documents from NYSIF after they had closed, and restated that NYSIF received what they needed from me (see Attachment V) and Tom  was just waiting to hear back from HR. My employer did not respond to my message on April 1st, or April 2nd, or April 3rd, or April 4th or April 5th. Equally significant, is the fact that my name did not appear on the attached work schedule (see Attachment W) I received for April 4, 2022, which comes to staff daily, so I believed my WC leave for treatment was effective on April 4th as was discussed with NYSIF and shared with HR multiple times.  Unfortunately for me, the next time I heard back from my employer was when I received the termination letter by email on April 6, 2022.*

- *As viewed in the attachments, sufficient medical documentation, signed by my two medical providers, was provided to this employer on two separate  occasions.*

- *At no such time,  did I "continually fail to report to work". Attached email correspondence between me and the HR director, Rick Criswell evidence that during my time out of the office from February 10th through April 6, 2022  I was either on approved remote work or approved sick leave.  Further, an employee can't be on approved leave and fail to report to work at the same time. During my employment with this employer, I was either working onsite, or approved to work remotely or approved to utilize my accrued sick and PTO leave.*

 As we have stated to you on many occasions, the essential job functions of the Company  Manager position include the requirement that the work be performed on-site, at the Company's  premises in New York. Notwithstanding these clear requirements, you have chosen to relocate to a  different state, refused to report to work in New York, and repeatedly refused to provide sufficient medical information and/or any acceptable medical certification substantiating a need to work  remotely. As a result, the Company has no choice but to terminate your employment effective today.



PDNYC, LLC.
The McKi1rick Hotel
530 West 27th Street
New York, NY 10001

**Egbufor's Statement Pertaining to Paragraph #8**

**Employer: "...you have chosen to relocate to a  different state, refused to report to work in New York, and repeatedly refused to provide sufficient medical information and/or any acceptable medical certification substantiating a need to work  remotely."**

- *As I have explicated above, these are <u>all false statements</u> made by the employer in retaliation to punish me for filing an internal race and age  discrimination complaint. The producer who to my surprise was in attendance at the Zoom close-out session on March 14th made his malice and revengeful intentions clear when as a response to my statement that the February 9th meeting we had was a terrible experience for me that was traumatizing, he immediately replied with venom that: "I made some very terrible allegations about us [them]. And we are traumatized as well." With him creating a "me versus them" situation, I found myself once again in a similar downward spiral and immediately exasperated and overwhelmed with fear, anxiety and torment over the microaggressions, gaslighting and bully tactics chosen for use by the employer to make me feel guilty over my race and age discrimination complaints.*

- *Claiming that I repeatedly refused to submit medical documentation is simply fallacious. Again, initially I was not requesting to take any time off from work, only a continuation of remote work for six more weeks. On discovery of my symptoms, I immediately saw a neurologist and I immediately communicated with my employer, informing HR that I was in dire need of therapy. Two signed therapy referrals were provided to my employer listing the type of therapies and the duration of each therapy I needed. On top of that, unlike what I witnessed occurring with other employees, after my documents were unnecessarily scrutinized for more and more private health information, I submitted a patient letter with additional information about my condition and the preferred accommodation to address it.  Yet and still, my medical documentation was deemed not enough by this employer for retaliatory and discriminatory reasons.*

- *Undoubtedly, this wrongful retaliatory and discriminatory discharge committed by the employer combined with the hostile work environment I had to endure for months at this organization from my supervisor, given my race and age, has taken a colossal toll on my emotional health and physical well being. Every time I have to sit down to read or write about the cruel and malicious actions I've experienced from this employer, unfortunately, my mind and emotions  take me back to a place I so desperately want to forget. With the loss of enjoyment, loss of work and income, and loss of hope, confidence and trust, sadly, I will forever be personally and professionally damaged by the malicious falsehoods, subterfuge and unlawful retaliatory actions  of this employer.*

The Company will issue your final paycheck and final payment for any approved expenses  incurred up to today's date by direct deposit. You will also receive information pertaining to the  termination of your benefits and ongoing healthcare options available to you through COBRA.

**Egbufor's Statements Pertaining to Paragraph #9**

**Employer: "The Company will issue your final paycheck and final payment for any approved expenses  incurred up to today's date by direct deposit."**

- *This termination letter is dated April 6, 2022. My final paycheck from this employer was for the pay period ending April 1st. I was not and still have not been paid for work completed on April 2nd through April 5th.*

- *On January 26, 2022, I passed the required F-03 Safety Personnel exam and received the certificate. Upon completion, I sent two emails to my supervisor, Carrie Boyd inquiring about which department I should use to upload my credentials. Unfortunately for me, as in several instances, my email was ignored by Carrie, so I never received reimbursement for the exam fee and time, which was supposed to be $100.*

 Please return all Company property in your possession, including, but not limited to, your  Company-issued laptop to me via Federal Express postmarked no later than April 8, 2022. You may  charge shipping for these items to our Federal Express account using the following information:

**Egbufor's Statements Pertaining to Paragraph #10**

**Employer: "…postmarked no later than April 8, 2022."**

- *I did not bring the company laptop or office keys with me to DC, as it was never my intention to stay in DC permanently. Upon completing my treatment and therapies and on my return back to New York, I returned the company laptop and office keys on June 2, 2022 using the account number and address below (see FedEx receipt as Attachment X).*

Account # 280161195
PDNYC, LLC
Rick Criswell
530 W 27th St
New York NY 10001

We thank you for your service to the Company and wish you the best of luck in your future endeavors.

Very truly yours,

Rick Criswell
Director of Human Resources, People & Culture

**EXHIBIT I**



# MCKITTRICK HOTEL ACCIDENT REPORT
### Home of Sleep No More, The Club Car, Gallow Green and Manderley Bar
### 530 West 27th Street, New York, NY 10001
### (212) 904-1880

**Employee Information**

1. Injured Employee's Name: ~~Dumebi Egbufor~~

2. Injured Employee's Address: ███████████████

3. Job Title: Company Manager

4. Employee's Telephone #: ——————-——-—— ███

5. Date of birth: ███████

**Accident Information**

6. Date of Accident: ———— 02/02/ 22

7. Time of Accident:  9:45 **A.M.**/P.M  8. Time Employee began work: 8  **A.M.**/P.M

9. Staff Member Injury reported to:

10. What does the employee allege he/she was doing just before the incident occurred? Striking the apartment in use by ███████, RD, move out was scheduled for yesterday morning. Headed to open the side door entrance for one of the movers.

12. What does the employee allege happened? After opening the door which is located in a very dark entryway and unoccupied side of the building with no lights available, I attempted to walk down the steps and slipped. I fell on my waist and twisted my ankle.

13. Where does the employee allege the accident occurred? 20 Exchange Building, Level C ——————————

14. Witnesses: ███████████, moving contractor for the day, contact of ███████████

15. Describe Injury/Illness in detail and indicate part of body affected (ex.bruised left elbow, fractured right foot rash left hand)

    Twisted right ankle, swollen and bruised ankle, bruised waist and lower back

15. Object/Substance Directly Caused Harm : Dark entry, no lights on staircase

16. If hospitalized/treated office: name and address: None at this time

17. What actions have been taken to prevent reoccurrence? Ice pack applied from PT, pain relievers taken, light duty

18. Report prepared by: Self_____Title:  Ph _____

> ANY PERSON WHO KNOWINGLY & WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY, FILES A STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS THE PURPOSE OF MISLEADING INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT ACT, WHICH IS A CRIME, PUNISHABLE BY LAW.

I have read this report & all if its content is correct. _____**D.Dumebi Egbufor**_____

                                                          **2** / **3** / **22**

**Employee Signature**                                    **Date**

# **FOR EXHIBIT J**

## **See Separate File Attached to Complaint**

# EXHIBIT K

From: Dumebi Egbufor <██████████████>
Date: February 5, 2022 at 4:14:28 PM EST
To: Carrie Boyd <███████████████████>
Cc: Rick Criswell <██████████████████>, Jonathan Hochwald <██████████████████>
Subject: Re: Action Items: Covid Policy Change/Update

Copy that. Same here. Thanks!

Best,
D

Link to SNM Company Forms: https://forms.gle/aaABFH7tujL7i6xG9

D. Dumebi Egbufor | Company Manager
she/her
██████████████
dumebi@emursive.com

On Sat, Feb 5, 2022 at 4:12 PM Carrie Boyd <cboyd@sleepnomorenyc.com> wrote:

Thanks D.  Confirming for all I'd love to be in the loop with each step before things are announced to cast and crew so I'm aware and can be part of the process.

On Sat, Feb 5, 2022, 2:57 PM Dumebi Egbufor <dumebi@emursive.com> wrote:

Hi Rick,

Yes, glad we had the opportunity to chat about this.
Forgot to loop Carrie as FYI.
I'll keep everyone posted on the questions/concerns/comments/new hot spots that arise from the cast/crew as this new policy change is implemented.

Best,
D

Link to SNM Company Forms: https://forms.gle/aaABFH7tujL7i6xG9

D. Dumebi Egbufor | Company Manager
she/her
██████████████
dumebi@emursive.com

On Sat, Feb 5, 2022 at 1:27 AM Rick Criswell <rick@sleepnomorenyc.com> wrote:
Thanks D

Glad we had our talk before the show.

Ricky
Sent from my iphone

On Feb 4, 2022, at 11:04 PM, Dumebi Egbufor <dumebi@emursive.com> wrote:

AWESOME!!

Best,
D

Link to SNM Company Forms: https://forms.gle/aaABFH7tujL7i6xG9

D. Dumebi Egbufor | Company Manager
she/her
dumebi@emursive.com

On Fri, Feb 4, 2022 at 11:03 PM Jonathan Hochwald <jonathan@emursive.com> wrote:

Thanks, D— fyi I already implemented Item B right after the call.

Appreciate the recap!

On Feb 4, 2022, at 10:48 PM, Dumebi Egbufor <dumebi@emursive.com> wrote:

Dear Jonathan and Rick,

As we begin to chart the course forward with new policies and a new medical expert on board for addressing Covid safety protocols, I thought it would be helpful to provide a quick rundown of NOW/LATER action items devised as potential next steps. These recommendations are set forth to hopefully address issues and concerns gathered from the all-staff policy change meeting held this afternoon, along with my introductory discussion with █████.

**Covid Policy Change Meeting**
**February 4, 2022, 2 pm, Ballroom and Zoom**

**<u>Objective:</u>**
Phase-out SNM audience Covid testing as quickly as possible.
Possible target date: Next Friday

**<u>NOW Action Items</u>**
**Item A: ██████ (medical expert joins staff to oversee the implementation of newly revised and ongoing Covid safety protocols, health advisories, & wellness program)**
Action 1: Essential functions, scope of her work and schedule commitment needed ASAP, e.g. on-call for Telehealth?, weekly wellness classes?, weekly show observations?, etc.
Action 2: Reintroduce ████ to the company/building to reset, clear the air and promote other work areas, benefits and advantages of having this new staff as a new added layer of support
Person(s) Responsible: Producers, Rick/HR

**Item B: Covid Messaging**
Action 1: Update language on all show websites to encourage guests to stay home if they are sick
Action 2: State what's necessary for guests to know they can receive a refund or request a date change if they provide proof of an illness related to Covid, this way guests don't feel like they are losing money if they have to miss a show due to Covid

Person(s) Responsible: Producers, Marketing, Operations

**Item C: Covid Screening Form**
Action 1: Construct a short online or paper screening form guests must complete and submit prior to admission (via a website or handoff at FOH)
Action 2: Consider translating form into other languages for international guests
Action 3: Form implementation begins next Friday
Person(s) Responsible: ███, D, Marketing, Operations, Rick/HR, FOH

**Item D: New Show "Hot Spots" (additional show adjustments for Covid safety)**
Action 1: ███████ completes show observations as many times as possible to ID and recommend potential (additional) show adjustments specific to Covid safety
Action 2: Cast/SMs complete Google form to ID and recommend new hot spots and modifications that are necessary now (survey deadline is Sunday, Click link to review draft survey: https://forms.gle/icYD16yV63fymSM5s)
Action 3: Approved adjustments are communicated with and authorized by performance/production/creative teams.
Person( s) Responsible: ███, D, Rick/HR, Carrie, ███

**Item E: HVAC System Review**
Action 1: Schedule HVAC review meeting with Facilities (███), Production (███) and Dr. ███.
Action 2: Introduce product recommendations identified by Dr. ███ as cost-effective ways for cleaning and changing filters and air purifiers
Action 3: Purchase product for use if/when approved
Person(s) Responsible: D, ███, Producers, Rick, Carrie, ███, ███


**LATER Action Items**
**Item: Communication Protocol and Flow Chart**
Action 1: Reexamine organizational chart to ID key messengers and key receivers for the purpose of streamlining communication through appropriate channels
Action 2: Construct building-wide communication flow chart/loop
Action 3: Share/present new communication protocol/chart with department heads to present to teams
 Person(s) Responsible: Rick/HR, D, Producers

-0-


Let the chiming in begin! Feel free to share with others. I look forward to your thoughts. Thanks!

Best,
D

Link to SNM Company Forms: https://forms.gle/aaABFH7tujL7i6xG9

D. Dumebi Egbufor | Company Manager
she/her
███
dumebi@emursive.com

# EXHIBIT L





















**EXHIBIT M**



SNM Company Responses to CM Covid Safety Google Feedback Form on Recommendations for New "Hot Spots" and Show Modifications

Feedback Received: February 6 - 9, 2022
Raw Data Provided to Management, RDs and Cast Reps: February 18, 2022

### **<u>Recommendations for the Space/Show Locations</u>**

- If there are no tables directly in front of the stage, then it is less likely that someone will cough/sneeze on the musicians/singer and cause illness.

- The walkout into the hotel lobby doesn't feel great right now in terms of crowd size. If we take away audience testing, I think the bar cast should not be required to spend so much time with the audience who will be unmasked (mostly) because they're drinking.

- This is a suggestion for bar folks - I do not see the manderley listed in the set of locations but it applies to manderley and post show hotel lobby. Our specific role requires us to be unmasked and conversing with patrons for 30 minutes after the show lets out- which is the only time that the bar area/hotel lobby has all of the patrons in one /two spaces (though we are stationed in the hotel lobby). I would like to make a suggestion that we cut that time down to 10 or 15 minutes post show for the time being where we have to be in character in such close proximity to the highest number of people in one space at night. I limit my social engagements outside of the show where I can to ensure I can show up to work to do my job and it would be really unfortunate to get sick at work. Our situation is a bit different than the other roles being we do engage very intimately and verbally throughout the night with numerous patrons each night.

- More space away from front of stage in Manderley for safety reasons

- Bar hosts shouldn't stay in the crowded bar spaces when the audience returns at the end of the show.

- The MacDuff's, DeWinters, and the herb room can become very crowded during certain moments, and these are smaller spaces. We should also consider making changes to

individual room/scene capacities, for example if there is a way to stop entry into the rep bar for witches 2 or entry into the speakeasy for the fight so that these scenes don't become dangerously crowded, we should talk about methods to enforce that.

## New Potential Hot Spots with Safety Concerns
### *Individual responses provided are not duplications*

- 2nd Floor - Hotel, manderley
- Manderley Bar, See above. Will follow up in the next few days
- Entry 2nd Floor - Manderley
- 2nd Floor - Reception Desk
- 3rd Floor - Macduff's
- 4th Floor - Herbs Room
- 4th Floor - Herbs Room
- 4th Floor - DeWinter's
- 4th Floor - DeWinter's
- 4th Floor - Rep Bar
- 4th Floor - Speakeasy
- If we were to bring back one on ones, basically all of those rooms would be hotspots because they're in much smaller spaces.

## General Recommendations and Suggestions

- People need to be reassured that they can get a full refund if they are feeling unwell whether they test positive for Covid or not. I believe this language has already changed but wanted to put it here just in case.

- I would love to see the face mask and Covid mask somehow combined into a single piece or have a more secure way of having the Covid masks worn correctly (nose and mouth covered) because the SNM white mask currently conceals whether or not the n95 is properly over the nose.

- Require proof of booster.

- I appreciated Jonathan's honesty, that he would've ended audience testing Friday if he could've. That proved to me what we already know so well, the producers do not care about us, they will not work to protect us, and we are disposable. It should not have taken ten years for health insurance to be as accessible as it is now, it should not have taken ten years for us to have a company manager that seems to ACTUALLY care about taking care of the company themselves and not the bottom line. We have had to fight for everything

because the producers seem unwilling and uninterested in supporting the people that make the show what it is.

- We really need to stress the importance of the audience maintaining a safe distance from performers and stage managers/PAs/crew. A lot of audience members push people around and try to squeeze in to scenes in smaller spaces to try and see what's happening, either getting too close to performers and/or trapping SMs against the wall. I know the audience is told to maintain a respectful distance from residents but maybe we need to add that is specifically for COVID safety and have translations of this message for guests who may speak another language. A lot of patrons in the last three shows have demonstrated a complete lack of awareness for personal space (which one would think would not be an issue in the context of a pandemic, but people want to get their money's worth I guess). Additionally, we should have a way of communicating to guests pre-show that if a particular scene seems too crowded, they should be encouraged to consider looking for something else to watch.

- We are sorry that FOH is having a difficult experience. For folks who work in the show, that is considered somewhat normal, in addition to the physical harassment and sexual misconduct we experience on a daily basis. It is the result of working with an intoxicated public in this unique performance, and something we handle at a high frequency with professionalism every day. Historically we have been strongly discouraged from reporting every incident, but perhaps Rick is finally ready to address a similar list of audience misbehavior as it affects the people who operate and perform in the show.

- I have seen a number of audience members in cloth or otherwise not K95 masks and been told that they denied the provided masks. This absolutely cannot happen and the front of the house needs to enforce the wearing of K95s starting at the door.

- As long as even a single company member wants audience testing to continue, I stand with them, and I have no qualms making my voice heard.

- Rick's emails have been irresponsibly unprofessional. Sending an email like last night's during the show is potentially dangerous as it distracts crew and performers during the most physically demanding portion of the show. They also are missing the larger point - we are ready for a respectful, direct conversation about the financial impact of testing. Listing all of the curse words that FOH experienced on a particular night mid show does not support a respectful dialogue. If that was information he felt we needed, he could have sent it the following morning.

- D. Thank you for organizing this and for being a voice for us!

- First and foremost, those update emails that Rick continues to send us have to stop. They make no sense as to why we need to know this information, especially considering how the last meeting went regarding changing COVID protocol. At best it's incredibly inappropriate to send the company daily emails regarding audience feelings towards testing. At worst, its asinine and gaslighting behavior. To be quite frank, considering the

amount of verbal abuse we take from patrons during the show, I couldn't care less about an audience member being disgruntled at the idea of having to get tested before entering the performance. Shall we send Rick a daily email about the verbal abuse and frustration we receive every day from simply doing our job? Or are we supposed to stay hush and keep that to ourselves? Especially when it can be so easy to explain to the audience the need to do this because they get in such close proximity to the cast and stage management. I keep reading comments about how people are upset because "no other theater in New York requires this." Well, no other theater is like ours. We get in very, very, VERY close space to the audience as a means to tell the story, and I'm sorry (not really) but I would much rather have a pissed audience member get tested instead of, oh, I don't know, GETTING COVID? At the end of the day, these emails do not give off the impression that this is being done out of care for the safety of the cast & crew. It more so feels like a means to mitigate possible monetary loss from audience members who refuse to come to the show because we require testing. And if that's the case, then be honest about it.

- A huge deciding factor for me in returning to the show was because of the protection I believed we were going to have with audiences being required to test. Stage Management specifically spends a large portion of our show with zero personal space, during particularly large audience shows, we routinely have patrons standing directly on top of us, even as we keep them at a safe distance from the performers. We put ourselves in that line of fire so that our unmasked coworkers may remain safe, on multiple fronts. Of course everyone being masked is a great help, but as we've all seen with Omicron, this is becoming more and more easily transmissible and my fears have been at least partially abated by having the knowledge that tests are being administered. Additionally, performers might have fresh bottles and clean dishware replaced for every scene, but at the end of the night it's up to stage management to strike all of that. We come into contact with every bottle, every glass, every prop that could potentially be contaminated.

- In the past week, the emails that have been sent and meetings that have been organized by Rick have been disrespectful to us, our time, and our well being. To name examples - he informed us at 8am on Tuesday, our ONLY day off, that we had an "optional" meeting at 5pm that day (to discuss Covid protocol - which is honestly not optional, it was mandatory if we had any chance of being heard by upper management); he has sent two highly upsetting emails during the final loop of the show - a very sensitive time to those on crew, and something the cast immediately has to look at after coming out of the show. Can we please implement some kind of protocol so he cannot disrespect our time like this? Because of Rick's actions, cast and Stage Management have not had a day off since January 29. There is no reason last night's email could not have been sent this morning.

- Not necessarily a show issue, but seeing as a policy (audience testing) has been taken away, I'd love to see something offered up in replacement. I'd really love to see an unlimited paid sick leave policy put into action. I feel like offering this or offering some other type of hazard pay would really follow through on the language of ensuring adequate Covid protections for the company.

- All we have been asking for for years is for honest and transparent communication. We have gathered that this is an issue of customer satisfaction and ticket sales. We are

prepared to have a meeting about that. Instead, we have Dr. ███, who may be knowledgeable in other fields but is not familiar with immersive performance. The nature of the meetings with her have been incredibly condescending, and obfuscates the actual conversation about the financial impact of audience testing.

- This seems like a manipulation of the situation, when all we want is someone to be direct and honest with us about what the actual issue with audience testing is. If testing is affecting ticket sales and our jobs are on the line, that's one thing. But if no one is going to come out and say that, then I don't understand why we are being gaslit and made to believe that our feelings do not matter. WHAT is the actual problem with audience testing? No one has answered this question, and I do not want to sit through another meeting about it only to have a lactation specialist tell me my feelings don't matter.

- There's nothing to say that this was the last wave or that rapid tests will be unable to prepare us for the next one. To directly quote Jonathan from Friday "we could have to wear tyvek suits, or five masks". As long as the situation is still THAT uncertain, we should continue testing. I have zero confidence that we will be able to bring audience testing back if we stop now. That kind of mixed communication would be even more frustrating for audiences and we could be putting ourselves at tremendous risk. The messaging from Sleep No More to potential audiences NEEDS to be loud and clear: Testing is required for everyone, hands down. And remind them again and again that no other show is doing this because no other show is LIKE this.

- Regarding the communications we've been sent this past week. It was beyond disrespectful that the original meeting invite was sent to us in the early morning of our only day off, a day that should have been spent resting and celebrating our first performance, but that was instead spent anxious about the meeting. Similarly, further emails being sent during the show, when they know full well that we are all in states of heightened tension, is simply uncalled for and unprofessional. Scheduling the first meeting for 5pm on our day off, and only telling us the day of, when I would bet money it had been scheduled prior to that morning, leads me to believe that this was planned with the intention of having as few cast and crew present as possible, and that our leadership never had any intention of actually maintaining audience testing for any extended duration, but rather told us it would happen to placate us and entice us into coming back. (I'd like to note here that Friday's meeting was also the first time we've had a producer present in any of our COVID meetings. We have been asking since the original information about the delay was disseminated last August to have a conversation with the producers themselves, not Rick or Carrie as their mouthpieces, about their decisions that directly impact us, the people without whom the show would not happen.) The last two nights we have been sent these front of house reports that frankly read as manipulative and like they're trying to guilt trip us. I'd like to remind everyone that those aggressive patrons then enter the show, and Stage Management are usually, once again, the ones on the front lines having to deal with these people to protect the performers. It was wildly uncalled for having that information sent to us and further fuels my understanding that our safety is simply NOT the producers' top priority. Which is laughable considering without us, they

don't have a show. If COVID spreads through the company, they do not have enough swings/subs to cover. That's a fact.

- What I understand from those emails, and from the aggressive comments, is that patrons have not been well informed about our COVID policy and there is no one to blame for that except our own staff. I advise our marketing/guest relations staff to push that information even further. Required COVID testing should be the first thing patrons read about when buying tickets and that information should be made available in many languages, many times over throughout the ticket buying process. We were sent email communication as "guests" the first night, and I didn't even read all of it. Those emails were lengthy and unclear, they need to be straightforward and to the point. I also do not believe the change in language noted in Rick's email the other night makes it any more clear that patrons should stay home if they're feeling unwell. People will stop reading as soon as they see "no refunds". Our messaging needs to be clear that this is required for the health and safety of everyone.

- I did not appreciate being repeatedly told by Dr ■■■ that hospitalization is highly unlikely for people that are fully vaccinated. That might well be so, but I'm not concerned about being hospitalized, I'm concerned about the parents in the cast bringing something home to their children, or those with immunocompromised roommates bringing it back to their apartments. I'm concerned about the effects that COVID has on the long term health of our company members. I had omicron at the beginning of January and I still find myself struggling to catch my breath. I still feel a pressure in my chest at times. I can't begin to imagine what that sensation might be like for those that are dancing or singing for three hours a night and that is not something we should risk allowing to spread. As Dr ■■■ repeatedly reminded us, the rapid tests, as they are now, aren't good at catching Omicron. However, if there's even a small chance that it can stop an audience member from bringing something into the company, who will then have potentially up to 3 infections days to spread it around internally, I believe that testing is without a doubt worth it.

**<u>EXHIBIT N</u>**

On Feb 6, 2022, at 4:53 PM, Jonathan Hochwald <jonathan@emursive.com> wrote:

Confirming I've received this.

While I'm unaware of the specific issues being raised, it's extremely important that we establish clear lines of communication.

The 5 of us should meet asap to discuss please.

Can we all meet at the McKittrick tomorrow at 2pm?

Thank you

On Sun, Feb 6, 2022 at 4:18 PM Dumebi Egbufor <dumebi@emursive.com> wrote:

Hi Rick,

Copy that. On another note, I'm not sure why this has become a problem. Additionally, and honestly, the way this is being handled seems a bit disingenuous and as another attempt to censor my communication and interaction with cast and crew.

Rick, you and I have discussed my deep and grave concerns with the leadership style and approach being employed towards me which may fall very closely to retaliation and discrimination. I have truthfully lost sleep over why I am being treated as an inanimate option without opinion. Opinions I make are constantly being met with some sort of reactionary retribution or being shut down entirely.

By and large, I'm finding it extremely hard to comprehend why as a *manager,* and unlike other managers on staff, it appears I do not have the right to construct ways to manage and record input I receive from cast and SMs on various issues, like Covid. I even announced and recommended to the producer Jonathan and every employee participating in the Covid safety meeting earlier this week that I will assist with collecting data to share with management and creatives on new "hot spots" that may arise now that audience testing is no longer required. The survey content was intentionally modified and deliberately entitled a "company management" survey. Someone please tell me where the error is in doing this?

As such, the survey methodology I've chosen is just my way of tracking and more efficiently managing verbal and texted or emailed feedback obtained from staff members, whom I thought I was hired - to see, to hear, and to support, as an essential function pursuant to my job description.

Sadly and unfortunately, this communication today coupled with the absolutely disappointing treatment that has happened to me since my first day at work, have all compelled me to believe I must immediately pursue legal consultation and employee assistance, as I am not willing and I can no longer continue to be relegated to less than assignments, and subjected to degrading discourse.

I came here to partner with a winning team of professionals, creatives, artists, and thinkers. Not to keep getting mired into microaggressions and gaslighting. To this end, I truly look forward to turning these course of events from personal grief, to more positive and productive working relationships.

Looping producers, Jonathan and Arthur as FYI.

Best,
D

Link to SNM Company Forms: https://forms.gle/anABFH7tujL7i6xG6

D. Dumebi Egbufor | Company Manager
she/her

dumebi@emursive.com

On Feb 6, 2022, at 2:42 PM, Rick Criswell <rick@sleepnomorenyc.com> wrote:

Hi D and Carrie,

Could I ask that before anything is sent to the cast regarding this testing and Covid situation to send to me first? We all need to be on the same page and sending survey(s) out to company is something I need to make sure has approval.

I appreciate it.

Thanks

--
Rick Criswell, Director of HR People and Culture
he/him/his
212-904-1880
https://calendly.com/rickvc813

**EXHIBIT O**

On Feb 7, 2022, at 7:27 PM, jonathan hochwald <jonathan@emusive.com> wrote:

D,

I'm following up on our emails below and in advance of our meeting at the McKittrick at a mutually convenient time this week.

You are so new at the company that you and I haven't even had a chance to meet in person yet!

We were thrilled to welcome you aboard as a Company Manager and I found our one conversation on Friday very positive.

At the start of any new employment relationship, however, it's important to establish clear lines of communication and to understand what we expect from one another. Here, we have an excellent opportunity to discuss how best to communicate amongst our management teams and discuss expectations so that we can all work positively and effectively together.

Your input is very important to us. But we also value and require collaboration and coordination, particularly relating to policies and protocols affecting our cast and crew. For example, on important issues related to COVID-19 and managing our workplace, it's very important that all of our key managers – including you – participate in discussions around related policies and protocols to make sure we are all aligned before they are implemented. You should know that, in connection with the COVID-19 issue, we constantly monitor industry trends and new developments, and regularly consult with outside medical and legal experts as we design and implement our policies and protocols. Those policies and protocols evolve over time, and any modification is the product of extensive discussion and deliberate decision-making that is done in conjunction with our outside advisors. All decisions we make regarding COVID-19 and how we respond to it – both internally and externally - must be the product of healthy discussion and agreement among the many elements of our business, including HR and senior management. They cannot be unilaterally made by any one person without following this process.

While I fully appreciate and assume that a survey you created and circulated was well-intended, I understand that this was done without receiving any input from HR or senior management. The survey was also circulated without giving your manager and HR the opportunity to consult with our medical and legal teams. Describing the survey as one from "company management" is also misleading because it implies that senior management and/or HR was consulted in preparing and circulating it. To be clear, no one is authorized to create or distribute surveys seeking personal information from employees without the collective approval of our senior management and HR teams, which you are a part of.

Also, I learned that you may be communicating with cast and crew in connection with workplace issues via third party chat/text messaging services like WhatsApp. Moving forward, we ask that all work-related electronic communications with cast and crew be conducted via our company email server only.

I look forward to further discussing these matters with you in person at the McKittrick Hotel as soon as possible.  I will ask Arthur, Carrie and Rick to join us.  I am confident that we will be able to work through issues collaboratively together and my goal is to simply ensure that we are all on the same page.

Finally, while your email below makes references to "retaliation" and "discrimination", it is unclear as to whether you wish to file a formal internal complaint.  We have strict policies prohibiting such conduct and detailed reporting and investigative procedures governing the same.  If you are concerned that you have been discriminated or retaliated against, please let me, your manager, or HR know so you can be directed to the appropriate next steps and have your concerns addressed in accordance with our written policies.

Jonathan
Jonathan Hochwald
Madstone/RealLive/emursive/sleepnomore
███████████

**EXHIBIT P**

12/31/21, 7:46 PM - Messages and calls are end-to-end encrypted. No one outside of this chat, not even WhatsApp, can read or listen to them. Tap to learn more.

12/31/21, 2:49 PM - Carrie Sleep No More created group "NYE Production!"

12/31/21, 7:46 PM - Carrie Sleep No More added you

12/31/21, 8:47 PM - Carrie Sleep No More: who know mander green room code?

12/31/21, 8:52 PM - ███████████ SNM: ██████

12/31/21, 9:18 PM - Carrie Sleep No More: thanks!

12/31/21, 11:11 PM - Carrie Sleep No More: 2nd wave pizza in the kitchen

1/1/22, 1:08 AM - +████████████: all "guests on the loose" have been accounted for

1/1/22, 1:09 AM - Carrie Sleep No More: phew!

1/1/22, 1:49 AM - Carrie Sleep No More: 10 minutes to the 2a countdown!

2/5/22, 12:06 PM - ███████████ SNM left

1/5/22, 1:30 PM - Messages and calls are end-to-end encrypted. No one outside of this chat, not even WhatsApp, can read or listen to them. Tap to learn more.

1/5/22, 1:30 PM - You created group "SNM PT Channel"

1/5/22, 1:35 PM - You added ██████████ SNM

1/5/22, 2:11 PM - You added █████████████████████████████████████████████████
████████████████████████████████

1/5/22, 2:13 PM - You added ████████████████

1/5/22, 2:13 PM - You added ██████████████████

1/5/22, 2:17 PM - You added █████████████████

1/5/22, 2:31 PM - D. Dumebi Egbufor: Hey SNM Fam! Welcome to the SNM PT group/channel! This is where you'll receive schedule updates and last calls for open cast slots before slots become open to

the crew and production team.  Please note this channel is only for group communication pertaining to PT. Individual Q/A should be sent to me directly. Thanks a bunch!

1/5/22, 2:35 PM - D. Dumebi Egbufor: Last Call: The following slots are still available today!

3:20 p

3:40 p

6:00 p

Use this link to sign up now: █████████████████

1/6/22, 8:24 AM - ████████ SNM: GM when are doors open for rapid test? In building this am?..10?

1/6/22, 8:25 AM - Carrie Sleep No More: fobs start working on doors at 10a

1/6/22, 8:25 AM - ████████ SNM: 🙏

1/6/22, 8:25 AM - Carrie Sleep No More: testing starts a few minutes before 11a

1/6/22, 11:17 AM - D. Dumebi Egbufor: Hello Sunshine! Have you had PT this week?? If not, sign up for one of these lovely slots still available today:

11:20

12:00

12:20

3:40

4:40

5:20

5:40

You're worth it!

😉

**<u>EXHIBIT Q</u>**

On Feb 7, 2022, at 9:53 PM, Dumebi Egbufor <dumebi@emursive.com> wrote:

Hi Jonathan,

Sure. Got it down.

On another note, please be advised, per your request, I have exited the following third-party group chats and messaging systems described below.

1. What'sApp - all company group chat with cast, SMs, Carrie and Kelbi

2. What'sApp - group chat with company manager, head stage manager/Kelbi and Carrie

3. What'sApp - group chat with stage managers, Carrie and Kelbi

4. Slack - McKittrick Hotel department heads, SMs and Carrie

-0-

Thanks!

Best,
D

D. Dumebi Egbufor
Company Manager
She/Her

# EXHIBIT R

On Feb 7, 2022, at 9:45 PM, Jonathan Hochwald <jonathan@emursive.com> wrote:

How about Wednesday at 10am at Conwell Tower (20 Exchange)?

# **EXHIBIT S**

From: Dumebi Egbufor <███████████████████>
Date: February 7, 2022 at 12:39:05 PM EST
To: "███████████████████████@olr.nyc.gov>
Cc: "D. Dumebi Egbufor" <███████████████████>
Subject: Re: [EXTERNAL] Re: Resources from the NYC Employee Assistance Program

Thanks so much, ██████!

Best,
D
Link to SNM Company
Forms: ██████████████████████
D. Dumebi Egbufor | Company Manager
she/her
██████████████████
██████████████████████

On Mon, Feb 7, 2022 at 12:33 PM ███████████████ (OLR) <███████████@olr.nyc.gov> wrote:

D,

I was honored to listen and witness this morning. I can only imagine the disappointment to have taken on this new position to then come to see that it includes such challenges of management and bigotry.

Wishing you the best in whatever you decide to do next,

██████

From: Dumebi Egbufor <███████████████████>
Sent: Monday, February 07, 2022 12:27 PM
To: ██████████████ (OLR) <███████████████@olr.nyc.gov>
Cc: D. Dumebi Egbufor ddumebiegbufor@gmail.com
Subject: [EXTERNAL] Re: Resources from the NYC Employee Assistance Program

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. Forward suspect email to phish@cyber.nyc.gov as an attachment (Click the More button, then forward as attachment).

Dear ██████,

I honestly can't thank you enough for being the ear I needed to hear me and the supportive shoulder I needed to rely on this afternoon. I truly appreciate your time and resourcefulness.
Thank you for the bottom of my heart.

Best,
D
Link to SNM Company

Forms: ███████████████████

D. Dumebi Egbufor | Company Manager

she/her

████████████

███ dumebi@emursive.com

On Mon, Feb 7, 2022 at 12:21 PM ████████████ (OLR) <████████████@olr.nyc.gov> wrote:

Hi D,

Thank you for outreaching the NYC EAP. It sounds like a very frustrating and disappointing dynamic at work.

Based on what you shared, the following might be good next steps to consider:

1. Contacting HR and asking them what is the number for the EAP which works with your company. You could even say that you are inquiring on behalf of a company member. (It'd be good information to know to pass along to them in the future.)

2. Contacting NY Peace Institute and inquiring about their mediation services:
   New York Peace Institute
   Address: 111 John St, New York, NY 10038
   Phone: (212) 577-1740
   https://nypeace.org/

Mediation services are free. They have a specific program providing mediation services to organizations and workplace dynamics: Workplace & Business - New York Peace Institute (nypeace.org). info@nypeace.org

3. New York City Commission on Human Rights: These are the folks where you can file a complaint at the city-level for discrimination that you may be experiencing at work.Human Rights (nyc.gov).

4. New York State Division of Human Rights (718-741-8400): This is where you would file a complaint at the state- wide level for workplace discrimination. New York State Division of Human Rights | (ny.gov)

5. NYC Well (888-692-9355): This is a free counseling and referral program run by the city for anyone who lives in NYC. They operate 24/7.

I hope that these resources may help you find further support as you navigate this challenging workplace scene.

Wishing you well,

████████

████████████ LMHC (she/her/hers)

EAP Specialist

NYC Employee Assistance Program (EAP) 250 Broadway, 28th Floor

██████████████████

████████████████

<image001.png>

From: Dumebi Egbufor <████████████████████>
Sent: Monday, February 7, 2022 9:49 AM
To: EAP (OLR) <eap@olr.nyc.gov>
Cc: D. Dumebi Egbufor <████████████████████>
Subject: [EXTERNAL] Assistance Needed
You don't often get email from dumebi@emursive.com. Learn why this is important

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. Forward suspect email to phish@cyber.nyc.gov as an attachment (Click the More button, then forward as attachment).

Hello,

I am writing to seek assistance with handling and managing a highly stressful work environment where my supervisor is employing microaggressions, gaslighting and retaliation tactics towards me. Her actions are subtle which makes me extremely nervous. I am not sure if this is due to race discrimination as the first Black woman they have hired in my position or incompetence, either way I know the treatment I am receiving from is unfair and illegal.

I have expressed my concern to the producers (producers) and the HR director (twice) of this organization. My email from yesterday is provided for your review. They would like for us to meet as a group. This plan makes me extremely nervous given the nature of the issue. I would like help with identifying a neutral party to help facilitate the discussion.

By and large, this work setting has caused me so much emotional stress, sleepless nights and anxiety. I'd also like counseling and support with my mental and emotional health which are both in dismay. Please contact me by phone: ████████████████████████████████████████████
██████████████

I truly look forward to your assistance.

Best,
D
Link to SNM Company
Forms: ███████████████████████
D. Dumebi Egbufor | Company Manager she/her
██████████████

████████████████████

**EXHIBIT T**

**Important COVID-19 Service Update READ MORE**

**ABOUT OUR SERVICES YOUR DISPUTE TRAINING WHAT'S NEW**

**GET HELP**

 **CONTACT DONATE**

### New York Peace Institute Mediation Request Form

Please fill out and "submit" this form and someone from New York Peace Institute will contact you shortly.

If you are filling this out for someone else, please let us know your Name/Organization.

First Name * D. Dumebi

Last Name * Egbufor

Pronouns *She/her

Cell Phone Number * ████████

Email * ████████████

Is this case currently in court? *No

IS THERE ANYTHING THAT YOU WOULD LIKE US TO BE AWARE OF WHEN CALLING YOU? (FOR EXAMPLE: THE PHONE WHAT WE ARE CALLING ABOUT.)

*Please feel free to call and leave messages or texts at anytime.

Zip code: * 11101

BRIEFLY DESCRIBE THE SITUATION OR CONFLICT YOU ARE INTERESTED IN OUR SERVICES FOR:

I feel unsafe and unprotected given the nature of the issue. I would like help with identifying a neutral party. By and large, this work setting has caused me so much emotional stress, sleepless nights and anxiety. I thought about resigning ASAP to save myself from additional shaming and retaliation.

Please contact me by phone as soon as you can: ████████████████████████.
The other people involved are my direct supervisor, the director of HR and the owners/producers of the organization.

To speed up the intake proccess, feel free to give us the other party's information.

First Name *Rick

Last Name *Criswell

Pronouns *he/him

Address *█████████████████████

Cell Phone *████████████

Email * rick@sleepnomorenyc.com


Let us get in the middle.

MANHATTAN LOCATION

BROOKLYN LOC

111 John Street Suite 600

New York, NY 10038

210 Joralemon Suite 618 Brooklyn, NY 11

© Copyright 2018 New York Peace Institute

# **EXHIBIT U**

**From:** Carrie Boyd cboyd@sleepnomorenyc.com

**Date:** February 10, 2022 at 10:17:29 AM EST

**To:** 
charlotte@mckittrickhotel.com

**Subject: New Hire Offer Procedures**

Hi all,

I mentioned briefly in the dept heads meeting yesterday that there's a new process in town for hiring, and wanted to expand here.

For the time being, Dan, Jonathan and Arthur all want to sign off on anyone new being hired to the company.  They have a personnel form that division head needs to fill out and get all of their signatures on before making an offer.

For the time being while this is in place, please can you send me the following info when you're ready to make an offer and I'll get the required paperwork rolling:

Name of employee

Status: New hire, returning hire, etc

Confirmation of Rate

Desired Start Date

Email address of employee

Let me know if you have any questions!

Thanks,
Carrie


--
**Carolyn Boyd**
**she/her**
C: 904-610-0535
https://calendly.com/carolyn-rae

# **EXHIBIT V**

From: jonathan hochwald <███████████████>
Date: February 10, 2022 at 3:17:37 PM EST
To: Dumebi Egbufor <███████████████>
Cc: Arthur Karpati <███████████████>
Subject: Follow up to yesterday's meeting

D,

Thank you for the meeting with us yesterday.  We think it was a good starting point to share our thoughts about how we can move forward with better lines of communication and expectations. In that connection, we will be following up with you to schedule a separate meeting to further review and discuss your job duties in greater detail and to make sure we are aligned. As we told you, we are happy to have you as a company manager and want to move through this period of change in our industry collaboratively.  Please stand by for further details regarding this meeting.

Separately, after speaking with you yesterday, we understand that you weren't prepared to discuss the issues that you related as "personal concerns" during our meeting.  As we told you yesterday, we take the references to "discrimination" and "retaliation" in your email seriously, and we have a zero-tolerance policy for discrimination, harassment and retaliation. Stated simply, such conduct has no place at any of our companies. In that connection, we attempted to understand from you the basis of any related concerns but, again, you indicated that you were not prepared to do so at that time.

Accordingly, if you would still like to pursue a concern or complaint of discrimination, retaliation or any other workplace issue, we certainly want to support you and address it.  To do that, Arthur and I would like to have another meeting with you on Wednesday, 2/16/22 at 10 am, so we can further understand your concerns. At that time, you should be prepared to provide any evidence or basis supporting such concerns. If you are not ready or available to meet with us next Wednesday, then please provide us with an alternative date/time that we can meet sometime next week for this purpose. As this is an internal matter, we do not believe it is appropriate to involve any third-party mediator - at least at this time - but we are open to engaging an outside investigator to review your claims or concerns once we get a better understanding from you as to what they are.

By the end of the day tomorrow, please confirm your availability to meet with us next Wednesday at 10 am for the purpose outlined above or provide an alternative date for us to meet sometime next week.

Thanks,

Jonathan
Jonathan Hochwald
Madstone/RealLive/emursive/sleepnomore
██████████

# **EXHIBIT W**

**From:** Carrie Boyd cboyd@sleepnomorenyc.com
**Date:** February 10, 2022 at 3:11:48 PM EST
**To:** rick SNM <██████████████>, Dumebi Egbufor
<██████████████>
**Subject:** ████ **resignation**

Hi both,

████ has given his resignation today due to personal reasons, effective immediately.

Rick, he would like to speak with you about some resources you might be able to explain to him via the EAP.

I have a new hire plan in the works that I'll loop all into once my notes are updated.

████ was also a recipient of the salary advancment.  I told him we would work with the producing partners on a fair repayment plan and we can discuss.

I believe ████ wants to inform his colleagues in his own way, so for now I'm just speaking with you both and directing in order to expedite the coverage process.


Thanks,
Carrie

# **EXHIBIT X**



# **EXHIBIT Y**

**From:** Dumebi Egbufor dumebi@emursive.com
**Date:** February 10, 2022 at 5:21:56 PM EST
**To:** Rick Criswell rick@sleepnomorenyc.com
**Subject: Anxiety Attack**

Hi Rick,

During the company meeting, I felt an anxiety attack approaching my body and mind when discussions were underway regarding ████ departure. I had outbursts at the elevator. I left the building to seek help for my mental state.

I'm headed to the urgent care for observation and a check up.

Best,
D


D. Dumebi Egbufor
Company Manager
She/Her

# **FOR EXHIBIT Z**

## **See Separate File Attached to Complaint**

# **EXHIBIT A1**

From: Dumebi Egbufor <​dumebi@emursive.com​>
Date: Thu, Feb 10, 2022 at 10:49 PM
Subject: Re: Anxiety Attack
To: Rick Criswell <​rick@sleepnomorenyc.com​>

Hello Rick,

Unfortunately, I've been admitted to the hospital until Sunday per the doctor's orders. Given this, I will have very limited capacity to perform any company management duties while here.

███ and Carrie have access to the PT schedule for updating the PT form and posting the schedule. I can't think of any other matter of importance right now. I'll email you if anything comes to mind.

Best,
D

D. Dumebi Egbufor
Company Manager
She/Her
██ 646-726-8939
dumebi@emursive.com

# **FOR EXHIBIT A2, A3, AND A4**

## **See Separate Files Attached to Complaint**

# EXHIBIT A5

From: Dumebi Egbufor <████████████████>
Date: February 13, 2022 at 9:27:50 PM EST
To: Rick Criswell <████████████████>
Subject: Re: Check In/Sick Leave Request

Hello Rick,

Thank you for checking in.

I was just released from the hospital this evening after having no access to any of my devices. In speaking to the doctors and social workers, I am taking their recommendation to request more time off for full recovery.

I am requesting sick leave tomorrow and on Wednesday, with a return on Thursday.
Lastly, I see multiple emails from the company under the belief that I am on "break" when I've been hospitalized for the last three days dealing with a very serious medical emergency and crisis.

Please inform the team I am out on sick leave and hope to catch up on emails very soon.

Thanks.

Best,
D


On Feb 12, 2022, at 9:11 AM, Rick Criswell <████████████████> wrote:

Hi D,

I wanted to check in and see how you are doing. Is there anything you need? Please reach out if we can be of any help.

Thanks
--
Rick Criswell, Director of HR People and Culture
he/him/his
████████████████████

# **EXHIBIT A6**



# MCKITTRICK HOTEL ACCIDENT REPORT
### Home of Sleep No More, The Club Car, Gallow Green and Manderley Bar
### 530 West 27th Street, New York, NY 10001
### (212) 904-1880

## Employee Information

1. Injured Employee's Name: <u>D. Dumebi Egbufor</u>

2. Injured Employee's Address: ███████████████████████

3. Job Title: <u>Company Manager</u>    4. Employee's Telephone #: ███████████

██ 5. Date of birth: ██████

## Accident Information

6. Date of Accident: <u>2/10/22</u>

7. Time of Accident: <u>5:15A</u>.M./**P.M** 8. Time Employee began work: <u>4:00 A</u>.M./**P.M**

9. Staff Member Injury reported to: <u>Rick Criswell</u>

10. What does the employee allege he/she was doing just before the incident occurred? <u>Earlier in the day, I was already overwhelemed and distressed dealing with the fallout from reporting my personal grievances and discrimination complaints to the producers which did not fare well. Immediately before this incident, I just completed a phone call w/Rick following up on a crew request to ban a guest from the show. When I walked in on a highly emotional and tense discussion during the company meeting on race and the marginalization of Blacks in the workplace. The discussion was mainly centered around the bases for the abrupt resignation of the only full-time Black male dancer in the company,</u> ███████████

11. What does the employee allege happened? <u>As the two only Black female dancers in the company were expressing outrage and one began to shed tears over ██████ resignation and the challenges to working in white majority spaces, the subject matter and atmosphere triggered my anxiety over similar challenges I'm confronting in the exact way and exact workplace. I began to feel out of breath and dizzy from a pounding headache on the left side of my brain. My heart was racing and I began to cry uncontrollably. I ran out of the ballroom to cool down but unfortunately my condition got worse so I proceeded to the closest urgent care and ended up admitted into the hospital for three days.</u>

12. Where does the employee allege the accident occurred? <u>Ballroom/Elevator</u>

13. Witnesses: ███████████

14. Describe Injury/Illness in detail and indicate part of body affected (ex.bruised left elbow, fractured right foot rash left hand) <u>Panting, claustrophobia and overheating, heart palpitations, pounding headache, dizziness, uncontrollable crying</u>

15. Object/Substance Directly Caused Harm : <u>None</u>

16. If hospitalized/treated office: name and address: <u>CityMD, 8th and 34th and Mt Sinai Hospital, 10th and 58th</u>

17. What actions have been taken to prevent reoccurrence? <u>None</u>

18. Report prepared by: <u>Self</u> Title: <u>Company Manager</u> Ph ███████████

**I have read this report and all of its content is correct. <u>D. Dumebi Egbufor 2/17/22</u>**

# EXHIBIT A7

From: jonathan hochwald < ███████████████ >
Date: February 10, 2022 at 3:17:37 PM EST
To: Dumebi Egbufor < ███████████████ >
Cc: Arthur Karpati < ███████████████ >
Subject: Follow up to yesterday's meeting

D,

Thank you for the meeting with us yesterday. We think it was a good starting point to share our thoughts about how we can move forward with better lines of communication and expectations. In that connection, we will be following up with you to schedule a separate meeting to further review and discuss your job duties in greater detail and to make sure we are aligned. As we told you, we are happy to have you as a company manager and want to move through this period of change in our industry collaboratively. Please stand by for further details regarding this meeting. Separately, after speaking with you yesterday, we understand that you weren't prepared to discuss the issues that you related as "personal concerns" during our meeting. As we told you yesterday, we take the references to "discrimination" and "retaliation" in your email seriously, and we have a zero-tolerance policy for discrimination, harassment and retaliation. Stated simply, such conduct has no place at any of our companies. In that connection, we attempted to understand from you the basis of any related concerns but, again, you indicated that you were not prepared to do so at that time.

Accordingly, if you would still like to pursue a concern or complaint of discrimination, retaliation or any other workplace issue, we certainly want to support you and address it. To do that, Arthur and I would like to have another meeting with you on Wednesday, 2/16/22 at 10 am, so we can further understand your concerns. At that time, you should be prepared to provide any evidence or basis supporting such concerns. If you are not ready or available to meet with us next Wednesday, then please provide us with an alternative date/time that we can meet sometime next week for this purpose. As this is an internal matter, we do not believe it is appropriate to involve any third-party mediator - at least at this time - but we are open to engaging an outside investigator to review your claims or concerns once we get a better understanding from you as to what they are.

By the end of the day tomorrow, please confirm your availability to meet with us next Wednesday at 10 am for the purpose outlined above or provide an alternative date for us to meet sometime next week.

Thanks,

Jonathan
Jonathan Hochwald
Madstone/RealLive/emursive/sleepnomore
████████████

# EXHIBIT A8

From: Dumebi Egbufor <>
Date: February 17, 2022 at 7:40:44 PM EST
To: Rick Criswell <■■■■■■■■■■■■■■■■■>
Cc: arthur karpati <■■■■■■■■■■■■■■■>, jonathan hochwald
<■■■■■■■■■■■■■■■■>
Subject: Re: Internal Written Discrimination Complaint

Dear Rick,

Thank you for confirming receipt of my complaint and for accommodating my
request to work remotely during the investigation period.

Best,
D
D. Dumebi Egbufor
Company Manager
She/Her


On Feb 17, 2022, at 7:36 PM, Rick Criswell
<■■■■■■■■■■■■■■■■> wrote:

> D,
>
> We are in receipt of your email below and the documents you
> attached. We will be in touch with you tomorrow to discuss next
> steps, which will include the immediate commencement of an
> investigation into your claims by an independent third party.
>
> While your position as Company Manager requires that you report
> to work on a daily basis, we will allow you to work remotely on a
> temporary basis while the investigation is being conducted. During
> this period, you will still be expected to effectively complete all of
> your job duties and comply with all management directives.
>
> If you have any concerns or questions regarding the above, please
> let me know.
>
> Again, we will be in touch tomorrow to advise you of next steps.
>
> Thank you,
>
> Rick

On Thu, Feb 17, 2022 at 9:31 AM Dumebi Egbufor
<dumebi@emursive.com> wrote:

Dear Rick,

Please find the attached written complaint and work request.

Thanks,
D

Link to SNM Company
Forms: https://forms.gle/aaABFH7tujL7i6xG9

D. Dumebi Egbufor | Company Manager
she/her

dumebi@emursive.com

# **EXHIBIT A9**

I am NOT worried about that whatsoever. You are a presence (just like I am a presence) and that always causes panic to those

who are misbegotten

mmmmhmmmm

I tried to chat but got swatted with we are doing the best we can....

More like we need a pat on the back for our lip service

11:31 AM

So I was like okay....keep going....
But before I did that I labeled

the issue as a whole in three parts
Fear
Secrets
and
Transparency

Then was told that not many people know what was

Then was told that not many people know what was going on there before now.....

# EXHIBIT A10

**From:** Lisa Harris < ████████████████ >
**Date:** February 22, 2022 at 4:21:12 PM EST
**To:** "D. Dumebi Egbufor" < ████████████████ >
**Cc:** Lindsay Stone < ████████████████ >
**Subject: RE: Meeting Request**

You're welcome. Enjoy the rest of your day.

**Lisa M. Harris** | Partner

**Sheppard**Mullin | Orange County & New York
+1 714-424-8228 | +1 212-653-8457 | direct

+1 213-448-4955 | cell

+1 714-428-5938 | direct fax
lharris@sheppardmullin.com | Bio

---

**From:** D. Dumebi Egbufor < ████████████████ >
**Sent:** Tuesday, February 22, 2022 1:13 PM
**To:** Lisa Harris < ████████████████ >
**Cc:** Lindsay Stone < ████████████████ >
**Subject:** Re: Meeting Request

Hi Lisa,

Thanks for your response and for answering my second question!

Talk soon.

Best,

D

On Feb 22, 2022, at 3:55 PM, Lisa Harris
< LHarris@sheppardmullin.com > wrote:

> Hi D,
>
> Thanks for confirming. No, I will not be recording any
> portion of the meeting, however, my colleague Lindsay
> Stone (copied here) will be assisting in this investigation
> and will be in attendance with me.

Lisa M. Harris | Partner
SheppardMullin | Orange County & New York
+1 714-424-8228 | +1 212-653-8457 | direct
+1 213-448-4955 | cell
+1 714-428-5938 | direct fax
lharris@sheppardmullin.com | Bio

---

From: D. Dumebi Egbufor
<ddumebiegbufor@gmail.com>
Sent: Tuesday, February 22, 2022 10:56 AM
To: Lisa Harris <LHarris@sheppardmullin.com>
Subject: Re: Meeting Request

Hi Lisa,

Confirming once again that I've received the Zoom link for
our meeting on Thursday.

I have an additional question for you. Will any parts of this
meeting be recorded?

Please advise.

Thanks,
D

On Feb 22, 2022, at 11:50 AM, D. Dumebi
Egbufor <ddumebiegbufor@gmail.com>
wrote:

> Hi Lisa,
>
> Thursday from 1-3 pm works for me,
> and so does Zoom.
>
> I'll look out for the link.
>
> Thanks,
> D

On Feb 22, 2022, at 11:37 AM, Lisa Harris
<LHarris@sheppardmullin.com> wrote:


Hi D,

Thanks for the quick response. How about Thursday
from 1pm-3pm EST? I am not sure if we will need
the full two hours, but I would rather have it and not
need it, then to not have enough time.

I can send the invite for either Zoom or Teams.
Please let me know if you have a preference
between the two.

Lisa M. Harris | Partner
SheppardMullin | Orange County & New York
+1 714-424-8228 | +1 212-653-8457 | direct
+1 213-448-4955 | cell
+1 714-428-5938 | direct fax
lharris@sheppardmullin.com | Bio

---

From: D. Dumebi Egbufor
<ddumebiegbufor@gmail.com>
Sent: Tuesday, February 22, 2022 8:04 AM
To: Lisa Harris <LHarris@sheppardmullin.com>
Subject: Re: Meeting Request

Good morning Lisa,

Thanks for this.  I am available at any time
beginning tomorrow through the rest of week,
preferably after 12 noon.

Please clarify the type of meeting you are
requesting. For instance, is this a meeting via Zoom,
Google Meet, etc.?

I just want to ensure I have the compatible
technology in place ahead of time.

Thanks again,
D. Dumebi Egbufor

On Feb 22, 2022, at 9:50 AM, Lisa Harris <L.Harris@sheppardmullin.com> wrote:

Good morning D,

My name is Lisa Harris and I am a Partner at Sheppard Mullin Richter & Hampton LLP. I understand Rick informed you that I would be reaching out to you.

I have been asked by the McKittrick Hotel to investigate your concerns and I would like to schedule a time to speak with you. Can you please let me know your availability for a virtual meeting this week? I expect that our initial meeting will take 1.5-2 hours.

Thanks,

**Lisa M. Harris (she/her/ella)** | Partner
**SheppardMullin** | Orange County & New York
 212-
lharris@sheppardmullin.com | Bio

# **FOR EXHIBIT A11 AND EXHIBIT 12**

## **See Separate Files Attached to Complaint**

# EXHIBIT A13

From: Rick Criswell <████████████████>
Date: March 11, 2022 at 4:18:47 PM EST
To: Dumebi Egbufor <████████████████>
Subject: Re: Therapy Sessions


HI D,

Thanks for letting me know.

Reach out if you need anything.

Thanks


On Fri, Mar 11, 2022 at 4:06 PM Dumebi Egbufor <dumebi@emursive.com> wrote:

Hello Rick,

I'm writing to inform you that after an urgent doctor's visit this week and during my time staying in DC with family, I received a doctor's order on March 9th to begin therapy for the next 4-6 weeks. Therapy is scheduled for 1-2 days a week. I'm waiting for the first appointment date to be confirmed some time next week.

I'm not sure what the plans are for my work status going forward but as a matter of importance I do wish to keep and complete my therapy sessions with the referring doctor and facility in DC, throughout the recommended treatment duration.

I'll keep you posted once my session dates and times have been confirmed. Thank you.

Best,
D
D. Dumebi Egbufor
Company Manager
She/Her
████████████
dumebi@emursive.com

# EXHIBIT A14

On Mar 11, 2022, at 11:07 AM, Lisa Harris <LHarris@sheppardmullin.com> wrote:

Hi D,

I hope this email finds you well. I am writing because I would like to schedule a Zoom meeting to convey the results of our investigation. Can you please let me know your availability for a 30minute meeting on Monday between 12pm and 3pm EST?

Thanks,

Lisa M. Harris (she/her/ella) | Partner
SheppardMullin | Orange County & New York
█████████████████ 212-████████████

# EXHIBIT A15

On Fri, Mar 11, 2022 at 6:16 PM Lisa Harris <LHarris@sheppardmullin.com> wrote:

Hi D,

Apologies for the delayed response, I was out of the office this morning.

Thank you for confirming receipt of the Zoom link. With regard to the other concerns raised, I can assure you that the timing between the scheduling of the investigation close-out and the below alleged events is purely coincidental as I had no knowledge of any statement made about you by a stage manager until I received your below email.

I look forward to speaking with you on Monday.

Regards,

Lisa M. Harris | Partner
SheppardMullin | Orange County & New York
███████████████████████
████████████
████████
lharris@sheppardmullin.com | Bio


From: D. Dumebi Egbufor <ddumebiegbufor@gmail.com>
Sent: Friday, March 11, 2022 11:02 AM
To: Lisa Harris <LHarris@sheppardmullin.com>
Cc: Lindsay Stone <LStone@sheppardmullin.com>
Subject: Re: Investigation Close-Out

Hi Lisa,

Zoom link received.

On another note,  I do want to share with you that I am quite disappointed and frustrated by the confusing calls I've received today from company members thinking I have been off from work due to a "fall up the stairs."

I understand that yesterday evening during the company meeting cast members were asking about my whereabouts, and unfortunately as I've been told, no one present from the leadership and management team (specifically, Carrie and ████) was prepared with an answer or statement of response.

Instead of Carrie or ████ providing a general statement in the likes of me working from home until further notice, I understand a stage manager told the ENTIRE company that I'm out due to a fall up the stairs, which is outrageous and completely untrue, and especially outrageous given that a stage manager, not my supervisor was allowed to share false information about employment status and physical health.

By and large, this is exactly the type of misinformation and ball of confusion that continues to permeate in this space due to the lack of ethical leadership, lack of respect and lack of regard I continue to receive from Carrie Boyd. Simply put, what people say about me and what they think about me will never matter to her, which is absolutely disgraceful.

Finally and quite honestly, based on the account of events that happened just yesterday, I find this invitation to participate in a "close-out" investigation session very suspicious and reactionary; causing me to lose all sense of trust in this process. It appears I may need to seek other external support for justice to be served.

You enjoy your weekend as well.

Best,
D. Dumebi Egbufor


On Mar 11, 2022, at 1:37 PM, Lisa Harris <L.Harris@sheppardmullin.com> wrote:

Thanks, D. I have sent the Zoom invite. I look forward to connecting with you on Monday.

Have a good weekend.

Lisa M. Harris | Partner
SheppardMullin | Orange County & New York
+███████████████████████████████████
███████████████████
███████████████
███████████████
lharris@sheppardmullin.com | Bio

**EXHIBIT A16**

On Mar 16, 2022, at 3:49 PM, Rick Criswell <rick@sleepnomorenyc.com> wrote:

Hi D,

I hope this email finds you well.

I understand that you are currently working remotely from Washington, D.C. and are requesting to remain in D.C. for therapy twice a week for an estimated four to six weeks. What I would like to clarify is whether you are requesting to continue to work remotely for this period or if you are requesting a leave of absence. We are here to support you in caring for your health, either way, but we do need to understand what you are requesting so that we can work with you to identify a reasonable accommodation. As part of this process, we will need a certification from your medical provider outlining your need for an accommodation.  That certification should contain the following information: (i) the nature, severity, and duration of your impairment; (ii) the activity or activities the impairment limits; (iii) the extent to which the impairment limits your ability to perform those activities; and (iv) the length of your requested accommodation.

Time off provided as a reasonable accommodation is generally unpaid. However, you may use any accrued paid time off during such period. In addition, if you are requesting a leave of absence, you are eligible to apply for short-term disability benefits under New York law, which may provide income replacement during any approved period of leave, up to a maximum of 26 weeks.  These benefits are managed and provided by our disability insurance carrier, New York State Insurance Fund (NYSIF). A form to apply for those benefits is also attached.

Please let me know how you would like to proceed no later than Friday, March 18.  I'm available to discuss any questions you may have.

Thanks
Rick
--
**Rick Criswell,** Director of HR People and Culture
he/him/his
212-904-1880     718-974-9734
https://calendly.com/rickyc813

# EXHIBIT A17

On Wed, Mar 16, 2022 at 4:18 PM Dumebi Egbufor
<dumebi@emursive.com> wrote:

Hi Rick,

Thanks for this.

Given the unfortunate and traumatic circumstances I personally
experienced stemming from my discriminatory working
conditions at the McKittrick Hotel under the supervision of Carrie
Boyd, I am requesting to work remotely until after I have
completed six (6) weeks of medical care.

I do not wish to disclose any more additional information
pertaining to my health matters as I perceive in doing so and
based on the way my condition was being recklessly described,
handled and in a sense exploited by Producer Jonathan Hochwald
(who thinks I just need to be placed and "setup in a room") during
this week's Zoom call is a grave mistake and another accident
waiting to happen.

I also understand pursuant to HIPAA laws I am not inclined or
required to share such information to more employer given that I
am not requesting a leave of absence or short term disability.

Thanks again for this follow-up.

Best,
D

Link to SNM Company Forms:
https://docs.google.com/forms/d/e/1FAIpQLSf0TtQkPXojH-
6XOHSRr_9GT2M85IoIcRu7DqgF4UUlVonB5Q/viewform


D. Dumebi Egbufor
Company Manager
She/Her
C: 646-726-8939
E: dumebi@emursive.com

# EXHIBIT A18

**From:** Dumebi Egbufor <dumebi@emursive.com>
**Date:** March 17, 2022 at 11:28:40 AM EDT
**To:** Rick Criswell <rick@sleepnomorenye.com>
**Subject: Re: Remote Work**

 Good morning Rick,

Thanks for this.

Beginning with your final point, respectfully please understand, the investigation administered by a paid law firm and representative of the organization in no way diminishes or nullifies my position which is that I have been unfairly treated and discriminated against given my race and age.

Back to your first point, I would ask for an opportunity to research the request you have made with the NY Department of Labor and Mayor's Office to ensure that I am not yet again being treated unfairly and unlawfully.

I will reach back with my findings by the close of business on Monday.

Best,
D

Link to SNM Company Forms:
https://docs.google.com/forms/d/e/1FAIpQLSf0TtQkPXojH6XOHSRr_9GT2M85l9lcRu7DqgF4UUlVonB5Q/viewform


D. Dumebi Egbufor
Company Manager
She/Her
 646-726-8939
 dumebi@emursive.com


On Mar 17, 2022, at 11:18 AM, Rick Criswell <rick@sleepnomorenye.com> wrote:

D,

Thank you for the clarification. As you know, the Company Manager role is an in-person position, and requires you to work on-site at the McKittrick Hotel in order to perform the essential functions of your job. You have asked to work remotely for six weeks as an accommodation to allow you to pursue medical care. As a resultare

required to provide medical documentation substantiating your need for this accommodation before your request can be evaluated or granted. While HIPAA does not apply to PDNYC, I assure you that we treat all medical documentation with care and in a confidential manner, and that we will do the same with respect to any documentation that you provide. However, please know that a failure to provide the requested medical documentation will be deemed a refusal to engage in the interactive process, and may result in the denial of your request.

As a final note, we remind you that your complaint of discrimination has already been investigated, and that the investigation did not find any discriminatory, or otherwise unlawful conduct.

Please confirm when you expect to be able to provide the documentation requested. I am available to discuss if you have any further questions.

Thanks
Rick

# EXHIBIT A19

On Mon, Mar 21, 2022 at 9:46 AM Dumebi
Egbufor <dumebi@emursive.com> wrote:

Good morning Rick,

Please find the attached documents. Have a wonderful day!

Best,
D

https://forms.gle/aaABFH7tqjL7i6xG9

D. Dumebi Egbufor | Company Manager
she/her

dumebi@emursive.com

On Fri, Mar 18, 2022 at 5:23 PM Dumebi Egbufor
<dumebi@emursive.com> wrote:

Hi Rick,

Message received. To confirm, for the record, you are the only
person who will be privy to my protected information. In making
a decision, you will share a description of what you have
received from me with the decision-making body of the
organization, namely Jonathan Hochwald, Arthur Karpati and
Carrie Boyd.

Please keep me apprised if and when you believe it will become
necessary to include additional persons into this process. In such
cases, I would also need to know the reason for this change.

I'll be in touch on Monday. Have a lovely weekend!

Best,
D

https://docs.google.com/forms/d/e/1FAIpQLSf0TtQkPXojH-
6XOHSRr_9GT2M85IoIeRu7DqgF4UUlVonB5Q/viewform

D. Dumebi Egbufor
Company Manager

She/Her

dumebi@emursive.com



THE McKITTRICK HOTEL

SLEEP NO MORE | GALLOW GREEN
THE HEATH | MANDERLEY BAR
530 W. 27TH STREET NEW YORK, NY 10001

On Mar 18, 2022, at 5:47 PM, Rick Criswell <rick@sleepnomorenyc.com> wrote:

Hello D,

We ask that you email the medical documentation that we are requesting to only one person - me - so that we can ensure it is only reviewed by the appropriate decision-makers.

In addition to me, Jonathan, Arthur and Carrie will share decision-making authority as we are collectively in the best positions to evaluate your accommodation request and, if granted, make sure that you can perform the essential functions of your job with reasonable accommodations in place.

I look forward to timely receiving the medical documentation that we've requested so that we can evaluate the best path forward.

Thanks,

Rick

On Fri, Mar 18, 2022 at 3:50 PM
Dumebi Egbufor
<dumebi@emursive.com> wrote:

Good afternoon Rick,

Following up on my request to have the names
of the persons involved in the decision-making
of my request for remote work.

Seeing that my request is associated with a
health matter which is considered personal and
private information, to ensure my protected
health information is in the right hands, is not
exploited, or utilized as hearsay/gossip (as I have
already learned has happened), and can be
tracked back to the persons who have access to
the information, in responding to your request,
I'd like to send any follow-up information
directly to the appropriate persons as one
correspondence.

Please advise truthfully and honestly (pardon my
previous typo).

Thank you.

Best,
D

Link to SNM Company Forms:
https://docs.google.com/forms/d/e/1FAIpQLSf0
TtQkPXojH-
6XOHSRr_9GT2M85IoIcRu7DqgF4UUlVonB5
Q/viewform


D. Dumebi Egbufor
Company Manager
She/Her

dumebi@emursive.com

# **EXHIBIT A20**

On Mar 22, 2022, at 2:49 PM, Rick Criswell <rick@sleepnomorenyc.com> wrote:

Hello D,

Thank you for your email.  I have reviewed your March 21 letter, along with the attachments you provided.  Based on your letter, I understand that you do not currently have a medical disability and that you are "not requesting accommodation for a certified disability" as the basis for your request to work remotely.  I appreciate the clarification and rest assured that your letter and attachments shall be treated with all required confidentiality.

As you know, the Company Manager role serves as a critical and personal liaison between Sleep No More's cast, crew and production team, and the essential functions of this position require inperson work.  I have attached your job description for reference, which makes clear that this position requires, among other things: (i) in-person attendance during rehearsals, performances, team meetings and production meetings; (ii) on-site availability for cast and crew 1:1 meetings and mediation sessions; (iii) facilitating employee onboarding; (iv) assisting with the administration of auditions and casting sessions; (v) serving as an on-site representative for artists and staff members to respond to show-related personnel concerns; and (vi) coordinating on-site catering and hospitality needs.  Sleep No More is a live production with several performances per week, and employs a full cast and crew that requires the presence and support of a Company Manager.  As a result, your position is simply not one that can be performed remotely for an extended period of time.

While we permitted you to work remotely on a temporary basis during the course of a third-party investigation into your recent workplace complaints, we have always expected and communicated to you that this arrangement was only intended to last for a temporary basis.  PDNYC did not authorize you to relocate outside of New York while performing your job or to work remotely for an extended time period.  While you have been working remotely, we have been required to backfill several of your on-site responsibilities that cannot be performed virtually, which has created difficult staffing and operational issues for the company.  This approach is simply unsustainable going forward and, as a result, we cannot grant your request to continue to work remotely for an additional six weeks.

We will, however, extend your authorization to work remotely until March 28, 2022 to allow you sufficient time to identify appropriate therapists based in New York City, if necessary, and with the expectation that you will report to work in person no later than March 29, 2022.  Please be advised that your failure to report to work by March 29 may compel us to terminate our employment relationship with you based on the current circumstances.

Please contact me with any questions.

Thanks
Rick

# **EXHIBIT A21**

About
Seasoned Event and Entertainment Producer with extensive experience in live music events and the immersive theater world. More than a decade in the industry with seven years of experience working with Emursive and Punchdrunk International developing Sleep No More in New York City. Focus on the nuance of successful and smooth production and audience experiences. Expansive network of vendors and performer connections including musicians, dancers, actors, drag and burlesque artists, aerialists, magicians, and DJs. Thrive in high-pressure environments with strong instincts and insightful judgment.

███████████
████████████████  at Emursive - Sleep No More
Brooklyn, New York, United States
209 followers · 205 connections
Join to view profile
Sleep No More
████████████████

Experience
Sleep No More
10 years 5 months
████████████████
Apr 2020 - Present · 3 years 3 months
New York, New York, United States
Producer of The McKittrick Hotel's legendary Halloween and New Year's Eve events as well as music festivals, concerts, and a large roster of different productions throughout the year including Speakeasy Magick.

==Company Manager==
==Feb 2013 - Feb 2016 · 3 years 1 month==
==New York, New York, United States==

==Supervised the 70-member cast of Sleep No More. Worked in a 24/7 on-call capacity to promptly handle emergency situations, injuries, and resolve issues==

Managed biannual audition process of 300+ performers— streamlined the process from lengthy, futile open calls to an invitation only system consisting of online submissions and prescreened applicants

Revamped the performer contract model, improving clarity and sustainability. Built and introduced a tier system to deliver fair performer show rates and growth opportunities for cast members

Executed contracts for all cast members every six months, consistently retaining an average of 85% of performers

Collaborated with Rehearsal Directors and Punchdrunk artistic team to ensure the artistic integrity of Sleep No More

Built employee incentive programs to boost morale and retention

# EXHIBIT A22

On Fri, Mar 25, 2022 at 4:18 PM Dumebi Egbufor <dumebi@emursive.com> wrote:

Good afternoon Rick,

To follow-up on your correspondence below and specified timeline for next week, I wanted to inform you as soon as possible that I've been in touch this week with Tom from the NY Insurance Fund to discuss next steps for obtaining workers compensation. He informed me that he would be reaching out to you. I'm not sure if this has happened.

Essentially after partaking in three medical appointments and assessments this week, the last one this morning, what has become extremely clear is that the working conditions I experienced which led to my need for mental health and therapy has now escalated to additional dire needs for physical and occupational therapy as you saw in the referrals I sent this week. This is precisely due to untreated work-related stress which necessitates urgent care and treatment.

Given that my request for remote work to complete the therapy I'm in need of has been denied, beginning on the return date provided from management, I am requesting to utilize my earned sick leave and PTO to provide me the much needed opportunity for more aggressive care and treatments, until I can connect with Tom to discuss next steps for workers compensation.

All in all, as you know, improving my mental and physical health are a top priority and critical levers for effectively and efficiently carrying out the on-site responsibilities of the company manager. As such, disregarding and overlooking my current diagnoses is damaging and would be to the detriment of my overall wellness and professional capacity.

I hope you can understand. I look forward to your response.

Thank you.

Best,
D

https://forms.gle/aaABFH7tujL7i6xG9

D. Dumebi Egbufor | Company
Manager she/her

dumebi@emursive.com

# **EXHIBIT A23**

On Mar 29, 2022, at 9:01 AM, Rick Criswell <rick@sleepnomorenyc.com> wrote:

Hello D,

I received your email and appreciate the follow-up.

I continue to understand that you are not requesting to work remotely as an accommodation due to a current medical disability and that you do not intend to submit medical documentation in connection with your request (indeed, we have received none to date despite our prior requests for the same). Assuming that continues to be the case, we understand and respect your choice.

However, as I've previously described to you at length, the essential functions of the Company Manager position require extensive and important in-person work, and cannot be performed remotely. Your continued absence has required us to backfill many of your on-site responsibilities and has caused various staffing and operational challenges for us. We simply cannot continue to operate the show for an extended period without an on-site Company Manager. As a result, we cannot grant your request to continue working remotely beyond Wednesday, March 30.

We do acknowledge, however, your desire to proceed with the therapy you've noted in your earlier emails. In that connection, we again encourage you to identify therapists based in New York City who can provide you with the services you require while also allowing you to report to work on-site. If you do decide to return to New York City for your therapy, we are happy to continue the conversation regarding how PDNYC can support you once you return. Please let me know by the close of business on Wednesday, March 30, if this is a path you wish to pursue.

Alternatively, if you are requesting to work remotely as a reasonable accommodation based on a current medical disability/impairment, I also request that you let me know no later than close of business on Wednesday, March 30. By that date, please also provide the previously requested medical documentation that PDNYC needs to assess your accommodation request including: (i) the nature of your medical condition/impairment, (ii) the specific activities the medical condition/impairment limits, (iii) the limits placed on your ability to perform such activities as a result of your medical condition/impairment, and (iv) any reasonable accommodations that you would require to enable you to perform the essential functions of your job and the length of such accommodations.

Your request to use paid leave on March 29 and March 30 is approved.  To the extent you provide the requested medical documentation on or before March 30, we will review it, reevaluate your request for remote work, and provide a response.  However, please be advised that your failure to timely provide the medical documentation requested above and to report to work on March 31 may affect your employment status with the company and could result in the termination of your employment.

Thanks,
Rick

# EXHIBIT A24

On Mar 29, 2022, at 2:30 PM, Rick Criswell <rick@sleepnomorenyc.com> wrote:

Hello D ,

As stated in my earlier email today, your responses to our requests below are currently due by March 30, not April 1. If you require additional time to respond to March 31, please advise immediately and we will consider.

We are happy to apply any remaining paid time off that you may have to March 30 and March 31.

Thanks,
Rick

On Tue, Mar 29, 2022 at 2:46 PM Dumebi Egbufor <dumebi@emursive.com> wrote:

Hi Rick,

Yes, replying to your request by April 1st would be helpful as I need time to gain an appointment with my PCP.

To another point, please share with me the "remaining paid time off" that I "may have."

Thank you.

Best,
D

On Mar 29, 2022, at 5:11 PM, Rick Criswell <rick@sleepnomorenyc.com> wrote:

Hello D,

To be clear, we need you back at work in NYC no later than March 31 or ask that you submit the medical documentation we've repeatedly requested from you by March 31 - not April 1. Your failure to comply with these requests may compel us to terminate your employment by end of day on March 31 without further warning.

Thank you,
Rick

# **EXHIBIT A25**

On Tue, Mar 29, 2022 at 2:46 PM Dumebi Egbufor <dumebi@emursive.com> wrote:

Hi Rick,

Yes, replying to your request by April 1st would be helpful as I need time to gain an appointment with my PCP.

To another point, please share with me the "remaining paid time off" that I "may have."

Thank you.

Best,
D

# **EXHIBIT A26**

On Tue, Mar 29, 2022 at 5:18 PM Dumebi Egbufor <dumebi@emursive.com> wrote:

Hi again,

Rick, please provide the number of PTO days I have available. Thank you.

Best,
D

Link to SNM Company Forms:
https://docs.google.com/forms/d/e/1FAIpQLSf0TtQkPXojH6XOHSRr_9GT2M85l
olcRu7DqgF4UUlVonB5Q/viewform


D. Dumebi Egbufor
Company Manager
She/Her
dumebi@emursive.com

# EXHIBIT A27

From: "D. Dumebi Egbufor" < ███████████████ >
Date: March 30, 2022 at 8:43:04 AM EDT
To: Rick Criswell < █████████████ >
Subject: Request for PTO Balance

 Good morning Rick,

I hope you are having a good morning. I'm not sure if you saw my two requests yesterday inquiring about my PTO leave balance.

I'm writing again to request this information as soon as possible.

I look forward to hearing from you.

Thanks so much.

Best,
D. Dumebi Egbufor

# **EXHIBIT A28**

On Mar 30, 2022, at 8:56 PM, Rick Criswell <███████████████████> wrote:

Hello D,

Your present balance is as follows:

- Paid time off: 17.33 hours
- Sick leave: 32 hours

As noted in my previous email, you are currently approved to use your available leave on March 30 and 31.

Please let me know if you have any questions.

Thanks

Rick

# EXHIBIT A29

From: Rick Criswell <██████████████>
Date: February 28, 2022 at 6:49:29 PM EST
To: Rick Criswell <████████████████>
Subject: Paid Time Off (PTO)

Hello All,

I am happy to announce a new Paid Time Off (PTO) policy.

Beginning April first, each full time employee will receive a bank of hours based on years of service. This bank will be all inclusive with NYS Sick and Safe time of 56 hours, vacation days, holidays (excluding days the company is closed), personal days and bereavement.

If you are a part-time employee, you will receive the NYS Sick and Safe Time leave of 56 hours.

Your PTO will be loaded in your PTO bank on Paycom beginning April 1. Your original hire date will be used in determining your tier.

0-4 years get 25 days per year
5+ years get 30 days per year

These days are good for one year between April 1-March 31.

Any requests will need to be approved by your supervisor.

If you have any questions, please let me know.

Thanks

--
Rick Criswell, Director of HR People and Culture
he/him/his
 212-904-1880
https://calendly.com/rickvc813

## **FOR EXHIBIT A30 AND EXHIBIT A31**

**See Separate File Attached to Complaint**

# **EXHIBIT A32**

On Apr 1, 2022, at 10:15 AM, Rick Criswell <rick@sleepnomorenyc.com> wrote:

Hello D,

We are in receipt of the March 31, 2022 letter written by Dr. Edward Hochman indicating that you have vestibular dysfunction. Please note that while the letter provides some of the information we requested, it is incomplete.  Specifically, the letter does not include: (i) the activity or activities your impairment limits; (ii) the extent to which your impairment limits your ability to perform those activities; and (iii) the length of your requested accommodation.  Please provide a supplemental certification that includes this information as soon as possible.

In the meantime, we will accept what you have provided on an interim basis and will work with you to ensure that the limitations currently described in Dr. Hochman's letter are addressed. In terms of a potential reasonable accommodation, we note that Dr. Hochman's letter merely indicates remote work as an example of an accommodation but certainly not the only accommodation available to you ("[a] reasonable accommodation would be to have adjustments made in her work so that she does not have exposure to loud noises or bright lights,***such as*** remote work") (emphasis added).

As I've previously described, the Company Manager role is an in-person position, and the essential functions of your job require you to work on-site.  Accordingly, we expect you to return to work in person at the Company's New York premises no later than Monday, April 4.  To accommodate the limitations described in Dr. Hochman's letter, we will provide you with a quiet work location without bright lighting, and you will not be required to attend portions of rehearsals or performances that include loud noise or strobe lighting.  Once we receive your supplemental certification, we will review these accommodations and adjust them if warranted.

We look forward to seeing you on Monday.  Please let me know if you have any questions.

Thanks

Rick

--
**Rick Criswell,** Director of HR People and Culture
he/him/his
212-904-1880
https://calendly.com/rickyc813

# FOR EXHIBIT A33

**See Separate File Attached to Complaint**

# **EXHIBIT A34**

On Feb 21, 2022, at 3:39 PM, Rick Criswell <████████████████> wrote:

Hi D,

Hope you had a nice weekend.

Your claim number for your worker's comp claim is ████████

Please reach out to ██████ and me if you need anything or have any questions.

Thanks

--
Rick Criswell, Director of HR People and Culture
he/him/his
    212-904-1880
https://calendly.com/rickvc813

# **EXHIBIT A35**

## **See Separate File Attached to Complaint**

# EXHIBIT A36




# EXHIBIT A37

From: "D. Dumebi Egbufor" < ███████████████████ >
Date: April 1, 2022 at 2:22:22 PM EDT
To: Thomas Davis < ████████████ >
Subject: Confidential Discharge Papers

 Hi Tom,

As requested, please find the attached discharge documents.

Thanks,
D. Dumebi Egbufor
████████████

<D. Egbufor, Hospital Discharge Papers, 2.13,22.pdf>


From: Dumebi Egbufor <dumebi@emursive.com>
Date: April 1, 2022 at 1:59:47 PM EDT
To: Thomas Davis <tdavis2@nysif.com>
Subject: Re: Medical Documents

 Hi Tom,

Yes, I do. It will take a minute for me to scan and email the items. I'll send the docs
from my personal email account. Thanks.

Best,
D

████████████████████████
https://docs.google.com/forms/d/e/1FAIpQLSf0TtQkPXojH6XOHSRr_9GT2M85I
aIeRu7DqgF4UUJVonB5Q/viewform


D. Dumebi Egbufor
Company Manager
She/Her
   646-726-8939
   dumebi@emursive.com

On Apr 1, 2022, at 1:58 PM, Thomas Davis <tdavis2@nysif.com> wrote:

Thank you for this.
In previous conversations I know you stated you were hospitalized back in February I believe, do you have the medical paperwork from that you could send me?

Thank you


From: Dumebi Egbufor <dumebi@emursive.com>
Sent: Friday, April 1, 2022 1:55 PM
To: Thomas Davis <tdavis2@nysif.com>
Subject: Medical Documents

> You don't often get email from dumebi@emursive.com. Learn why this is important

ATTENTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

 Hello Tom,

As requested, please find the attached medical documentation. Let me know if you need additional information.

Thanks for your assistance.

Best,
D. Dumebi Egbufor
(646) 726-8939

# EXHIBIT A38

From: Dumebi Egbufor <██████████████>
Date: April 1, 2022 at 5:54:09 PM EDT
To: Rick Criswell <███████████>
Subject: Re: Follow up/WC/SL Today

 Hello Rick,

Not sure what time this reply was initially composed but I'm just receiving it now at
5:47 pm, which by most standards is considered the end of the day. Furthermore, your
request is once again untimely and does not provide reasonable enough time for a
response with the requested information.

During my communication and several discussions with WC reps, I've been informed that you
have not return their calls.

I, on the other hand, have in fact been in touch with NYSIF and have submitted the
information they've requested with the understanding that I will begin WC on 4/4/22.

Best,
D

██████████████████

https://docs.google.com/forms/d/e/1FAIpQLSf0TtQkPXojH6XOHSRr_9GT2M85l
olcRu7DqgF4UUIVonB5Q/viewform


D. Dumebi Egbufor
Company Manager
She/Her
██████████████
██████████████████

On Apr 1, 2022, at 5:34 PM, Rick Criswell <███████████████████> wrote:

Hello D,

As noted in my previous email, our carriers have advised us that you are not currently
approved for workers' compensation and/or short term disability benefits.  To the extent
that you have received such approval or any updates from GCG or NYSIF, please
provide me with a copy by close of business today.

We have provided you with over two weeks to obtain the information regarding your claimed medical condition(s), which you have still refused to fully provide. While you finally submitted a letter from your doctor yesterday, as we noted, it did set forth much of the required information that we've repeatedly and lawfully requested. Nevertheless, we considered the information that was provided, and have offered to adjust your work environment to meet the accommodations articulated in your doctor's note. Specifically, in response to Dr. Hochwald's recommendation that you avoid exposure to loud noises or bright lights, we have offered access to a quiet workspace without bright lighting and confirmation that you will be excused from rehearsals or performances that include those elements. We are certainly not suggesting that you will be isolated, but only confirming that we can provide you with a quiet and relatively low-lit space to work as your physician has recommended. Once you return to work at the Company's premises in New York, we can work together to identify a space that meets those needs and where you feel comfortable.

While I understand this accommodation may not be what you prefer, as you acknowledge below, the on-site presence of the Company Manager is an essential function of that position and allowing you to continue working remotely would constitute an undue hardship on our business. To the extent you wish to propose alternative reasonable accommodations other than remote work, we are happy to consider and discuss them.

We continue to expect your in-person attendance at work on April 4. Again, your failure to report to work on that date may result in the termination of your employment.

Thanks
Rick


On Fri, Apr 1, 2022 at 12:00 PM Dumebi Egbufor <Dumebi@emursive.com> wrote:

Hello Rick,

Thanks for this.

Firstly, sufficient time was not provided for me to seek assistance from my actual medical provider and neurologist to address every single item you requested. I requested additional time from you and it was denied.

Secondly, the medical team I saw yesterday believed providing information on every single point you requested violates privacy laws under HIPAA, of which they are accountable to. In all, they believed sufficient information was provided for this request

to evidence the need for accommodations as specified on the Patient letter and my Therapy Referral submitted to you previously.

Thirdly, the accommodations you have described, precisely isolating me in a room (which is the second time I've heard this from management), is emphatically inappropriate, unrealistic, and unhelpful, and in practice may lead to additional personal harm.

What is most devastating about this entire deplorable and horrible course of events is the sheer lack of empathy, lack of interest, the lack concern and failure of senior management to fully understand and address the physical manifestations of inequities and emotional unrest on BIPOC (Black, Indigenous, People of Color) employees.

Simply put, why on earth would you want to further isolate and place a vulnerable member of your staff, who already feels isolated and harassed in the workspace given her race and age, and a person who experienced a public anxiety attack in the workplace due to leadership harassment and work inequities, in a box every day?

Please let that sink in.

In conclusion, I have not asked to work remotely forever, just six weeks to provide me the opportunity to correct and strengthen the emotional and now physical dysfunctions that are before me that this organization and leadership team caused.

While I truly value the need for the CM to be on-site, let's be clear, for years the CM was never on-site and SNM stayed afloat. You continue to state my absence has caused you to backfill staffing but when I asked Producer Jonathan Hochwald to explain how, so I can address this, no answer was provided.

By and large, my case is no different from ██████ who received a six week therapy referral like me, and although she does not want to be placed on workers compensation, replacement staff and accommodations were made for her immediately without the management team even seeing her doctor's letter. She also has not received any threats to her employment as you have done with me repeatedly during the last couple of days. All of this has caused me a great deal of anxiety and unfortunately has placed my emotions once again on a downward spiral.

To conclude, given that the leaders of this organization are unwilling to compromise with a short-term request for remote work and the appropriate accommodations as prescribed by my medical providers, I have communicated my decision to go on workers compensation with the NY Insurance Fund effective Monday, April 4, 2022.

I am also requesting to take sick leave today to deal with the emotional setback I am feeling from this communication and the matter as a whole.

Thank you.

Best,
D
D. Dumebi Egbufor
Company Manager
She/Her

dumebi@emursive.com

# **EXHIBIT A39**

## **See Separate File Attached to Complaint**

# **EXHIBIT A40**



April 6, 2022

D, I am so sad to hear you are going.. I hope you're okay, and I will miss your beautiful spirit so so much. 💔  9:20 AM

a lot of sadness too. They have no idea just how incredible you are, and I am so, so sorry. I hope we can cross paths again someday, as you are truly one of the most goddess-powered humans, and we ALL could not say enough how lucky we were to share time and space with you.  10:29 AM

And if there's anything we as a cast can do for you... anything at all, I would be more than happy to gather us on your behalf :)  10:31 AM

Message

# **EXHIBIT A41**

**Transcript of Phone Conversation Between**
**D. Dumebi Egbufor (DE) and Thomas Davis (TD), NYSIF**

**Date of Call: Tuesday, May 10, 2022**
**Time of Call: 10:16 am**
**Duration of Call: 12 minutes and 47 seconds**

TD: How are you?

DE: Thanks for calling me, yes I was trying to get a rundown of kind of what took place, because we when we last, ah, were in communication I called you several times of course and told you that I was ah, going to be seeking treatment from my um, injury and was asking if there was anything I needed to do um and explained the date of April the 4ᵗʰ and you told me by phone that there was nothing else I needed to do and that everything was OK. So I'm just trying to figure out what took place um.

TD: I'm not sure what you mean because if you were seeking treatment then you would seek your treatment and your providers would bill us. As of right…

DE: No I was, OK go head.

TD: No, you can go head.

DE: No, I'll listen, 'cause II I just wanna make sure that we're on the same page.

TD: Oh, I was just saying at this time that we haven't got any medical. I'm on board file right now, and they don't have any medical in. So…

DE: Yeah but I was telling you about, needing to work, um, I would have, needing to take treatment for six weeks and that I was going to um, do so because I couldn't get um, remote work from the employer.
TD: I mean that's between you and them. That, that, really has nothing to do with us.

DE: Right
TD: Are you still working there?

DE: OK, so let me just make sure I'm I'm clear about where we are from the very, from our last conversation, 'cause I know that when I talk to you I specifically explained to you what the situation was, that I needed to be out for six weeks of therapy and that I would need, that my employer told me that I would need to do short term disability or workers compensation, and I called you and I specifically explained that to you and you stated "oh just that's fine that basically I just need to tell you when I'm going to be out" and I told you April the 4th. Do you recall that?

TD: Ok, so then basically what happens is, just because, ok you already have a claim.

DE: Yeah.

TD: OK, so, we've, I've, I've been in contact with your employer and they've let me know that you are no longer with them as of, I believe four, four was the date, is that correct?

DE: Well, the termination date was April the 6th. I was…

TD: Ok, right, so basically around there then, Ok. So at that point if they've terminated you, um, we have your claim but if you've been terminated and you've been working up until that point, there's really nothing we can do. I mean if you wanna do, pursue your claim, at this point, I tell you'll have to contact the workers comp board to request a hearing or something of that nature.

DE: Yeah, but I'm just trying to figure out what took, because when we talked before that time, which we talked about three times before that, I mean I started calling, you know once I got my um, referral for therapy I started calling you, and we spoke at least three times about the situation and you made it very clear to me at least I took away from that, that there was nothing more I needed to do, except tell you when I'm going out. So I'm just trying to figure out what happened and then you told me at one point that you reached out to the employer and weren't getting a call back, so I'm just trying to figure out what took place from the time you spoke to me and told me specifically everything was OK, to where I am now.

TD: So you, up until you were terminated by your employer that was you were working, so it was a no loss time claim. So then once…

DE: But I called about needing to take time off and try to figure out from you what I needed to do and you told me I only needed to let you know when I was going out for treatment.

TD: Right, but then you were, you said, like I said I confirm from your employer that you were terminated as of, I, whatever the da, I believe they told me four, four, four six, but around there. So once that happens then, if you are looking, seek, to do, to pursue a claim

DE: Yeah, because, we were, we were in communication. I sent you, you requested information from me I sent information. I sent two items that you emailed and asked for and so I thought everything was OK. I'm just trying to figure out what did I, what happened, everything seemed to be on the track for me to be
TD: I guess, I'm a little confused. What exactly are you looking for?

DE: An answer as to what happened because when we were talking everything they kept telling me to be in touch with workers comp, which is you, and I was in touch with you. I told you the date I was going out on treatment and you said "OK, that I'm just waiting for your employer to call me back" so I'm trying to figure out from you, what happened

TD: Ok, so have you sort any treatment?

DE: Oh, yes, I've been, I, yes, I have been in treatment almost done, and so I'm trying to figure out how, because they're claiming that I didn't provide information um, and that's the reason why um, they took the adverse action. So I'm trying to figure out what did I miss in the process. Because when you, I called workers comp, I told you about the situation. You told me to tell you the date. I told them the date. You told me, you want, you emailed me and told me to send you information. I sent you information and now I'm in this, you know, very horrible situation and so I'm trying to figure out what, what happened.

TD: So I got the information you sent me right, which it looks like, I'm looking at right now, it's like when you were in the hospital, some medical discharge paperwork

DE: And then I sent you a referral, Yep

TD: Correct, yeah, I mean I'm looking it over. I mean I see a little bit on here, it doesn't really give too much detail information but if you're saying you've been treating since then, we don't have anything in so there's nothing for me to review, really I

DE: Well, I mean, I've been treating since I've been terminated. I mean the next, when when I talked with you and sent that information that was on a Friday. That Monday or Wednesday the next week I received a letter surprisingly that I'm no longer, you know the, the termination letter. So I'm trying to figure out. I didn't hear back from you. I called. When we, when you and I were talking you said you were waiting for the employer to call you back, so I'm thinking that I'm going on workers comp on the 4th. I did everything I was supposed to do and then I received a letter from them and then I didn't hear back from you. So I hope you understand the situation I was in

TD: Because at that point there's nothing for us to do. You've been, there was no loss time up until that point, and that at point you were terminated, so there's really, and we didn't, we have no medical and there's nothing really for us to do. I mean at this point

DE: Yeah I understand but I'm trying to figure out why wasn't I put on workers comp.

TD: We don't just, just because you have, because you, you're separated from employment at that point once you were terminated

DE: Yeah but but we talked before that happened

TD: So I understand that

DE: Yeah

TD: But just because you get terminated we don't just automatically pick payments up,

DE: No, no, no, no, no,

TD: You're now terminated from your employer

DE: No, no, I'm not, no Tom, I'm not even talking about what happened after. What happened before? Like what can you share with me to explain what happened before that, that day took place? Because you know at the beginning of this call, you asked am I still working with them and then you come back and tell me, "oh you were terminated," so you know the answer to that, I'm not even sure why you asked me that so. I'm mean, I'm not even dealing

TD: Because I have to get you, I have to get your opin, your version of it as well. But there's nothing for us to do because you were working that whole time.

DE: I'm not even asking you, for you to do anything Tom, except explain, what took place, what happened before I got to that point?

TD: I'm confused. I'm not sure what exactly you're looking for. That's what I'm confused about.

DE: Tom, I'm looking for, OK I'm sorry about you being confused, but I'm thinking I'm asking a very straightforward question. You and I were talking that entire week. You called me back and I explained Tom I'm going to start treatment on April the 4th, you told me OK, there's nothing more that I need to do. I asked specifically Tom, is there any document I need to sign, is there anything else I need to do. You said, "No that's all.  I'm just waiting for your employer to call me back."

TD: (clears throat) I mean if you start seeking treatment then, you, I mean whether you do or not, that's up to you. But then you would need to tell your empl, whoever you're seeking treatment with, hey this is related to a workers comp claim.

DE: Right, so I'm trying to figure out from you, with our communication, you then you, then I wrote you you then I was in touch with you I sent the paperwork and documents, and for, three days later, that situation happened with with their adverse action. So I'm trying to figure out what happened because you went from telling me that everything was OK,  there was nothing more for me to do, to now the situation that happened on April the sixth. What were you told? I mean I mean after you received my information you didn't even write me back.
TD: There's nothing for me to write back on, it's literally just paperwork, and

DE: Yeah, but you requested the information from me, as if that was what I needed to do to get to the next step.

TD: I'm guessing, OK, this is where I'm confused, what are you looking for the next step to be, like what are you seeking? That's where I'm

DE: I was, I was thinking that I, the next, with everything that I talked to you about, told you the date that I was going, I was thinking that that's the status that I would have been placed in with the employer, on workers comp. That's what I thought.

TD: OK but then they, but they terminated you.

DE: No I'm not talking about the day that that happened. I'm talking about once you and I finished up you asked me to give you information it was April the 1st, and I'm I'm trying to figure out from you what did you do next?

TD: There's nothing for me to do because at that point you were still working with your employer and we don't have any medical in, there was nothing for me to do.

DE: So why did you ask me for the information?

TD: To look at it and see what you were talking about because you were saying you had some medical, well I need to see what medical you have.

DE: No I didn't, I didn't, no, no, no, no. When you and I spoke, I expl, did you not understand from me that I was going, seeking treatment for April the 4th? Did you not understand that?

TD: But whether you seek treatment or not.

DE: No, but I'm just asking Tom, what did you think I was calling you for? Did you not understand from the very beginning that I, when we talked and you call me back and I appreciate every time you called, did you not understand from me that I was calling to find out what I needed to do in order to get on to take treatment, the, from the referral? Did you not understand that that's why I was calling you?

TD: I I I don't remember, it's possible, I don't remember since it was so long ago.

DE: And did you not tell me that there was nothing else I needed to do, because my claim was already

TD: You're the one, if you're seeking medical treatment that's up to you to seek the medical treatment then you will tell us

DE: Right up of course but I was asking you what, because the employer was saying I was on, workers compensation was the next option so that's why I reached out to you and I was asking what is it that I need to do. You said nothing else because my claim is open, isn't that what you told me?

TD: I said right now we have your claim, OK whether or not, we, there there was nothing for me to do, I guess is what I'm saying. At this point if you're looking to proceed your claim I I would just advise you to contact the workers comp board. State your case. State exactly what you stated to me and you can pursue a hearing if you'd like.

DE: Well I was just trying to figure out, from, I was just, because I was left hanging there. And, so, I was just trying to figure out what is it, that, else that took place from the time, so so after I I sent you the information nothing else happened until you received a call that I, that they had terminated me?

TD: So that was on that Monday, right. I believe I spoke to you on that Friday, which was the first.

DE: Right

TD: That Monday the 4th yes, I was informed by your employer that you, you had been terminated.

DE: On the 4th?

TD: Which was that following Monday, correct.

DE: So you received an e-mail or call from them on the 4th that I have been

TD: Correct

DE: Ok, look Tom, I appreciate your help. I just, I just, I was just trying to find out what happened because I was, I was left hanging there. And all of it I'm dumbfounded by it. I am absolutely astonished, shocked, saddened and very, you know,

disturbed, um, and so I just needed to find out. There is nothing more that I needed and so I appreciate you calling me back.

TD: Would you like the workers comp board phone number?

DE: Ah, yeah, sure.

TD: OK, well let me know when you're ready.

DE:  What is that, ok sure.

TD: It's 877-632-4996

DE: Ok, appreci

TD: And again you're welcome to give them a call and let them know exactly what happened and seek a hearing if you'd like.

DE: Ok
TD: Ok?

DE: Thank you again, Tom take care.

TD: Yep

DE: Bye, bye

TD: You're very welcome, bye bye.

**EXHIBIT A42**

From: Rick Criswell <█████████████>
Date: April 6, 2022 at 8:35:59 AM EDT
To: "D. Dumebi Egbufor" <███████████████>
Subject: Fwd: Letter


Hello D,

Please see the attached letter.

Thank you
 Rick


--
Rick Criswell, Director of HR People and Culture
he/him/his
█  212-904-1880
https://calendly.com/rickyc813

This e-mail message and any attachments may contain legally privileged and/or
confidential information. If you are not the intended recipient(s), or the employee or
agent responsible for delivery of this message to the intended recipient(s), you are
hereby notified that any dissemination, distribution or copying of this e-mail message is
strictly prohibited. If you have received this message in error, please immediately
notify the sender and delete this e-mail message from your computer.

## <u>FOR EXHIBIT A43 AND A44</u>

**See Separate Files Attached to Complaint**