UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| D. DUMEBI EGBUFOR<br><br>     Plaintiff,<br><br>vs.<br><br>CAROLYN BOYD., et al.<br><br>     Defendants. | **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>1:24-cv-09779-AS |

## INTRODUCTION

Plaintiff, D. Dumebi Egbufor, requests that the Court deny the Defendant's motion to dismiss. In the alternative, Plaintiff requests that the Court grant Plaintiff leave to amend Plaintiff's complaint to address any deficiencies identified by the Court. *Nielsen*, 746 F.3d at 62. ("Generally, leave to amend should be freely given, and a pro se litigant in particular should be afforded every reasonable opportunity to demonstrate that he has a valid claim. A pro se complaint should not be dismissed without the Court granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated.") (internal quotation marks and citation omitted).

In construing Plaintiff's response, Plaintiff asks that the Court read any new additional facts asserted in this opposition brief as supplementing the operative complaint, as the Court must do with pro se litigants. *Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014) (overturning the district court's grant of dismissal where the complaint and opposition papers to a motion to dismiss when combined stated a claim upon which relief could be granted).

1

## FACTS

Plaintiff notes that the Court has the operative complaint which sets out the relevant facts. Plaintiff refrains from unnecessarily re-stating those same facts here. However, Plaintiff notes that the memorandum of law in support of the motion to dismiss misstates the allegations in the complaint. To ensure clarity, Plaintiff notes the following misstatements and omissions in the memorandum of law.

1. **Defendants' Misstatement on Page 6 of 26: "On November 2, 2022, Plaintiff filed a Charge of Discrimination with the EEOC alleging discrimination based on disability, national origin, and race (ECF No. 1-14)."**

    Correction: Plaintiff's EEOC Charge of Discrimination alleges national origin, race, sex, and age discrimination. Plaintiff did not allege discrimination based on disability. (*See Plaintiff's Employment Discrimination Complaint, Page 4, Section III, A. Federal Claims*).

2. **Defendant's Misstatement on Page 6 of 26: "Plaintiff was employed by Emursive for approximately four months before she was terminated for failing to report to work."**

    Correction: Plaintiff Egbufor was terminated while on approved leave. Plaintiff never failed to report to work. After the workplace injury incurred on February 10, 2022 Plaintiff was approved by Defendant Criswell, Human Resources Director, to either work remotely or to utilize her earned sick leave during Plaintiff's hospitalization, and additionally to use her paid time off (PTO) to schedule visits with Plaintiff's medical providers to secure documentation in compliance with multiple requests from the Defendants, who rejected Plaintiff's previously provided medical documentation as insufficient.

On April 1, 2022, Plaintiff was approved by the New York State Insurance Fund (NYSIF) for workers' compensation leave to begin on April 4, 2022, so that Plaintiff could undergo additional treatment for her work injury caused by the Defendants on February 10, 2022. *(See Plaintiff's Exhibits: A33, A34, A35, A36, A37, and A38).*

Defendants did not list Plaintiff on the daily work schedule and Day Sheet for April 4, 2022, showing that Plaintiff was not scheduled for work that day. *(See Plaintiff's Exhibit A39).* Unknowingly to Plaintiff, however, on April 4, 2022, Defendants contacted NYSIF to willfully disrupt and cancel Plaintiff's workers' compensation leave. To do so, Defendants willfully lied to NYSIF by stating that Plaintiff was terminated on April 4th. *(See Exhibit A41).*

Defendants maliciously and wrongfully terminated Plaintiff two days later, on April 6, 2022. *(See Plaintiff's Exhibit H and Exhibit A42).*

3. **Defendants' Omission on Page 7 of 26: "Among other things, Plaintiff's job duties included: (i) being present "during all rehearsals and performances for [the Show]"; (ii) attending daily meetings with cast, crew and onsite management; (iii) facilitating new employee onboarding; (iv) assisting with auditions and casting sessions; (v) coordinating onsite catering and hospitality needs; and (vi) arranging transportation and lodging for visiting artists. (Id.)."**

Correction: Plaintiff's other essential job functions germane to this case required Plaintiff to: (1) "Coordinate with the physical therapist to ensure all cast are meeting their weekly requirements with PT," (2) "Track show related injuries for cast and crew and work with PT to plan out recovery and sustainability plans, and (3) Coordinate with the payroll officer for accurate reporting of all cast and crew weekly payroll." *(See Exhibit G).*

3

Given Plaintiff's essential job functions pertaining to processing work injuries, and subsequent leave requests and care plans, Plaintiff was highly familiar and proficient with Defendants' standard policies and procedures as they applied to other staff members with injuries, remote work requirements, and/or medical treatment.

Defendants' differed from the policies and procedures known to Plaintiff by making overly burdensome requests for medical documentation with unreasonable deadlines and applying more severe restrictions to Plaintiff's remote work authorization than those applied to similarly situated employees. The policies and procedures Defendants applied to Plaintiff constituted differential treatment.

4. **Defendant's Misstatement on Page 8 of 26: "On January 3, 2022, consistent with her job duties, Plaintiff was tasked with overseeing the move of the Company's visiting rehearsal director into a short-term rental apartment."**

Correction: As stated and reflected in Plaintiff Egbufor's job description, consistent with Plaintiff's actual job duties, Plaintiff was only required to: "Arrange transportation/hotels/ground transportation for visiting artists, and oversee all rental listings and acquisitions for guest artist housing." Plaintiff's job duties did not require her to oversee moving, to physically move furniture and objects or any other physical demands. (*See Plaintiff's Exhibit G).*

On January 3, 2022, however, Plaintiff was directed by Defendant Boyd to perform the following inconsistent with her job duties:: (a) Move and lift furniture from a storage in the basement of the building to an upstairs apartment, (b) Clean the entire apartment, which included: cleaning toilets, showers, dishes, glasses, pots, and pans, sweeping and mopping the entire apartment, dusting and dumping trash, and (c) Setting up and placing down rugs, beds, mattresses, and beddings. At such time, Defendants' had a Facilities department as well as a

Production department with over 10 employees whose job duties required physical demands, and who could have been directed by Defendant Boyd to do what she wrongfully assigned Plaintiff to do. When Plaintiff spoke to Defendant Criswell to express concerns about the moving assignment, Defendant Criswell informed Plaintiff that Defendant Boyd reported that Plaintiff volunteered for the move, which was incorrect.

On February 2, 2022, Defendant Boyd again directed Plaintiff to do the same inappropriate tasks when the rehearsal director moved out from that same apartment. During this second moving assignment, Plaintiff was injured after falling down the steps of a dark hallway in the Defendants' hazardous and unsafe office space. (*See Plaintiff's Exhibit I*).

5. **Defendants' Misstatement on Page 8 of 26: "Due to delays during the move, Plaintiff arrived late to a New Employee Orientation scheduled on the same day. (Compl. at 9 ¶ 5)."**

Correction: Due to the inappropriate assignment given to Plaintiff by Defendant Boyd, Plaintiff arrived 10 minutes before the New Employee Orientation ended, depriving Plaintiff of a vital training for new employees.

6. **Defendants' Misstatement on Page 8 of 26: "Plaintiff claims that, within three weeks of her hire, Boyd began to cease soliciting comments from her during staff meetings. (Compl. at 9-10 ¶¶ 10-16)."**

Correction: Contrary to Defendants' misstatement, Defendant Boyd never provided Plaintiff the opportunity to speak. Defendant Boyd did not "cease soliciting comments," but rather repeatedly and completely ignored Plaintiff when she tried to speak, preventing and excluding Plaintiff from giving important updates and information during all-staff Company meetings. Plaintiff was the only manager treated in this manner. Managers outisde of Plaintiff's

5

protected class received the acknowledgment and reception that were universal standards in the performance and production industry and actively provided updates at all-staff meetings.

7. **Defendants' Misstatement on Page 9 of 26: "Without formal approval from Emursive's human resources department or from management, Plaintiff subsequently circulated her survey via WhatsApp to cast and crew members. (Compl. at 17 ¶¶ 10, 12)."**

Correction: Plaintiff received verbal public and written approval from Emursive's producer, Defendant Hochwald, to solicit staff feedback. Plaintiff did not unilaterally develop and circulate a survey.

In an all-staff meeting where all Defendants were present except Defendant Karpati, Plaintiff suggested a feedback form in the spirit of being solutions-driven and with hopes of bringing the cast and crew down from a panic over Defendants' decision to stop audience testing. Plaintiff explained to everyone her idea of creating a feedback form on potential show hot spots with high touch points. Defendant Hochwald replied to Plaintiff in front of everyone: "That's a great idea!" With this verbal approval, Plaintiff developed the form and sent the draft to all of the Defendants, along with other actionable items from the meeting. Defendant Hochwald responded to Plaintiff's same email, saying that he "already implemented Item B and [he] appreciated the recap." Plaintiff did not receive any management or HR disapproval on the feedback form. (*See Plaintiff's Exhibit K*). Plaintiff subsequently circulated the form, then she posted the form link to the existing cast and crew WhatsApp group.

8. **Defendants' Misstatement on Page 9 of 26: "On February 6, 2022, Criswell emailed Plaintiff to ask for her to seek his approval before circulating surveys to the Show's cast and crew. (ECF No. 1-2 at 79)."**

6

Correction: On February 6, 2022, Criswell emailed Plaintiff Egbufor with the following: "Hi D and Carrie, Could I ask that before anything is sent to the cast regarding this testing and Covid situation to send to me first? We all need to be on the same page and sending survey(s) out to company is something I need to make sure has approval." *(See Plaintiff's Exhibit N).* Plaintiff never sent an email or any survey to cast pertaining to "this testing and Covid situation." Plaintiff's feedback form pertained to potential show hot spots and show modifications, not testing. *(See Plaintiff's Exhibit M).*

Later that day, Defendant Criswell texted Plaintiff on her cellular phone that same evening to "sincerely apologize" and say he was "really confused," he was "given the wrong information about a survey today," and "thought it was pertaining to Covid related things specifically," that he "was told something different." *(See Exhibit L).*

9. **Defendants' Misstatement on Page 9 of 26: "Upon receiving Criswell's request, Plaintiff emailed the Individual Defendants on February 6, 2022 claiming that Criswell was trying to "censor" her, and criticized the Individual Defendants' leadership style, which Plaintiff felt "may fall very closely to retaliation and discrimination. (ECF No. 1-2 at 78-79; Compl. 18 at ¶ 18)."**

Correction: Upon receiving Criswell's email on February 6, 2022, Plaintiff Egbufor responded to Criswell with the following and copied the other Defendants: "Copy that. On another note, I'm not sure why this has become a problem. Additionally, and honestly, the way this is being handled seems a bit disingenuous and as another attempt to censor my communication and interaction with the cast and crew." *(See Plaintiff's Exhibit N).* Out of frustration and sadness over what was now a pattern from Defendant Boyd, Plaintiff went on further to state that she was finding it "hard to comprehend why as a manager and unlike other

managers" she "[did] not have the right to construct ways to manage and record input from the cast." *(See Exhibit N).* Plaintiff reminded Defendant Criswell that she received approval from Defendant Hochwald for the feedback form, and that she had been expressing concerns over the repeated differential treatment and discrimination, retaliation and microaggressions she was being subjected to (by Defendant Boyd), which Defendant Criswell/HR failed to address. *(See Exhibit N).*

As a result of this confusion, Plaintiff was wrongfully reprimanded by Defendant Hochwald who directed her to cease using WhatsApp and all third party software, which other managers were allowed to continue to use. Being the only one required to leave the company group chats was an embarrassment for Plaintiff, and this unfair treatment created major obstacles for Plaintiff to work and communicate more efficiently with the cast and crew. *(See Plaintiff's Exhibit O).*

10. **Defendants' Misstatement on Page 9 of 26: "On February 9, 2022, the Individual Defendants met with Plaintiff, but she stated that she was not "prepared to discuss [her] claims" at that time. (Compl. at 21 ¶ 1, 22 ¶ 7)."**

Correction: In the February 7, 2022 meeting invitation email from Defendant Hochwald for the meeting that was held on February 9, 2022, Defendant Hochwald stated that the meeting would be held to discuss "how best to communicate." Plaintiff was not requested to be prepared to speak on her complaints. (*See Plaintiff's Exhibit O).*

Defendants Hochwald and Karpati intentionally flipped the meeting agenda to be about Plaintiff's complaints. They then demanded that Plaintiff discuss her complaints without any advance notification and in front of her supervisor and harasser, Defendant Boyd.  Plaintiff pleaded to schedule another time for this discussion, but instead, Defendants Hochwald and

Karpati asked Defendants Criswell and Boyd to leave the room, then they ambushed and accosted her with verbal, raucous, and condescending attacks behind closed doors, which traumatized, exasperated and inflamed Plaintiff's now deepening work anxiety.

11. **Defendants' Misstatement on Page 10 of 26: "As a result, Plaintiff claims that her "state of being was shattered," causing her to experience symptoms of anxiety and seek admission to the Mt. Sinai Psychiatric Ward. (Compl. at 27 ¶ 27, 28 ¶ 33, 30 ¶ 5)."**

Correction: Plaintiff's state of being, on-the-job anxiety attack, and suicidal ideation, which required her to be taken from CityMD then admitted to Mt. Sinai Hospital, was not Plaintiff's choice or her fault, and was not as a result of just one event, or solely caused by the one event Defendants are selectively deciding to focus on, the staff meeting on February 10, 2022.

Plaintiff was suffering from a confluence of work-related mental and emotional stress, namely: the hateful statement regarding Plaintiff's country of origin made by her boss and the company owner, Defendant Karpati; the disparate treatment by Defendants in comparison to similarly situated colleagues, and the hostile treatment in retaliation for Plaintiff's discrimination complaints. Defendant Criswell testified under oath during the workers' compensation hearing that he shared Plaintiff's complaints with Defendants Hochwald and Karpati. He also confirmed no follow-up meeting was ever held with Defendant Boyd or with Plaintiff, which was a significant failure of leadership that nearly cost Plaintiff her life.

The Independent Medical Examination completed by Defendants' insurance representative found on December 19, 2022, that Plaintiff's on-the-job anxiety attack on

9

February 10, 2022 and her subsequent condition: "within a reasonable degree of certainty the claimant d[id] suffer from causally related anxiety."  (*See Plaintiff's Exhibit A4*).

12. **Defendants' Misstatement on Page 10 of 26: "Plaintiff was discharged on February 13, 2022 and traveled to Washington D.C. (Compl. at 30 ¶ 10)."**

Correction: Given her diagnosis and the psychiatric work-injury Plaintiff suffered on the job, local regulations and Mt. Sinai's hospital policies mandated that Plaintiff identify her nearest relatives prior to being discharged from the hospital and travel to her nearest relatives as a condition to discharge. Plaintiff does not have relatives in New York. Plaintiff's nearest relatives are in Washington, DC. Plaintiff did not leisurely choose to travel to Washington, DC.

13. **Defendants' Misstatement on Page 11 of 26: "Defendants subsequently retained an outside investigator (the "Investigator") to investigate Plaintiff's complaint. (Compl. at 33 ¶¶ 15-16)."**

Correction: Defendants subsequently retained an internal investigator from their present counsel, SheppardMullin, to investigate Plaintiff Egbufor's complaint. Defendants' current counsel assigned their colleague Lisa Harris as the Investigator. Lindsay Stone, from the same law firm, was assigned to assist Lisa Harris. Lindsay Stone is currently sending Plaintiff correspondence in this present matter on behalf of Defendant's counsel. The Investigator was not external. Plaintiff's request to Defendant Hochwald for support from an actual neutral mediator through the NY Peace Institute was rejected. *(See Plaintiff's Exhibit T and Exhibit V)*.

14. **Defendants' Misstatement on Page 11 of 26: "The Investigator informed Plaintiff that her investigation "did not find evidence of discrimination," but had identified opportunities for improvement with "leadership practices and communications." (Compl. at 37 ¶ 48)."**

Correction: The Investigator informed Plaintiff that her investigation did not find evidence of discrimination, but she did *find issues* with leadership practices and communications. Those leadership practices and communication issues were exactly the same issues creating a pervasively hostile work environment for Plaintiff's diffential treatment and retaliation.

Although Plaintiff submitted several written pages to evidence her complaints, when Plaintiff requested a report of the findings from Harris, Plaintiff was told there was no written report.

15. **Defendants' Misstatement on Page 11 of 26: "Hochwald subsequently invited Plaintiff to return to work, noting that Emursive had been required to delegate certain of her in-person tasks to other co-workers in Plaintiff's absence. (Compl. at 38-39 ¶¶ 64-65, 69, 77)."**

Correction: During this meeting on March 14, 2022 with Defendant Hochwald and Harris, Hochwald informed Plaintiff Egbufor she "was really missed," they wanted Plaintiff back, and they have had to "backfill" her work.

Plaintiff was shocked by Hochwald's backfilling claims. This was the first time Plaintiff had heard that, as Plaintiff was readily available and accessible online and had been proficiently completing all tasks and job duties required of her while working remotely. Plaintiff requested that Defendant Hochwald identify tasks that had required backfill. Defendant could not and did not provide an answer to Plaintiff; and neither did any of the other Defendants when asked several additional times.  Simply put, the Defendants knew and still know that Plaintiff's roles were being executed and managed remotely, without slippage or the need for any "backfilling." Since the inception of the *Sleep No More* show for which Plaintiff was hired, and prior to Plaintiff's hiring as the third company manager, the first and second company managers of this

11

exact show were both white women Plaintiff met while employed, and who worked remotely and on-call with a larger cast and crew, and did so collectively for over eight years.

16. **Defendants' Misstatement on Page 11 of 26: "To facilitate Plaintiff's return to in-person work, Hochwald requested a meeting, which Plaintiff declined to attend unless it was virtual. (Compl. at 39 ¶¶ 69-70)."**

Correction: During this Zoom call with Defendant Hochwald and Harris, Hochwald mentioned that he thought Plaintiff and all of the Defendants including himself should meet in person before Plaintiff came back. Plaintiff never declined to meet unless it was virtual. Plaintiff only stated that "given the circumstances that occurred with the Defendants at their last meeting" on February 9, 2022, where she was ambushed, humiliated and harassed by Defendants Hochwald and Karpati, she was "still traumatized" and thought "it would be best for everyone to meet virtually as a first step, from safe places, where everyone can feel comfortable." Hochwald then ended the meeting.

Plaintiff's suggestion to meet virtually prior to her return was a reasonable request especially considering the inciting events, and Defendants' denial of Plaintiff's reasonable request to meet virtually created more hostility, sadness, anxiety, fear and distress for Plaintiff.

17. **Defendants' Omissions on Page 11 of 26: "On March 16, 2022, Criswell emailed Plaintiff to inquire about her request to complete therapy sessions in Washington, D.C."**

Correction: On March 11, 2022, Plaintiff emailed Defendant Criswell with a medical update on her declining health that led to her being examined by a neurologist in Washington, DC and receiving multiple therapy referrals. Defendant Criswell responded to Plaintiff with his approval for her to proceed with therapy in Washington, DC, stating: "Hi D, Thanks for letting

me know. Reach out if you need anything. Thanks." *(See Plaintiff's Exhibit A13).* With Defendant Criswell's March 11, 2022 approval on record, Plaintiff began to schedule her therapy sessions in Washington, DC.

**18. Defendants' Misstatement on Page 12 of 26: "On March 16, 2022, Plaintiff refused to provide the medical certification that Criswell requested, citing her belief that "HIPAA laws" precluded her from doing so, and clarified that she was not seeking a leave of absence. (ECF No. 1-2 at 138)."**

Correction: Although Defendant Criswell gave an initial approval to Plaintiff on March 11, 2022 for her to work remotely while undergoing therapy in Washington, DC, a week or so later, Defendants requested further medical documentation. Plaintiff expressed reasonable privacy concerns to Defendant Criswell in response to Defendant Criswell's request for a medical certification, which Plaintiff knew to be required only for a leave of absence or a short term disability. Plaintiff also expressed concerns over whether Defendant Criswell's request was in violation of HIPAA laws. Plaintiff did not request a leave of absence or a short term disability and was therefore concerned that the medical certification request was not relevant and may result in the mishandling of her privileged medical information.

Upon information and belief, these requests constituted differential treatment. During employment at Emursive, Plaintiff's essential function primarily included processing injury reports, injury leave requests, therapy referrals, and therapy sessions for cast and crew injured on the job. In her role, Defendants never directed Plaintiff to request medical certifications from other employees. Plaintiff knew that employees who were outside of her protected class had previously received authorization to work remotely during an injury. Defendants suddenly changed their leave policy as it applied to Plaintiff.. Even after Plaintiff submitted her therapy

13

referrals to Defendant Criswell, her therapy referrals and valid medical documentation was continuously rejected. Plaintiff ultimately submitted copies of her two therapy referrals to Defendant Criswell on March 21, 2022. Defendants rejected both. Plaintiff submitted a third piece of medical documentation by Defendant's exact deadline of March 31, 2022, that again confirmed the same diagnosis from the therapy referrals and responded to Defendants' medical certification request. Defendants also rejected this medical certification as retaliation for her complaint.

19. **Defendants' Misstatement on Page 12 of 26: "In her Complaint, Plaintiff acknowledges that the essential functions of her job could not be performed remotely, but asserts in conclusory fashion that she should have been permitted to attempt to perform them from Washington, D.C. (Compl. at 46 ¶¶ 53-54)."**

Correction: There was no such statement in Plaintiff's Complaint. Plaintiff acknowledged that similar to what her white predecessors had done for years, most of Plaintiff's essential functions could and were in fact proficiently executed and administered by her remotely.

20. **Defendants' Omissions on Page 13 of 26: "On the same day, Plaintiff inquired about her remaining PTO balance and asked for an additional extension of her time to provide a medical certification to April 1. (ECF No. 1-2 at 162)."**

Correction: Plaintiff made three total requests to Defendant Criswell inquiring about her remaining PTO balance and asking for an additional extension of the deadline to submit medical certification by April 1, 2022. Plaintiff made this request because Defendants were providing an inadequate amount of time for her to do what they were mandating – (1) obtaining now a fourth medical document from her neurologist, (2) transferring her medical records from Washington,

DC to New York, (3) getting re-examined in New York, (4) receiving new therapy referrals from a New York neurologist, and (5) identifying three new therapists in New York, all of this was being required of Plaintiff to complete in just three days, which was clearly impossible, unreasonable and unfair.

Plaintiff had more than enough earned leave, specifically 17.33 PTO hours and 32 hours of sick time, to use to obtain documentation from medical providers. Nonetheless, Defendants denied Plaintiff one extra day.

**21. Defendants' Omissions on Page 14 of 26: "On the same day, Plaintiff responded to Criswell complaining that Emursive was "unwilling to compromise with a short-term request for remote work" and announcing her "decision to go on workers' compensation." (Compl. at 55 ¶ 13; ECF No. 1-2 at 184)."**

Correction: Since Plaintiff was suffering from an on-the job injury already reported and filed by Defendant Criswell on February 21, 2022, Plaintiff first made Defendant Criswell aware of her intentions for workers' compensation leave on March 25, 2022. Defendants' Memorandum of Law states: "On March 25, 2022, Plaintiff emailed Criswell to notify him that she had contacted a representative from the New York Insurance Fund to "discuss next steps for obtaining workers compensation. (Compl. at 47 ¶¶ 1-2; ECF No. 1-2 at 153). Plaintiff subsequently asked to use her accrued sick leave and paid time off ("PTO") to pursue "more aggressive care and treatments" for her alleged therapy needs (Compl. at 47 ¶ 3; ECF No. 1-2 at 153)."

On April 1, 2022, Plaintiff became eligible to use her newly earned PTO leave of 200 hours she was awarded that day, plus her existing earned leave of 49 hours, which was enough leave for her therapies, and which Plaintiff requested to use for qualified medical treatments.

15

Case 1:24-cv-09779-AS    Document 34    Filed 04/17/25    Page 16 of 20

*(See Exhibit A29 and Exhibit A30).* Just as Defendants had rejected Plaintiff's three medical documents, Defendants again, rejected Plaintiff's request to use her earned leave for qualified medical treatments.

22. **Defendants' Omissions on Page 14-15 of 26: "Criswell responded by informing Plaintiff that Emursive's carriers had not approved Plaintiff for workers' compensation or short-term disability benefits, and invited Plaintiff to participate in the interactive process to identify "alternative reasonable accommodations other than remote work" if she wished to do so. (Compl. at 55-56 ¶¶ 14-15; ECF No. 1-2 at 182-83)."**

Correction: Plaintiff was in fact approved by NYSIF to start workers' compensation leave beginning on April 4, 2022. Plaintiff was not and was never formally "invited to participate in any interactive process" at any point during the surrounding circumstances and the pervasively harmful and hostile working conditions she was subjected to by the Defendants. When Plaintiff did attempt to be interactive and proactive, like her reasonable request to meet virtually after suffering a major psychiatric injury from work and hospitalization, Plaintiff and her suggestions were continuously shut down, ignored and rejected.

Defendants contacted NYSIF on April 4, 2022 to cancel Plaintiff's workers' compensation leave by wrongly informing NYSIF that Plaintiff's termination date was April 4, 2022. Plaintiff's termination actually occurred on April 6, 2022. This further evidences retaliation and malicious intent, and that Defendants were in fact aware and knew that Plaintiff's workers' compensation leave was due to start on April 4, 2022. *(See Exhibit A41).*

23. **Defendants' Omissions on Page 15 of 26: "Criswell further reminded Plaintiff that she was expected to return to work on April 4. (ECF No. 1-2 at 183)."**

16

Correction: Defendant Criswell stated to Plaintiff that the report date was in effect unless Plaintiff was able to provide confirmation of her workers' compensation leave by the end of the day on April 1, 2022. *(See Exhibit A38).* This message was sent to Plaintiff after business hours at 5:34 pm on April 1, 2022, despite Defendant Criswell requesting confirmation from workers' compensation by the end of the day, after he knew NYSIF had already closed.

After communicating with NYSIF's representative Tom Davis on a regular basis beginning on March 25, 2022 through April 1, 2022, Davis confirmed Plaintiff was able to take workers' compensation leave starting on April 4, 2022 for additional treatment of the injury on file that she was still experiencing, and he stated that he was still waiting for Defendant Criswell to return his calls. *(See Plaintiff's Exhibit A38).* As such, Plaintiff shared this issue with Defendant Criswell, telling him that Davis had called him several times to finalize her workers' compensation leave.

When Plaintiff called Davis on May 10, 2022, seeking answers after being wrongfully terminated by the Defendants and to specifically find out what happened and why Plaintiff was not placed on worker's compensation leave, Davis informed Plaintiff that he "received a call from the Defendants on April 4, 2022 stating that Plaintiff had been terminated so there was nothing he could do." *(Plaintiff's Exhibit A41).*

**24. Defendants' Misstatement on Page 15 of 26: "Plaintiff failed to report to in-person work on April 4 as requested or otherwise engage in the interactive process."**

Correction: Not hearing from any of the Defendants on April 2, 2022 through April 4, 2022, which were workdays for Defendants Emursive and PDNYC, and not seeing her name listed on the daily work schedule emailed to her on, and for April 4, 2022 *(See Exhibit A39)*, Plaintiff interpreted this to mean she was not required to report to work on April 4, 2022 because

17

her workers' compensation leave was actually in effect, in accordance with the confirmations Plaintiff had received from NYSIF and had informed Defendant Criswell in writing on April 1, 2022.

## ARGUMENT

Here, the Defendants have raised various arguments against the causes of action Plaintiff Egbufor alleged under federal and state law. Plaintiff asks the Court to construe the complaint liberally in considering its ruling. The Defendants have raised numerous arguments, all of which fail, but Plaintiff is unable to respond specifically to them all because there are so many and is pro se. To this end, the following summations are provided to further demonstrate the validity of Plaintiff's claim:

(a) Defendants' arguments intentionally overlook, ignore and mischaracterize the facts by honing in on a few facts rather than the totality of the evidence supporting Plaintiff's claim, that unlawful race, sex, age and national origin discrimination and retaliation did occur on multiple levels, both *before, and intensifying after* Plaintiff participated in a protected work activity;

(b) There is nothing "race-neutral" about the hateful statement Defendant Karpati said directly to Plaintiff or the hostile, punitive and differential treatment primarily Defendant Boyd along with Defendants Hochwald and Karpati directed and targeted specifically towards Plaintiff, in front of others, which were all about Plaintiff alone, and of which, everyone witnessed and knew was just happening to Plaintiff;

(c) For Defendants to suggest that Defendant Boyd as Plaintiff's immediate supervisor and head director of performance and production and Defendant Karpati as the co-owner and producer of the show along with Defendant Hochwald, are not decision-makers, is absolutely preposterous.

In the theater industry, producers and directors are the bosses. The buck stops with them; they decide how time and money are spent. Further, the Defendants were all involved in all decision-making pertaining to Plaintiff, as managing agents of Defendants Emursive and PDNYC LLC; thus they are all personally liable for engaging in wrongful and unlawful conduct, and finally,

(d) FMLA protects people who are entitled for leave for a qualified treatment. This is what Plaintiff tried to avail herself to by using her adequate amount of earned PTO and Sick leave as well as eventually trying to use workers' compensation leave, that she had and was entitled to use under her work contract, but was in fact discriminated and retaliated against and denied the use of, while others with work injuries in need of qualified treatments were approved for leave and/or remote work.

## CONCLUSION

Plaintiff does not intend to waive or forfeit any of Plaintiff's causes of action. For the foregoing reasons, Plaintiff respectfully requests that this Court deny the motion to dismiss. In the alternative, Plaintiff requests that the Court grant Plaintiff leave to amend Plaintiff's complaint to address any deficiencies identified by the Court, and any other relief this Court deems just and proper.

**Dated: April 17, 2025**

/s/ *D. Dumebi Egbufor*
**D. Dumebi Egbufor**
462 W 42nd Street, Unit 2624
New York, NY 10036
(646) 726-8939
Email: ddumebiegbufor@gmail.com
PRO SE

## **WORD COUNT CERTIFICATION**

      I, D. Dumebi Egbufor, certify that according to the word count of the word processing program used to prepare the foregoing brief, there are 5,264 words in this document.

*/s/ D. Dumebi Egbufor*
D. Dumebi Egbufor
