October 7, 2026

**VIA ECF**

Hon. Arun Subramanian
U.S. District Judge
U.S. District Court for the Southern District of New York Daniel Patrick Moynihan U.S. Courthouse
500 Pearl St.
New York, NY 10007

**Re: Time and Case Sensitive Appeal to Order Granting Enforced Settlement in the Case of Egbufor v. Boyd, et al., No. 1:24-cv-09779-AS**

Dear Judge Subramanian:

I am in receipt of your Order, dated October 6, 2026, granting the Defendants settlement enforcement in my case. Your Honor, Sir, please accept this letter as my Appeal to that Order for the following reasons: 1) The Order is based on factual inaccuracies and allegations asserted by the Defendants, and not actual occurrences, 2) Based on what was described in your Order, as was alleged by the Defendants, it becomes adamantly clear that I did not thoroughly understand the settlement agreement or the mediation process governing such agreements, and 3) Unethical, inappropriate conduct and behavior were exhibited by the pro bono counsel appointed to represent me for mediation. On another important note, Your Honor, Sir, let me also take this time to sincerely apologize for not reporting these below issues to you earlier or within the content of my previous letter to you on July 2, 2026, in response to the Defendant's motions. I just thought that the next step from there would have been an Oral Argument Hearing as was requested by the Defendants. In addition, given the confidential nature of mediation that kept being stressed to me over and over again, by my appointed counsel, I was also of the belief that I was prohibited and limited in what I could actually place in writing regarding the mediation. All and all, Your Honor, Sir, I thank you for your patience towards me as a Pro Se litigant, and I respectfully ask that you please oblige me at this time to bring forth these significantly detrimental matters to my case.

**<u>The Order is based on factual inaccuracies and allegations asserted by the Defendants, and not actual occurrences.</u>**

1. I did not ever state that I was "in full agreement" with the settlement, which is why, when requested, I did not agree to sign the Agreement during the mediation.
2. I only agreed to <u>review</u> the settlement terms.
3. The terms of the settlement addressed additional issues beyond compensation. Knowing this, there was no way I ever intended to agree to numerous terms at once, without first reviewing all of the terms.
4. Like with any person in any type of settlement, not taking the time to comprehensively review the terms of an agreement, would have been very irresponsible and reckless of me. Both states of being, I was not willing to embody.
5. In fact, during the mediation, I asked my appointed counsel several questions about if there would be a follow-up to the mediation, a second session, an opportunity to review the terms and come back to the table; like when purchasing a home and partaking in other types of settlement processes.
6. In response to my questions, I was informed by my appointed co-counsel, Ms. Fatima Oedraogo, that "yes, parties have gotten back together to change the terms, including dollar amounts."
7. Ms. Oedraogo even shared an instance where the employer returned to the table with additional compensation for a litigant, which was encouraging.
8. Gleaning from her response, I understood that the terms before me that day, were for my review, with the option of my revision, renegotiation and/or refusal.
9. I did not participate in revising the Agreement with either counsel.
   In fact, I was not asked or even told that revisions were being made.
10. Herein again, is what I meant in my previous letter to you, Your Honor, Sir, when I stated that I was "being kept in the dark."
11. Upon receipt of the Agreement from the Defendants, which occurred during the mediation session, my appointed counsel, Ms. Susanne Toes Keane immediately began to read the Agreement (I did not have a hand in constructing), out loud to me, which was honestly quite surprising.
12. I also could not see the terms on the screen to follow along with her as she was reading.
13. As I informed my appointed counsel several times, this mediation process was extremely triggering for me and I was experiencing anxiety and emotional distress again arising from this environment.
14. Given my increased anxiety level created by this awful situation that continues to take an extreme toll on my state of being, Your Honor, honestly, Sir, at a point while Ms. Toes Keane was reading the terms to me, I did not hear a word she was saying. I blanked out.
15. The anxiety and anguish overtaking my body and mind blocked my ears. I just kept thinking to myself, on repeat "I can't wait until she stops reading to me. I really need quiet time to review the Agreement independently and with my family."

**<u>Based on what was described in your Order as was alleged by the Defendants, it becomes adamantly clear that I did not thoroughly understand the settlement agreement or the mediation process governing such agreements.</u>**

1. Principally, to restate the significance, the response from my appointed co-counsel, Ms. Oedraogo who shared with me that I could come back to the table after I review the terms, provided a great sigh of relief for me.
2. Building from her statement and her official capacity as my co-counsel, I was now under the belief that I would have time to fully digest all terms of the Agreement and I would be able to make changes to any part of the Agreement at a later time.
3. At no such time did I think or believe that stating I agreed to <u>review</u> the terms of the Agreement meant that I would be bound to the terms of the Agreement.
4. In addition, no one in their official capacity as my counsel or even the assigned mediator, informed me or provided a precaution to me, that by agreeing to <u>review</u> the Agreement, I would be in full agreement to all terms in the Agreement as a binding contract.
5. As soon as Ms. Toes Keane ended her read-aloud of the Agreement, in her next breath, she urgently requested that I sign the Agreement and she described various ways I could email her the Agreement with my electronic signature.
6. Not once did she even stop to ask if I was okay with the terms, her only interest was pressuring me to sign the Agreement right then and there.
7. This unethical behavior from my appointed counsel is addressed in the next section.
8. To emphasize again Your Honor, Sir, with my foundational knowledge and understanding as a Pro Se litigant, I was under the impression that I would have had the time to *actually* review and revise the Agreement both independently and collectively with all parties, but the latter never happened.
9. Further, when taking the time I urgently needed to personally review the Agreement, I realized that, given the excruciating pain of working just four months in a position that subjected me to hate, retaliation, hostility, subterfuge and the willful malicious actions of my employers, the Defendants, which has caused me my livelihood, my reputation, my credibility, my career, and my peace of mind for the last four years and nearly caused me to end my life, it became clearer and clearer to me that I could not live with the terms as specified in the Agreement.
10. I received the term sheet on the same day of the mediation, June 23, 2026, and after much deliberation, I emailed my appointed counsel that same evening to explain my reservations as stated above here in this section, in Item #9. In that same email to my appointed counsel, I also requested an adjustment to the settlement amount, which was a highly reasonable request and comes with the process of settlement negotiations.

**Unethical and inappropriate conduct and behavior were exhibited by the pro bono counsel appointed to represent me for mediation.**

1. Unfortunately, Your Honor, Sir, my experience with the appointed counsel for my mediation was beyond dissatisfaction, it was highly inappropriate and a disservice.
2. On the other hand, it's important to note that my experience with the appointed counsel was very different from my overall experience with the organization and other staff assisting me with my initial filings for this case, which also happens to be at the same employer of the appointed counsel.
3. To start, after discussing my requests with the appointed counsel, I was promised to review the Demand Letter that would be sent to the Defendants, but it never happened.
4. In fact, I am not sure the appointed counsel even sent such a letter to the Defendants as was discussed and as was promised.
5. During our initial discussions, the appointed counsel had a different co-counsel involved in the case. We met by phone a few times leading up to mediation and he stated that he was assisting with constructing my Demand Letter.
6. After I mentioned to him that I recalled a time when my former supervisor, Defendant Carolyn Boyd said to me in the second week or so on the job, that the only reason I was hired was because Defendant Rick Criswell, HR manager at that time, saw that I had DEI on my resume, this co-counsel's interest was peaked.
7. Shortly after that, though, he was removed from the case.
8. Without any explanation, I did not hear from that counsel again and I never saw in writing what we had been working on for days as demands for the Defendants.
9. Looking back, I truly believe his removal from the case without any explanation, was deliberate and inappropriate.
10. On every single occasion when I made requests to the appointed counsel, without fail, she would completely dismiss my positions and shut down everything I said.
11. On various occasions, appointed counsel also tried to minimize my case by comparing what I suffered months on end, through my diagnosis of vestibular dysfunction, to something she had experienced, as if we were dealing with the same things, which was unethical, insensitive, absolutely appalling and tone deaf of her to do so.
12. Co-counsel to the principal appointed counsel used similar tactics as well, when she tried to laughably, normalize the national origin stereotyping she claimed to have experienced being from the same country.
13. This conduct again was highly unethical and inappropriate. There is nothing even slightly laughable about my experience or anyone experiencing hate.
14. "No, you can't do that. No, you can't do this," that was the appointed counsel's response every time to everything. After the mediation tanked, I told the appointed counsel that I planned on writing a letter to you. Unbelievably, Your Honor, Sir, the appointed counsel smirked and replied just as I stated here, "No, I can't," that essentially I would not be able to write to you since "everyone feels pressured during mediation."

15. In another instance, I shared with the appointed counsel that I really hope to ultimately help employers and employees create a work culture with psychological safety and to lookout for pitfalls that could lead to matters like my case. I can't make this up, Your Honor, Sir, the appointed counsel's response was, yes, again, the same way she always replied to everything: "No, you can't do that." She was so full of disparagement.
16. Clearly, being on my side was not the strategy for this appointed counsel. From no follow up, no follow through, and to no affection for my infirmities, by and large, as I alluded to in the above section, all through (before, after and during) mediation, the appointed counsel chose to employ fear tactics that were misleading and wrapped in deception and sarcasm, in hopes of pressuring me to forgo positions, requests, and demands for the Defendants that I believed were necessary to my case.
17. Summarily, appointed counsel and her co-counsel's behavior and conduct during mediation fell outside of the New York Rules of Professional Conduct in operationalized in areas: Rules 1.1- Competence, Rule 1.3 – Diligence, and Rules 2.1-2.5, 3.1-3.9- Counselor and Advocate Roles.

To conclude Your Honor, Sir, during mediation while I shared a substantially reduced reward and compensation expectations to pursue, the appointed counsel replied, "that's fine for the court room but not for mediation." Another shocking response. Nonetheless, if this is in fact a universal truth in litigation settlements, than Your Honor, Sir, as part of my Appeal, I plead and pray that you will please, grant me a summary jury trial of my peers as I initially requested when filing this case. With this, the new relief I seek is reasonable for the performance and production industry. Whereas, the production germane to this case ran for three years, which was my intention to work proficiently at serving and supporting the entire run of that show, but was sadly cut short, due to the unlawful discriminatory and retaliatory actions of the Defendants, I hereby request backpay for the three years along with restitution for my pain and suffering.

Thank you sincerely Your Honor, Sir for your time, attention and consideration.

Respectfully,



D. Dumebi Egbufor
46-28 Vernon Blvd., Unit 217
Long Island City, NY 11101
ddumebiegbufor@gmail.com